UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Appellant: | Attorneys Present for Appellees: |
| Not Present | Not Present |

Proceedings:        (IN CHAMBERS) ORDER RE BANKRUPTCY APPEALS (21-7572 DKT. 1; 22-2004 DKT. 1; AND 22-6637 DKT. 1)   [UNDER SEAL]    JS-6

I.    **Introduction**

On May 21, 2019, Jonathan D. King ("King," "Trustee" or "Appellant"), acting solely in his capacity as the Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd. (collectively "Zetta Jet" or "Debtors"), filed an Adversary Complaint against CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company ("CAVIC") and Bombardier Aerospace Corporation ("BAC", or together with CAVIC, the "2004 Defendants"). 2004 R.[1] at 000347-80 (the "2004 Complaint"). The 2004 Complaint asserted seven causes of action: (1) against CAVIC seeking a declaratory judgment that the Financed Leases[2] are financings and not true leases; (2) against BAC seeking a declaratory judgment that the APA is terminated; (3) against CAVIC seeking a declaratory judgment that CAVIC's security interest in the Refund is not perfected; (4) against CAVIC seeking to avoid CAVIC's allegedly unperfected security interest; (5) against CAVIC stating that the Trustee can recover the Refund for the benefit of the estate; (6) against BAC stating that the Refund is the property of the estate; and (7) against CAVIC for the avoidance and recovery of preferential transfers. *Id.* On October 7, 2020, the second cause of action was maintained and all of the remaining ones were dismissed without prejudice. 2004 R. at 002815-83 (the "2004 First Dismissal").

On September 13, 2019, Appellant filed an Adversary Complaint against Jetcraft Corporation("Jetcraft Corporation"); Jetcraft Global, Inc. ("Jetcraft Global"); JetCoast 5000-5, LLC ("Jetcoast"); Orion Aircraft

---

[1] Docket entries from *In re Zetta USA, Inc.*, 2:21-cv-07572-JAK (Sept. 22, 2021) are referred to with the prefix "7572 Dkt." Docket entries from *In re Zetta Jet USA, Inc.*, 2:22-cv-02004-JAK (Mar. 25, 2022) are referred to with the prefix "2004 Dkt." Docket entries from *In re Zetta Jet USA, Inc.*, 2:22-cv-06637 (Sept. 16, 2022) are referred to with the prefix "6637 Dkt." Documents from the bankruptcy court proceedings in these cases are referred to with the prefixes "7572 R.," "2004 R.," and "6637 R.," respectively.

[2] In this Order, in connection with the discussion of the factual background of this matter, these agreements are referred to as the "Finance Leases," because that is how they are identified in the relevant pleadings. However, the use of this term does not reflect any conclusion as to the status of the relevant transactions, including whether they involved finance or operating leases.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Holdings Ltd. ("Orion"); Jetcraft Asia Limited ("Jetcraft Asia," and together with Jetcraft Corporation, Jetcraft Global, Jetcoast, and Orion, "Jetcraft"); FK Group Ltd. ("FK Group"); FK Partners Ltd. ("FK Partners"); Jahid Fazal-Karim ("Fazal-Karim" and together with Jetcraft, FK Group, and FK Partners, the "Fazal-Karim Defendants"); Bombardier Aerospace Corporation ("BAC"); Bombardier, Inc. ("BI," and together with BAC, "Bombardier"); Learjet, Inc. ("Learjet"); ECN Aviation Inc. f/k/a Element Aviation Inc. ("Element Aviation"); and ECN Capital Corporation, as successor to Element Financial Corporation ("ECN" and together with Element Aviation, "Element," and together with the other Defendants named in the Adversary Complaint, the "6637 Defendants"). 6637 R. at 000192-256 (the "6637 Complaint").

The 6637 Complaint asserted 17 causes of action: (1) aiding and abetting a breach of fiduciary duty against the Fazal-Karim Defendants and Bombardier; (2) civil conspiracy against the Fazal-Karim Defendants and Bombardier; (3) a violation of Cal. Bus. & Prof. Code § 17200 against the Fazal-Karim Defendants and Bombardier; (4) unjust enrichment against the Fazal-Karim Defendants and Bombardier; (5) constructive trust against the Fazal-Karim Defendants and Bombardier; (6) fraud against the Fazal-Karim Defendants and Bombardier; (7) avoidance and recovery of a fraudulent transfer and obligations related to Plane 1 against Jetcraft Corporation, Jetcoast, ECN, and Element Aviation; (8) avoidance and recovery of a fraudulent transfer and obligations related to Plane 10 against Jetcraft Global, Orion, ECN, and Element Aviation; (9) avoidance and recovery of a fraudulent transfer and obligations related to Plane 11 against Element Aviation and ECN; (10) avoidance and recovery of a fraudulent transfer and obligations related to CAVIC Payments against Bombardier; (11) avoidance and recovery of a fraudulent transfer and obligations related to Plane 6 against Bombardier; (12) avoidance and recovery of a preference against ECN and Element Aviation; (13) avoidance and recovery of a preference against Bombardier; (14) avoidance and recovery of a preference against Bombardier and Learjet, Inc.; (15) willful violation of the automatic stay against Bombardier; (16) turnover of property of the estate against Jetcraft Corporation and Jetcraft Global; and (17) disallowance of claims against each of the 6637 Defendants. *Id.* On March 11, 2020, the first, second, third, fifth, sixth, tenth, eleventh, thirteenth, fourteenth and seventeenth causes of action were dismissed without prejudice, and the fourth cause of action was dismissed with prejudice. 6637 R. at 1173-216 (the "6637 First Dismissal").

On September 13, 2019, Appellant filed an Adversary Complaint against Yuntian 3 Leasing Company Designated Activity Company f/k/a Yuntian 3 Leasing Company Limited ("Yuntian 3"), Yuntian 4 Leasing Company Designated Activity Company f/k/a Yuntian 4 Leasing Company Limited ("Yuntian 4"), Minsheng Financial Leasing Co., Ltd. ("Minsheng Financial"), Minsheng Business Aviation Limited ("Minsheng Business" and together with Minsheng Financial, "Minsheng"), Export Development Canada ("EDC"), Universal Leader Investment Limited ("Universal Leader"), Glove Assets Investment Limited ("Glove Assets"), Truly Great Global Limited ("Truly Great"), and Li Qi ("Li," and together with the other Defendants named in the Adversary Complaint, the "7572 Defendants"). 7572 R. at 00221-73 (the "7572 Complaint").

The 7572 Complaint asserted 15 causes of action: (1) avoidance and recovery of fraudulent transfers related to the 2015 Acquisitions against Universal Leader, Glove Assets, and Li Qi; (2) avoidance and recovery of fraudulent transfers related to Plane 6 and Plane 7 against Li Qi, Universal Leader, Glove Assets, Yuntian 3, Minsheng Financial, and Minsheng Business; (3) in the alternative to the second cause of action, avoidance and recovery of a preference to Yuntian 3; (4) in the alternative to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

second cause of action, avoidance and recovery of a preference to Li Qi, Universal Leader, and Glove
Assets related to the Plane 6 Loan Transfers; (5) in the alternative to the second cause of action,
avoidance and recovery of a preference to Li Qi and Universal Leader related to the $55 Million
Transfer; (6) in the alternative to the second cause of action, avoidance and recovery of fraudulent
transfers to Minsheng Business and Yuntian 4; (7) in the alternative to the second cause of action,
turnover of property of the bankruptcy estate against Yuntian 4, Minsheng Business, and Minsheng
Financial; (8) avoidance and recovery of fraudulent transfers related to the Interest Payment Transfers
against Universal Leader and Li Qi; (9) avoidance and recovery of a preference to EDC and Yuntian 4;
(10) avoidance and recovery of a preference to Yuntian 4; (11) turnover of property of the bankruptcy
estate against Yuntian 4, Minsheng Financial, and Minsheng Business; (12) avoidance and recovery of
a preference related to the Legal Fees Transfers against Minsheng Business, Minsheng Financial,
Yuntian 3, and Yuntian 4; (13) recharacterization of Universal Leader's Third Investment as an equity
interest; (14) violation of the automatic stay against Truly Great and Li Qi; and (15) disallowance of
claims against Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, Universal Leader, Glove
Assets, and EDC. *Id.* On July 29, 2020, the first, second, fourth, fifth, eighth, thirteenth and fifteenth
causes of action in the 7572 Complaint were dismissed without prejudice by the Bankruptcy Court.
7572 R. at 02126-75 (the "7572 First Dismissal").

On March 4, 2020, Appellant moved for an order compelling Bombardier to deposit the Refund into the
Bankruptcy Court's registry pending resolution of the claims against Bombardier. 2004 R. 000924-40.
On May 13, 2020, that motion was denied. 2004 R. 002424.

On December 4, 2020, Appellant sought to file one consolidated complaint in lieu of amending the 2004
Complaint and 6637 Complaint. 2004 R. 002984-98; 6637 R. 001784-88. On April 5, 2021, Appellant's
motion was denied. 2004 R. 003129-30; 6637 R. 003151-3153.

On March 29, 2021, Appellant filed an amended Adversary Complaint against the 7572 Defendants.
7572 R. at 02292-390 (the "7572 FAC"). The 7572 FAC stated ten causes of action: (1) avoidance and
recovery of fraudulent obligations and subsequent transfers made on account of such obligations
related to the 2015 Plane 6 and Plane 7 Finance Leases[3] against Universal Leader, Glove Assets, and
Li Qi; (2) avoidance and recovery of fraudulent obligations and subsequent transfers made on account
of such obligations related to the Minsheng Refinancing against Li Qi, Universal Leader, Glove Assets,
Yuntian 3, Minsheng Financial, and Minsheng Business; (3) in the alternative to the second cause of
action, avoidance and recovery of fraudulent transfers against Minsheng Business and Yuntian 4; (4) in
the alternative to the second and third causes of action, turnover of property of the bankruptcy estate
against Yuntian 4, Minsheng Business, and Minsheng Financial; (5) turnover of property of the
bankruptcy estate against Yuntian 4, Minsheng Financial, and Minsheng Business; (6)
recharacterization of Universal Leader's Third Investment as an equity interest; (7) violation of the
automatic stay against Truly Great and Li Qi; (8) recharacterization of the 2016 Plane 6 Lease

---

[3] In this Order, in connection with the discussion of the factual background of this matter, these agreements are
referred to as the 2015 Plane 6 and Plane 7 Finance Leases because that is how they are identified in the
relevant pleadings. However, this is not intended to reflect any conclusion as to the status of the relevant
transactions, including whether they involved finance or operating leases.
.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Agreement against Minsheng Business, Yuntian 3, Li Qi, Glove Assets, and Universal Leader; (9) recharacterization of the 2016 Plane 7 Lease Agreement against Minsheng Business, Yuntian 3, Li Qi, Glove Assets, and Universal Leader; and (10) disallowance of claims with respect to Yuntian 3, Yuntian 4, Universal Leader, and Glove Assets. *Id.*

On April 28, 2021, Appellant sought leave to amend the 2004 Complaint to add four new parties and one new claim. *See* 2004 R. 003206, 003225. On July 23, 2021, the Bankruptcy Court denied the motion for leave to amend. 2004 R. 010608-35.

On July 28, 2021, Appellant filed an amended Adversary Complaint against the 2004 Defendants. 2004 R. at 16019-53 (the "2004 FAC"). The 2004 FAC stated six causes of action: (1) against CAVIC seeking a declaratory judgment that the Financed Leases are not true leases; (2) against BAC seeking a declaratory judgment that the Plane 5 APA is terminated; (3) against CAVIC seeking a declaratory judgment that CAVIC's security interest in the Refund is not perfected; (4) against CAVIC seeking the avoidance of its unperfected security interest in the Refund; (5) against CAVIC seeking to recover the Refund; and (6) against CAVIC for turnover of the Refund. *Id.*

On July 28, 2021, Appellant also filed an amended Adversary Complaint against the 6637 Defendants. 6637 R. at 026671-825 (the "6637 FAC"). The 6637 FAC stated causes of action numbered between one and 32, although several numbers were intentionally skipped in identifying them: (1) aiding and abetting breach of fiduciary duty against the Fazal-Karim Defendants and Bombardier; (2) civil conspiracy against the Fazal-Karim Defendants and Bombardier; (3) a violation of Cal. Bus. & Prof. Code § 17200 against the Fazal-Karim Defendants and Bombardier; (6) fraudulent misrepresentation against the Fazal-Karim Defendants and Bombardier; (7) fraudulent concealment and non-disclosure against the Fazal-Karim Defendants and Bombardier; (8) avoidance and recovery of actually fraudulent transfers related to Plane 1 against Jetcraft Corp. and Jetcoast; (9) avoidance and recovery of constructively fraudulent transfers related to Plane 1 against Jetcraft Corp. and Jetcoast; (10) avoidance and recovery of actually fraudulent transfers related to Plane 10 against Jetcraft Global and Orion; (11) avoidance and recovery of constructively fraudulent transfers related to Plane 10 against Jetcraft Global and Orion; (12) avoidance and recovery of actually fraudulent transfers related to Planes 2-5 against Bombardier; (13) avoidance and recovery of constructively fraudulent transfers related to Planes 2-5 against Bombardier; (14) avoidance and recovery of actually fraudulent transfers related to Planes 2-5 against Bombardier; (15) avoidance and recovery of constructively fraudulent transfers related to Planes 2-5 against Bombardier; (16) avoidance and recovery of actually fraudulent transfers related to Plane 6 against Bombardier; (17) avoidance and recovery of constructively fraudulent transfers related to Plane 6 against Bombardier; (18) avoidance and recovery of a preference against BAC; (19) avoidance and recovery of a preference against Learjet, BI, and BAC; (20) violation of the automatic stay against BAC; (24) turnover of property of the estate against Jetcraft Corp. and Jetcraft Global; (25) disallowance of claims against all Defendants; (31) avoidance and recovery of actually fraudulent transfers related to Plane 6 against Bombardier; and (32) avoidance and recovery of constructively fraudulent transfers related to Plane 6 against Bombardier. *Id.*

On August 17, 2021, the Bankruptcy Court dismissed the first, second, sixth, seventh, eighth, ninth and tenth causes of action in the 7572 FAC with prejudice. 7572 R. at 10350-94 (the "7572 Final Dismissal"). On September 22, 2021, Appellant appealed the dismissal of the 7572 FAC with respect to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the claims against Li Qi, Universal Leader, Glove Assets, and Truly Great (the "7572 Appellees"). 7572 Dkt. 1. On December 30, 2021, Appellant filed an opening brief stating its position. 7572 Dkt. 30 (the "7572 Opening Brief"). On March 28, 2022, the 7572 Appellees filed an answering brief, contending that the 7572 Final Dismissal should be affirmed. 7572 Dkt. 43 (the "7572 Answering Brief"). On April 13, 2022, the Appellant filed a timely reply brief. 7572 Dkt. 44 (the "7572 Reply Brief").

On March 8, 2022, the Bankruptcy Court dismissed the first, third, fourth, fifth, and sixth causes of action in the 2004 FAC with prejudice. 2004 R. at 021053-121 (the "2004 CAVIC Final Dismissal"). On March 25, 2022, Appellant appealed the dismissal of the 2004 FAC with respect to the claims against CAVIC and BAC. 2004 Dkt. 1. On August 16, 2022, Appellant filed an opening brief in support of its position. 2004 Dkt. 52 (the "2004 Opening Brief"). On October 14, 2022, the 2004 Appellees filed answering briefs, contending that the 2004 CAVIC Final Dismissal should be affirmed. 2004 Dkts. 65, 66 (the "2004 Bombardier Answering Brief," the "2004 CAVIC Answering Brief," and collectively, the "2004 Answering Briefs"). On January 6, 2023, Appellant filed a timely reply brief. 2004 Dkt. 74 (the "2004 Reply Brief").

On June 23, 2022, the Bankruptcy Court dismissed the first through third, sixth, seventh, twelfth through twentieth, twenty-fifth, thirty-first, and thirty-second causes of action in the 6637 FAC with prejudice. 6637 R. at 041476-558 (the "6637 Final Dismissal"). On September 16, 2022, Appellant appealed the dismissal of the 6637 FAC with respect to the claims against BAC, BI, and Learjet. 6637 Dkt. 1. On February 22, 2023, Appellant filed an opening brief in support of its position. 6637 Dkt. 45 (the "6637 Opening Brief"). On April 19, 2023, the 6637 Appellees filed an answering brief, contending that the 6637 Final Dismissal should be affirmed. 6637 Dkt. 69 (the "6637 Answering Brief"). On May 17, 2023, Appellant filed a timely reply brief. 6637 Dkt. 71 (the "6637 Reply Brief").

A hearing on all three appeals was held on August 21, 2023. For the reasons stated in this Order, the 7572 Final Dismissal, 2004 CAVIC Final Dismissal and 2004 Bombardier Final Dismissal are **AFFIRMED**. The 6637 Final Dismissal is **REVERSED IN PART** as to the first, second, and seventh causes of action and **AFFIRMED IN PART** as to all other claims. All the interlocutory orders of the Bankruptcy Court are **AFFIRMED**. In the 6637 Adversary Proceeding, the Trustee is given leave to add a breach of contract cause of action related to BAC's alleged breach of the Charter Agreements. However, the Trustee is not given leave to add any other parties, causes of action, or legal theories.

This Order is initially issued under seal. Within 14 days of its issuance, the parties shall jointly submit any proposed redactions, with a corresponding declaration from a percipient witness as to why the information should not be available on the public docket in this action. Based on a review of those submissions, a redacted version of this Order shall be made available on the public docket in conformance with the determinations made in response to the requested redactions.

## II.   Factual Background

Because the Trustee is seeking review of rulings on motions to dismiss, all the factual allegations in the 7572 FAC, the 2004 FAC, and the 6637 FAC are taken as true for purposes of resolving the present appeals.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
| Title | In re Zetta Jet USA, Inc., et al. | | |

A.    Parties and Relevant Non-Parties

The Trustee is the duly appointed Chapter 7 trustee of the bankruptcy estates of the Debtors. 6637 FAC ¶ 20.

1.    The Debtors and Related Parties

Debtor Zetta PTE was organized on July 15, 2015, by Geoff Cassidy ("Cassidy") together with James Seagrim ("Seagrim") and Matthew Walter ("Walter"). 6637 FAC ¶ 21. Cassidy owned 34% of Zetta PTE's shares through Asia Aviation Company Pte. Ltd. ("Asia Aviation") and Seagrim and Walter each owned 33% of Zetta PTE's shares. *Id*. Zetta PTE is a Singaporean corporation. 2004 FAC ¶ 16.

Zetta PTE purchased Zetta USA, one of the other Debtors, in August 2016 and merged with Asia Aviation. 6637 FAC ¶ 22. Zetta USA is a California corporation. 2004 FAC ¶ 17. Zetta USA was formerly known as Advanced Air Management, Inc. ("AAM") until the August 2016 merger. 6637 FAC ¶ 23. Zetta USA was a private jet charter company based in Burbank, California, and operated by Seagrim and Walter. *Id*. Asia Aviation was owned by Cassidy and his wife at that time, Miranda June Tang Kim Choo ("Tang"); it operated a single jet on behalf of the jet's owner until it was merged into Zetta PTE. *Id*. ¶ 24.

Cassidy was at all relevant times the Debtors' Managing Director and a Director of Zetta PTE. 6637 FAC ¶ 25. Tang was at all relevant times a Director of Zetta PTE. *Id*. ¶ 26. Seagrim was the Debtors' Director of Operations and a Director of Zetta PTE and Zetta USA. *Id*. ¶ 27. Seagrim was based in Zetta USA's Burbank, California office. *Id*. Walter was the Debtors' Director of Sales and a Director of Zetta PTE and Zetta USA. *Id*. ¶ 28. Walter was also based in Burbank. *Id*.

Li Qi ("Li") is a businessman and investor who resides in Hong Kong. 6637 FAC ¶ 29. He became a director of Zetta PTE on February 26, 2016. *Id*. Li allegedly controls three entities relevant to this matter: Universal Leader Investment Limited ("Universal Leader"); Truly Great Global Limit ("Truly Great"); and Glove Assets Investments Ltd. ("Glove Assets"). *Id*. It is alleged that Truly Great is nominally owned by Li's mother. 7572 FAC ¶ 37.

Zetta PTE did not hold any formal board meetings until August 17, 2017. 6637 FAC ¶ 30. Board decisions before that date were made by the issuance of written directors' resolutions or by e-mail. *Id*. Zetta PTE's Memorandum of Association required a majority vote of its directors to enter into the transactions at issue here. *Id*. ¶ 31. It also required that any "director who is in any way, directly or indirectly, interested in a transaction or proposed transaction with the Company shall declare the nature of his interest in accordance with the provisions of the Act" and further states that "a director shall not vote in respect of any transaction in which he is interested (and if he does his vote shall not be counted), nor shall he be counted for the purpose of any resolution regarding the same." *Id*.

Zetta Jet Global 6000-1 Limited ("Zetta Jet 6000-1"), Zetta Jet Global 6000-2 Limited ("Zetta Jet 6000-2"), Zetta Jet Global 6000-3 Limited ("Zetta Jet 6000-3"), Zetta Jet Global 6000-4 Limited ("Zetta Jet 6000-4"), Zetta Jet Global 6000-5 Limited ("Zetta Jet 6000-5"), Zetta Jet Global 5000-1 Limited ("Zetta Jet 5000-1"), Zetta Jet Global 5000-2 Limited ("Zetta Jet 5000-2"), and Zetta Jet Challenger 650-1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Limited ("Zetta Jet 650") (collectively, the "Zetta BVI Subsidiaries") are companies formed under the laws of the British Virgin Islands (the "BVI") by Zetta PTE. 6637 FAC ¶ 35. Zetta PTE is the sole shareholder of each of the Zetta BVI Subsidiaries. *Id.* Cassidy and Seagrim were the directors of each of the Zetta BVI Subsidiaries. *Id.* The Zetta BVI Subsidiaries were formed just prior to each finance and lease transaction for which they were needed. *Id.* ¶ 36. They did not conduct business, had no bank accounts, had no employees, generated no income, had no presence in the BVI, and never held a meeting of their Board of Directors. *Id.* They served no purpose other than their role in these transactions. *Id.* Specifically, Zetta Jet 5000-1 was used in the transaction involving Plane 1, Zetta Jet 6000-4 in the transaction involving Plane 4, Zetta Jet 6000-5 in the transaction involving Plane 5, Zetta Jet 6000-3 in the transaction involving Plane 6, Zetta Jet 6000-2 in the transaction involving Plane 7, Zetta Jet 6000-1 in the transaction involving Plane 10, and Zetta Jet 5000-2 in the transaction involving Plane 11. *Id.* ¶ 37.

2.    Fazal-Karim, Jetcraft, and Related Parties

Fazal-Karim owns 95%, and is the Chairman of the Boards, of Jetcraft Corp. and Jetcraft Global, as well as the director and sole beneficial owner of FK Partners and FK Group. 6637 FAC ¶¶ 38, 43. It is alleged that he is a resident of the United Arab Emirates. *Id.* ¶ 38. He has more than 25 years of experience in the aviation industry. *Id.* ¶ 39. In May 2008, Fazal-Karim acquired 50% of Jetcraft Corp. *Id.* Prior to that, he worked at Bombardier from approximately 2001 to 2008 as the regional vice president of sales for the Americas, and then as the vice president of international sales. *Id.* Previously, he worked at Airbus as Vice President of Business Development and Asset Management from 1996 to 2001. *Id.*

Since at least August 16, 2015, Fazal-Karim, through his entity, FK Group, allegedly held himself out as the exclusive representative of Bombardier in southeast Asia. 6637 FAC ¶ 40. He also allegedly represented Bombardier in sophisticated negotiations involving billions of dollars in connection with sales of Bombardier aircraft, and in extremely complex transactions involving some of the world's largest corporations and most wealthy individuals. *Id.*

Jetcraft Corp. is a Delaware corporation whose principal place of business is in North Carolina. 6637 FAC ¶ 41. Jetcraft Global is a BVI corporation whose principal place of business is in North Carolina. *Id.* ¶ 42. Jetcraft Asia is a BVI corporation whose principal place of business is in North Carolina. *Id.* ¶ 44. Jetcraft Asia is a wholly owned subsidiary of Jetcraft Global. *Id.* Jetcoast is a Delaware corporation whose mailing address is in North Carolina, and which is also a wholly owned subsidiary of Jetcraft Global. *Id.* ¶ 45. Orion is a BVI corporation whose registered office is in that jurisdiction. *Id.* ¶ 46. It is also a wholly owned subsidiary of Jetcraft Global. *Id.*

Jetcraft is in the business of providing sales, leasing, acquisition and trade services with respect to aircraft. 6637 FAC ¶ 47. It distributes new and pre-owned aircraft and provides consulting, fleet planning, and contract services. *Id.* Fazal-Karim operates Jetcraft, and in doing so uses his "fk-group.net" e-mail account, sometimes with a signature block that says "Jetcraft Chairman." *Id.*

Anne Behrend ("Behrend") is the Chief Financial Officer of both Jetcraft Corp. and Jetcraft Global; she is located in Indiana. 6637 FAC ¶ 48. Peter Antonenko ("Antonenko") is the Chief Operating Officer of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Jetcraft Corp., and is located in Minnesota. *Id.* ¶ 49. Chad Anderson ("Anderson") is the President of Jetcraft Corp., and is also located in Minnesota. *Id.* ¶ 50.

FK Group is an entity based in Dubai. 6637 FAC ¶ 51. FK Partners is a United Kingdom entity whose registered office is in that jurisdiction. *Id.* ¶ 52.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

        3.   <u>Bombardier and Related Parties</u>

BI is a Canadian corporation whose principal place of business is in Montreal, Canada. 6637 FAC ¶ 53. BAC is a Delaware corporation whose principal place of business is in Texas. *Id.* ¶ 54. BAC is a wholly owned subsidiary of BI. *Id.* Bombardier Business Aircraft is allegedly a division of both BI and BAC. *Id.* ¶ 55. Learjet is a Kansas corporation whose principal place of business is there. *Id.* ¶ 56. It is also a subsidiary of BAC. *Id.*

Khader Mattar ("Mattar") is the Vice President of Sales for the Middle East, Africa, Asia Pacific and China for Bombardier Business Aircraft. 6637 FAC ¶ 57. In that role, he was responsible for overseeing Bombardier's sales in Asia and was its primary point of contact for Bombardier's relationship with the Debtors. *Id.* Mattar is based in Dubai. *Id.* Yu Yubin ("Yu") is the Vice President of Sales for the Middle East and Africa and Director of Sales for the Greater China region for Bombardier Business Aircraft. *Id.* ¶ 58. Yu was also very involved in Bombardier's relationship with the Debtors. *Id.* Finally, David Coleal ("Coleal") is the President of Bombardier Business Aircraft and allegedly oversaw the work of both Mattar and Fazal-Karim. *Id.* ¶ 59.

        4.   <u>Financing Parties</u>

CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company ("CAVIC") is an Irish corporation located in that jurisdiction. 6637 FAC ¶ 60. AVIC International Leasing Co. Ltd. ("AVIC") is a Chinese corporation located in that jurisdiction. *Id.* ¶ 61. AVIC is allegedly the ultimate parent corporation of CAVIC, and was allegedly responsible for designing and negotiating the transactions between CAVIC and the Debtors. *Id.*

The ZJ6000-1 Statutory Trust ("ZJ6000-1 ST"), the ZJ6000-2 Statutory Trust ("ZJ6000-2 ST"), and the ZJ6000-3 Statutory Trust ("ZJ6000-3 ST," and collectively the "CAVIC Statutory Trusts") are trusts formed under Delaware law with registered offices in that jurisdiction. 6637 FAC ¶ 62. They are special purpose vehicles established by AVIC for the financed leases of Planes 2-4. *Id.* It is alleged that all decisions made by the trusts were at the direction of AVIC. *Id.*

The Zetta MSN 9716 Statutory Trust ("9716 Trust") is a trust formed under the laws of Wyoming whose principal office is in Utah. 2004 FAC ¶ 24. The 9716 Trust is a trust formed by Zetta PTE, which allegedly exercised sole authority and control over it. *Id.* The Zetta MSN 9740 Statutory Trust (the "9740 Trust") is another trust formed under the laws of Wyoming whose principal office is in Utah. *Id.* ¶ 27. Again, it is alleged that Zetta PTE formed the 9740 Trust and exercised sole authority and control over it. *Id.* The Zetta MSN 9764 Statutory Trust ("9764 Trust") is also a trust formed under the laws of Wyoming whose principal office is in Utah. *Id.* ¶ 30. It was allegedly formed by Zetta PTE, which allegedly exercised sole authority and control over it. *Id.* Finally, the Zetta MSN 9788 Statutory Trust ("186 Trust") is another trust formed under the laws of Wyoming, whose principal office is in Utah, and that was formed by Zetta PTE, and allegedly controlled by that entity. *Id.* ¶ 33.

Wells Fargo Bank Northwest N.A. ("Wells Fargo") is a national banking association whose principal place of business is in Utah. 6637 FAC ¶ 63. Wells Fargo is a party to various trust agreements in which it acted as owner-trustee of certain of the airplanes at issue. *Id.* Specifically, it worked with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Yuntian 3, Yuntian 4, Universal Leader, and Glove Assets during the sales of Plane 6, Plane 7, and Plane 12. 7572 FAC ¶ 69.

TVPX ARS Inc. ("TVPX") is a Wyoming corporation that was a party to various trust agreements with certain subsidiaries of the Debtors. 6637 FAC ¶ 64. Under those agreements, TVPX agreed to hold the alleged finance leases for aircraft in trust for the benefit of the subsidiaries. *Id.* TVPX also acted as signatory for the CAVIC Statutory Trusts. *Id.*

Element Aviation is an Ontario company whose principal place of business is in Ontario. 6637 FAC ¶ 65. Element Aviation is a wholly owned subsidiary of ECN Capital Corporation ("ECN"), another Ontario company. *Id.* ¶¶ 65-66. Michael O'Keefe ("O'Keefe") is the Vice President of Capital Markets in ECN's Aviation Finance Division. *Id.* ¶ 67. Frederic Larue ("Larue") is the Vice President of Business Development in ECN's Aviation Finance Division. *Id.* ¶ 68. Tony Bergeron ("Bergeron") is the President, Element Aviation Finance, of ECN. *Id.* ¶ 69. Steve Hudson ("Hudson") is the CEO of ECN. *Id.* ¶ 70.

Export Development Canada ("EDC") is a Canadian corporation located in Ontario. 6637 FAC ¶ 71. It was CAVIC's secured lender under the Plane 2-5 alleged finance leases. *Id.*

Minsheng Financial Leasing Co., Ltd. ("Minsheng Financial"), Minsheng Business Aviation Limited ("Minsheng Business," or with Minsheng Financial, "Minsheng") are also aviation financiers. 6637 FAC ¶ 100. Minsheng Financial is organized under the laws of China with its principal place of business there. 7572 FAC ¶ 65. It is alleged that Minsheng Financial is an affiliate and controlling entity of Minsheng Business, Yuntian 3, and Yuntian 4. *Id.* Minsheng Business is a Chinese company whose principal place of business is in Hong Kong. *Id.* ¶ 66. Yuntian 3 and Yuntian 4 are Irish companies whose principal places of business are there. *Id.* ¶¶ 67-68.

B.      Cassidy, Seagrim, and Walter Form Zetta PTE

In 2008, when Cassidy was approximately 19 years old, he made headlines in Australia when he allegedly attempted to buy two yachts worth more than $27 million by claiming that he was the chief executive of an aviation company. 6637 FAC ¶ 72. His false statements were allegedly exposed when he claimed that he could not use his credit card because he had recently purchased a $300,000 piano, and misspelled the name of his alleged hometown. *Id.* The party who was selling the yacht allegedly called Cassidy's purported bank and discovered that it had never heard of Cassidy. *Id.* Later in 2008, Cassidy allegedly attempted to buy an Australian professional basketball team by making the same false statements as to his wealth, but was unsuccessful. *Id.* ¶ 73. Cassidy would later allegedly state that he was entitled to "drink the top shelf expensive and exclusive alcohol and Champagne and eat caviar," instead of "bottom shelf alcohol" and "McDonalds." *Id.* ¶ 96.

In 2012, when Cassidy was approximately 24 years old, he entered the Asian private luxury jet market. 6637 FAC ¶ 74. By 2014, Cassidy and Tang were the owners of Asia Aviation, which managed a Bombardier jet for private use by a wealthy Singaporean. *Id.* ¶ 75. Asia Aviation did not have an Air Carrier and Operator Certificate under 14 C.F.R. Part 135 (a "Part 135 Certificate") issued by the FAA, which is required to operate certain commercial charter flights for paying customers. *Id.* ¶ 76.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

AAM, a private jet charter business operated by Seagrim and Walter, had nine airplanes by 2014, which consisted of both managed and leased aircraft. 6637 FAC ¶ 77. AAM catered primarily to high net worth individuals, celebrities and corporate clients in the U.S. and Europe. *Id.* AAM had a Part 135 Certificate, and significant experience in operating a charter airline that serviced many customers. *Id.* ¶ 78.

In or around March 2014, a representative of Cassidy approached Seagrim and Walter. 6637 FAC ¶ 79. AAM ultimately executed a Tri-Party Charter Management Agreement with Asia Aviation and the Singaporean owner of the jet so Cassidy could operate charters on the jet that Asia Aviation managed. *Id.* In early 2015, Cassidy asked Seagrim and Walter to enter a joint business venture with him. *Id.* ¶ 80. Cassidy allegedly told Seagrim and Walter that he had access to large amounts of capital in China that could be used to purchase new aircraft, that he was independently wealthy due to a recent inheritance, that he had experience in his family's business operating charter services in Asia, and that he had access to wealthy Chinese clientele who would pay top-of-market rates for the use of aircraft. *Id.* It is alleged that all these statements were false. *Id.*

On July 15, 2015, Cassidy, Seagrim, and Walter incorporated Zetta PTE in Singapore to conduct a private luxury jet charter business. 6637 FAC ¶ 81. Each of them owned one-third of the stock in the new company. *Id.* At or about the same time, AAM made a filing with the FAA as to conducting authorized operations under the business name "Zetta Jet," and this name was affixed to all new aircraft delivered to Zetta PTE. *Id.* It was established that all existing planes of Asia Aviation and AAM were added to the AAM Part 135 Certificate, and that AAM would operate all the revenue-generating chartered flights. *Id.* ¶ 82.

Zetta PTE's finance department was located in Singapore; it reported to Cassidy and his wife, Tang. 7572 FAC ¶ 85. Until Cassidy and Tang were removed from their positions in August 2017, both had the right to approve transfers of funds with respect to Zetta PTE. *Id.* In late 2016, Zetta USA sent all of its financial records to Singapore as requested by Cassidy. *Id.*

In September 2015, a few months after Zetta PTE was formed, Cassidy created the First Business Plan, which he sent to potential financiers to seek to attract interest in Zetta PTE. 7572 FAC ¶ 128. The Trustee alleges that the First Business Plan contained several materially false and misleading statements. *Id.* ¶ 130. Specifically, the Trustee contends that the First Business Plan stated a profit margin that was significantly higher than that of the Debtors' more established competitors, understated the financing and other costs that were ultimately incurred, projected that the Debtors would be able to lease the aircraft for a higher hourly rate than was ultimately realized, and overstated the amount of contracted future revenue the Debtors had. *Id.*

C.    Bombardier's Financial Condition

At or about the time Zetta PTE was formed, the Asian private jet industry was experiencing difficulty due to economic downturns in China, Asia's largest private jet market. 6637 FAC ¶ 83. Both Mattar and Fazal-Karim made public comments that the private jet industry in Asia was suffering, primarily because of a slow market in China. *Id.* Competitors in the industry made similar comments. *Id.* ¶ 84.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

During the fall of 2015, Bombardier's share price fell. 6637 FAC ¶ 87. The financial condition of the company also required that it lay off a significant number of employees. *Id.* ¶ 85. Bellemare later stated that Bombardier was "on the brink of bankruptcy" in 2015. *Id.* ¶ 88.

    D.    Zetta PTE's Transactions in Planes

In each of the following transactions, the Debtors would enter an aircraft purchase agreement ("APA") with Bombardier or a Jetcraft subsidiary. 6637 FAC ¶ 106. The APAs required Zetta PTE to pay ███████ *Id.* ██████ *Id.* ████ *Id.* ██████ *Id.*

The Debtors never had sufficient funds to purchase aircraft without financial support. 6637 FAC ¶ 107. Accordingly, they obtained financing either from Jetcraft and Li or from an aircraft financier like CAVIC, Element, or Minsheng. *Id.* The financing transactions allegedly took place using either a direct secured loan from a financier under which a debtor-controlled entity was a borrower and the financier was the lender, or using a "finance lease" where the financier received a payment (characterized as rent) over a fixed term and the Debtors could exercise a nominal or free option to purchase the aircraft, which was used for the other planes. *Id.* ¶ 108. Under both structures, the financier did not possess or operate the airplane, but only received principal and interest payments form the Debtors, who would take on all the risks and obtain any benefits of ownership. *Id.* ¶ 109. At closing, either TVPX or Wells Fargo would serve as owner-trustees or lessor-trustees to effect the transaction. *Id.*

During the transactions, Zetta USA was used to operate the planes under its Part 135 Certificate, either under a lease from Zetta PTE or a sub-lease from TVPX. 6637 FAC ¶ 112. To maintain its Part 135 Certificate, the following was required: Zetta USA's principal base of operations had to be located in the United States; its Director of Maintenance, Chief Pilot, and Director of Operations had to be its direct employees, and its president and two-thirds or more of its board of directors were required to be citizens of the United States; and at least 75% of its voting interests were required to be owned or controlled by persons who were citizens of the United States. *Id.* ¶¶ 113-15. In addition, Zetta USA signed guarantees for all the obligations under the aircraft financing documents. *Id.* ¶ 116.

    1.    <u>The First Element Transaction (Plane 1)</u>

This transaction involved the purchase of a Bombardier Global 5000 (Plane 1) from Jetcoast that was financed by Element. 6637 FAC ¶ 118. On November 19, 2015, Cassidy, on behalf of Zetta PTE, executed a letter of intent with Element to Purchase Plane 1. *Id.* ¶ 119. On December 5, 2015, Cassidy entered into an Aircraft Purchase Agreement (the "Plane 1 APA") with Jetcraft Corp. and Jetcoast for this airplane. *Id.* ¶ 120. The transaction closed on December 30, 2015. *Id.* ¶ 121. Element Aviation entered into an Aircraft Loan Agreement (the "Plane 1 Loan Agreement") with Zetta PTE through Zetta Jet 5000-1 to finance the purchase. *Id.* The same day, Zetta USA, which was still known as AAM, agreed to guarantee the operating lease on the aircraft. *Id.* Element, the Debtors and TVPX then

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

effected the transaction. *Id.* Seagrim and Walter executed the directors' resolutions and other transactional documents in California. *Id.* ¶ 122. Zetta PTE was required to pay a ▮▮▮▮▮▮ deposit within ▮▮▮▮▮▮▮▮▮ of entering the APA, with the balance of ▮▮▮▮▮▮▮ due at the time of closing. *Id.* ¶ 123. It paid the deposit on December 10, 2015. *Id.* ¶ 124. On December 30, 2015, Zetta PTE directed Element Aviation to disburse $37.8 million to Jetcoast. *Id.* ¶ 126. That same day, AAM wired ▮▮▮▮▮ to Jetcraft Corp. *Id.* ¶ 127. Finally, Zetta PTE wired ▮▮▮▮▮▮ to Jetcraft Corp. on January 5, 2016. *Id.* ¶ 128.

The Debtors accepted delivery of Plane 1 at Cahokia, Illinois and the plane was thereafter based in Burbank, California. 6637 FAC ¶¶ 129, 131(c). The transaction was to be governed by New York law, and the closing occurred in Oklahoma City. *Id.* ¶¶ 131(b), 131(d). Payment was allegedly sent through Wachovia Bank in New York as a correspondent bank. *Id.* ¶ 131(e).

On December 30, 2015, Jetcraft Corp. and Element Aviation entered into a Repurchase Agreement (the "Plane 1 Repurchase Agreement"). 6637 FAC ¶ 132. Under that agreement, Jetcraft Corp. agreed that if the Debtors defaulted on their obligations on Plane 1, Jetcraft Corp. would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Fazal-Karim, Jetcraft Corp., and Jetcoast received ▮▮▮▮▮▮▮ in commissions and ▮▮▮▮▮▮ in other profits on Plane 1. 6637 FAC ¶ 130.

During November 2015, Cassidy and Fazal-Karim agreed that Cassidy would be paid $500,000 by Jetcraft as part of the "purchase price" of Plane 1. 6637 FAC ¶ 252. At this time, the payment was termed a "3rd Party Fee" and described as an "outside commission" *Id.* ¶¶ 252, 269. On March 4, 2016, Cassidy, using his Asia Aviation e-mail account, sent Fazal-Karim an invoice dated March 1, 2016, for $500,000 in "Support Services" and requested that a payment be made to Cassidy's private bank account. *Id.* ¶ 256. On March 28, 2016, Behrend sent $500,000 from Jetcraft Global's bank account in the Cayman Islands to Cassidy's personal bank account. *Id.* ¶ 258. This payment was not disclosed in the transaction documents, and this payment was inconsistent with the provision in the Plane 1 APA that the Debtors had not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 260.

The Trustee contends that this payment was a bribe. *See* 6637 FAC ¶ 241. The FAC defines it as the First Kickback, and alleges that it was a payoff for agreeing to use Fazal-Karim to acquire all future planes from Jetcraft or Bombardier. *Id.* It was also an alleged inducement to acquire Plane 1 in the First Element Transaction and to acquire Planes 2-6 from Bombardier directly as part of a letter of intent signed at the same time as the financing proposal for the First Element Transaction. *Id.* The Trustee contends that the transactions relating to Planes 1-6 were all part of a single agreement. *Id.* ¶ 242. The Trustee supports this position by noting that the transactions were negotiated simultaneously and directed at the common goal of securing four or five Global 6000 aircraft for the Debtors. *Id.* Also, on November 3, 2015, less than one month before the letters of intent for Planes 1-6 were signed, the parties discussed a draft letter of intent that mentioned all six planes. *Id.* ¶ 244. In addition, it is alleged that Bombardier had a direct financial interest in the sale of Plane 1 because, when Bombardier sold Plane 1 to Jetcraft, it was agreed that Bombardier would receive a percentage of any return earned by Jetcraft if and when Jetcraft elected to resell the aircraft. *Id.* ¶ 250.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

On December 2, 2015, Cassidy sent an e-mail to Seagrim and Walter that attached a document showing that Zetta PTE would be more than $1.6 million "in the red" based on the closing of Plane 1. 7572 FAC ¶ 154.

      2.    <u>The CAVIC Transactions (Planes 2-5)</u>

          a)    The Transactions

During the discussion as to the First Element Transaction, Cassidy negotiated and entered into a letter of intent to purchase six additional Global 6000s directly from Bombardier. 6637 FAC ¶ 133. Planes 2-5 and Plane 6, which was eventually purchased by Li, were part of this letter of intent. *Id.* It was executed on November 18, 2015. *Id.* ¶ 134.

Cassidy, on behalf of Zetta PTE, executed four APAs with BAC (the "Plane 2-5 APAs") on December 10, 2015, for four Global 6000s ("Planes 2-5" and collectively the "CAVIC Aircraft"), directly from Bombardier. 6637 FAC ¶ 135. Under the Plane 2-5 APAs, ████████████████████████████████████████████
████████████████████████
      *Id.* ¶ 136. ██████████████████████████████████████
██████
   *Id.*

To complete the purchase of the CAVIC Aircraft, the Debtors obtained financing from CAVIC through an alleged finance lease structure. 6637 FAC ¶ 137. At the closing of the sale of each airplane, the Debtors (through TVPX) entered into finance lease agreements with CAVIC (through the CAVIC Statutory Trusts). *Id.* Specifically, on or around May 24, 2016, the Debtors (through TVPX as owner trustee) entered into an alleged finance lease with CAVIC (through the ZJ6000-1 ST) for Plane 2. *Id.* On or around September 16, 2016, the Debtors (through TVPX as owner trustee) entered into an alleged finance lease with CAVIC (through the ZJ6000-2 ST) for Plane 3. *Id.* On or about December 23, 2016, the Debtors (through TVPX as owner trustee) entered into an alleged finance lease with CAVIC (through the ZJ6000-3 ST) for Plane 4. *Id.* On the same days, TVPX entered into corresponding sub-leases with Zetta USA. *Id.* To repay CAVIC for the financing, the Debtors made payments characterized as ones due under the lease. *Id.* ¶ 138. The alleged finance leases were entered into by TVPX, acting as trustee for the ultimate benefit of the Debtors. *Id.* ¶ 139. Using sub-leases, all responsibility and obligations under the alleged finance leases were passed from TVPX to Zetta Jet. *Id.* The sub-leases mirrored the alleged finance leases in terms of the amount of rent, interest, and other non-financial obligations. *Id.* TVPX never made or received payments on the CAVIC Aircraft. *Id.*

The Trustee contends that the parties intended to enter into a finance lease, rather than a true or operating lease, for the following reasons: Zetta PTE was not able to terminate the lease after acceptance of the CAVIC Aircraft; Zetta PTE had the option through its subsidiaries and TVPX to purchase the CAVIC Aircraft at the end of the lease period for only $100 each; the risk of loss or damage to the CAVIC Aircraft passed to the Debtors upon delivery and the Debtors' obligations to make rent payments continued even upon a total loss of the aircraft; the Debtors had an absolute and unconditional obligation to pay rent to CAVIC even if their use of the CAVIC Aircraft was interrupted

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

due to a defect that affected airworthiness; the outstanding rent accrued interest and would accrue default interest in the event of a default; the rent was calculated based upon the principal amount and interest that CAVIC owed EDC under its loan under its Facility Agreement with EDC and floating rates in interest charged under that facility; the final payment of rent was equal to the final amount that was due to EDC by CAVIC under the Facility Agreement; the Debtors were responsible for all general maintenance obligations and the cost and expense of replacing all parts; and the Debtors were responsible for all insurance costs on the CAVIC Aircraft. 6637 FAC ¶ 140.

The Debtors accepted delivery of Planes 2-4, and would have accepted delivery of Plane 5, at Windsor Locks, Connecticut. 6637 FAC ¶ 142(d). The closings occurred in Oklahoma City. *Id.* ¶ 142(b). The payments for these planes were sent to BAC's Bank of America account in Texas. *Id.* ¶ 142(e).

Zetta PTE made transfers to BAC for the CAVIC Aircraft, including the following: $1 million on December 4, 2015; $10 million on February 16, 2016; $10 million on March 8, 2016; $1.2 million on March 28, 2016; $2.4 million on or about June 30, 2016[4]; $3,091,334 on March 28, 2017; and $3,262,834 on June 27, 2017. 6637 FAC ¶ 143. The Debtors also made transfers to BAC totaling $120.36 million in loan proceeds from CAVIC. *Id.* Ultimately, Plane 2 was delivered on or about May 24, 2016, Plane 3 was delivered on or about September 22, 2016, Plane 4 was delivered on or about March 28, 2017 and Plane 5 was never delivered. *Id.* ¶¶ 144-47.

Fazal-Karim received commissions of ▮▮▮▮▮ for each of the transactions for Planes 2-5. 6637 FAC ¶ 148.

b)    The Plane 5 Pre-Delivery Payments ("PDPs")

Under the Plane 5 APA, advance payments, which were called pre-delivery payments ("PDPs"), were to be made on a periodic basis to fund the purchase of Plane 5. 2004 FAC ¶ 34. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *d.* This right is denoted the "Refund." Under the Plane 5 APA, Zetta PTE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *Id.* ¶ 69.

On December 10, 2015, when the Plane 5 APA was signed, Universal Leader paid BAC ▮▮▮▮▮ in PDPs. 2004 FAC ¶ 41. On February 25, 2016, BAC and Zetta PTE executed a First Amendment to the Plane 5 APA. *Id.* ¶ 42. On March 28, 2016, Zetta PTE paid PDPs totaling ▮▮▮▮▮ to BAC under the Plane 5 APA. *Id.* ¶ 43. On September 26, 2016, BAC and Zetta PTE executed a Second Amendment to the Plane 5 APA. *Id.* ¶ 44.

In March 2017, the Debtors were due to make another, $30 million PDP under the Plane 5 ADA. 2004 FAC ¶ 36. In the fall of 2016, CAVIC and Zetta PTE allegedly began negotiating the terms of a financing relationship whereby CAVIC would finance the manufacture and purchase of Plane 5 and

---

[4] This payment was originally made in connection with Planes 8-9, but was later transferred to apply to Plane 4 on March 24, 2017. 6637 FAC ¶ 143.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|----------------------------------------------------------------|------|----------------|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Zetta PTE would repay this loan, with interest, allegedly pursuant to a lease financing structure. *Id.* ¶ 45. On November 17, 2016, Zetta PTE and AVIC, on behalf of CAVIC, memorialized the blueprint for the structure of the alleged PDP loan and long term lease financing agreement in a Term Sheet, which was sent from AVIC to Zetta PTE as a "letter of intent." *Id.* ¶ 46. On December 13, 2016, BAC and Zetta PTE executed a Third Amendment to the Plane 5 APA. *Id.* ¶ 47.

On December 22 and 23, 2016, it is alleged that Zetta PTE, Zetta USA, CAVIC, EDC, TVPX, and the ZJ6000-4 ST signed the following documents:

- The PDP Facility Agreement between EDC as lender, security trustee and agent, and CAVIC as borrower;
- The 186 Trust Agreement between Zetta Jet 6000-5 as trustor and TVPX as lessee trustee, which formed the 186 Trust;
- The ZJ6000-4 Trust Agreement between CAVIC as trustor and TVPX as owner trustee, which formed the ZJ6000-4 ST;
- The Plane 5 Lease Agreement between the ZJ6000-4 ST as lessor and TVPX as lessee;
- The Plane 5 Sub-Lease between TVPX as lessor and Zetta Jet USA, Inc. as lessee;
- The Plane 5 Lease Guarantee between the ZJ6000-4 ST as beneficiary and Zetta PTE, Zetta USA, Asia Aviation Holdings PTE Ltd., and Geoff Cassidy as guarantors;
- The Plane 5 FPA between CAVIC as seller and TVPX as owner trustee and buyer;
- The Plane 5 FPA Guarantee between CAVIC as beneficiary and the same guarantors as the Plane 5 Lease Guarantee; and
- The Plane 5 EDC Security Agreement between CAVIC as borrower and EDC as security trustee.

2004 FAC ¶ 48.

Under the PDP Facility Agreement, CAVIC could issue utilization requests to EDC to borrow $30 million. 2004 FAC ¶ 76. CAVIC was required to make only one principal payment to EDC at the Expiry Date, which was the delivery date of the plane, or 11 months after funding, whichever occurred earlier. *Id.* However, regular interest payments were also required. *Id.* Following the funding of this transaction, the Debtors made two interest payments to CAVIC on based on CAVIC's invoices for "financing interest" issued under Section 6.1.1 of the Plane 5 FPA. *Id.* ¶ 36.

Under the PDP Facility Agreement, CAVIC could prepay at its option so long as it was not in default and the prepayment was after the first monthly interest period. 2004 FAC ¶ 77. It is alleged that the Plane 5 FPA was a condition precedent to the effectiveness of the PDP Facility Agreement. *Id.* ¶ 36. In these documents, CAVIC agreed not to alter the terms of the Plane 5 FPA without the consent of EDC. *Id.*

Under the Plane 5 FPA, the Debtors allegedly were unconditionally obligated to repay the alleged "Plane 5 PDP Loan" advanced under the PDP Facility Agreement upon the Expiry Date, absent a default by CAVIC. 2004 FAC ¶ 79. Nevertheless, under the Plane 5 FPA, the Debtors could require CAVIC to sell them its interest in the aircraft by having it voluntarily prepay under the PDP Facility

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Agreement. *Id.* ¶ 84. If the Debtors did not do so and CAVIC did not prepay, Plane 5 would be transferred to the ZJ6000-4 ST. *Id.* ¶ 86. The ZJ6000-4 ST would then lease Plane 5 to TVPX under the terms of the Plane 5 Aircraft Lease, and TVPX would then sub-lease Plane 5 to Zetta USA under the terms of the Plane 5 Sub-Lease. *Id.* ¶ 87. The amounts owed would be rolled into the Plane 5 EDC Long-Term Finance Facility Agreement, and the Debtors would repay their obligations through quarterly rent payments under the Plane 5 Lease Agreement and Plane 5 Sub-Lease. *Id.* After 28 quarterly rent payments, the final payment of which was calculated to be for the outstanding balance owed to EDC under the Plane 5 EDC Long-Term Finance Facility Agreement, the Debtors could exercise a $100 purchase option to acquire title to Plane 5. *Id.* It is alleged that e-mail correspondence between the parties refer to this transaction as "leasing and financing," to CAVIC as the "lending" party, and to payments as a "drawdown of the Aircraft Loan." *Id.* ¶ 88.

On March 16, 2017, the ZJ6000-4 ST, as a borrower, and EDC, as a lender and security trustee, executed the Plane 5 EDC Long-Term Finance Facility Agreement. 2004 FAC ¶ 49. This agreement committed EDC to provide funding to CAVIC of up to $40.5 million, or ▮▮▮▮ of the Plane 5 purchase price, upon delivery of Plane 5. *Id.* The debt incurred under this agreement was used to calculate quarterly rent payments under the Plane 5 Lease Agreement and Plane 5 Sub-Lease. *Id.* It is alleged that the borrowings under the Plane 5 EDC Long-Term Finance Facility Agreement would allow the Debtors to roll over the alleged PDP Loan into the principal loan balance financed under the Plane 5 Lease Agreement. *Id.*

On March 25, 2017, BAC and Zetta PTE executed both a Fourth Amendment and a Fifth Amendment to the Plane 5 APA. 2004 FAC ¶ 50. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ after payment of which the parties are released from all claims against each other. *Id.* ¶ 68.

On March 31, 2017, Zetta PTE assigned certain of its rights and obligations under the Plane 5 APA to CAVIC pursuant to a March 31 Assignment executed by BAC, CAVIC, and Zetta PTE. 2004 FAC ¶ 51. On either March 30 or March 31, BAC received $30 million from CAVIC to satisfy Zetta PTE's obligation under the Plane 5 APA. *Id.* ¶ 52. On March 31, 2017, BAC, TVPX and CAVIC executed the Consent, in which BAC agreed to the Security Agreement and FPA. *Id.* ¶ 53. It is alleged that the March 31 Assignment expressly stated it was for the purpose of procuring financing for Zetta PTE's acquisition of Plane 5, and it is also alleged that the contemporaneous, corresponding transactional documents and November 2016 term sheet stated that the proposed assignment was for security. *Id.* ¶ 37.

On June 21, 2017, BAC, Zetta PTE, and CAVIC executed a Sixth Amendment to the Plane 5 APA. 2004 FAC ¶ 54.

It is alleged that CAVIC failed to perfect its security interest in the Refund under the March 31 Assignment. 2004 FAC ¶ 39. It is further alleged that BAC is currently holding the Refund, has not asserted an independent claim to the Refund, and is awaiting the adjudication of the rights of the Trustee and CAVIC to the Refund before returning it. *Id.* ¶ 40.

3.    The Li / Minsheng Transactions (Planes 6-7)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Also in December 2015, Cassidy worked with Li, later a shareholder and director of Zetta PTE, to acquire two additional Global 6000s, one of which Li had purchased earlier for Zetta PTE to operate. 6637 FAC ¶ 149. In October and November 2015, at the same time Cassidy and Fazal-Karim were negotiating letters of intent relating to Plane 1, Cassidy and Fazal-Karim were also negotiating letters of intent to purchase five to six additional Global 6000s directly from Bombardier. *Id.* ¶ 150. Cassidy informed Fazal-Karim that one of these planes would be assigned to Li. *Id.* Li and Cassidy also discussed having Zetta PTE purchase a Global 6000 (Plane 7) from Li's company, Universal Leader. *Id.* ¶ 151. Plane 7 was a used plane, although Cassidy caused the Debtors to pay the same price for both Plane 6 and Plane 7. 7572 FAC ¶ 204. Cassidy offered Li a guaranteed 10% return, which was allegedly twice the market rate for similar transactions. 6637 FAC ¶ 151.

In December 2015, Universal Leader transferred $48 million to Zetta PTE's bank account, where they were allegedly commingled with other funds belonging to Zetta PTE. 6637 FAC ¶ 152. It is alleged that there was no formal loan documentation regarding the transfer of these funds prior to when that occurred. *Id.* On December 10 and 28, 2015, respectively, Zetta PTE transferred $46.3 million and then $1 million from its Singapore account to BAC's Bank of America bank account in Texas towards the purchase of another Global 6000 (Plane 6). *Id.* ¶ 153. Although Zetta PTE paid Bombardier directly for Plane 6, the title to Plane 6 passed to Glove Assets, another company affiliated with Li, rather than Zetta PTE. *Id.*

Fazal-Karim received a ▇▇▇▇▇▇ commission from Bombardier for the Plane 6 transaction. 6637 FAC ¶ 154. On December 28, 2015, Fazal-Karim told Mattar that he was not willing to disclose his commission to Li. *Id.* ¶ 155.

On or about December 29, 2015, Cassidy, on behalf of Zetta PTE, entered into two Master Aircraft Finance Leases--the 2015 Plane 7 MAFL and the 2015 Plane 6 MAFL. 6637 FAC ¶¶ 157, 158. The 2015 Plane 7 MAFL was with Universal Leader and attached a Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreement. *Id.* ¶ 157. The purchase price for Plane 7 was $50 million. *Id.* The 2015 Plane 6 MAFL was with Glove Assets, and it was also accompanied by a Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreement. *Id.* ¶ 158. Under the terms of these agreements, the lessee was granted the full residual economic ownership of the asset, and assumed the attendant risks, at the inception of the lease in exchange for the payment of principal and interest over the lease term, including a final $20 million balloon payment due at the end of the lease. *Id.* ¶ 160.

The obligations could not be terminated by the lessee. 6637 FAC ¶ 160. However, Zetta PTE could pay off the balance early, but was required to make a prepayment penalty of 50% of the remaining interest due. *Id.* ¶ 163. Zetta PTE agreed to pay $50 million in 60 monthly installments at an effective annual interest rate of 12% including a final $20 million balloon payment at the end of the term. *Id.* ¶ 162. Annex 4 to the Supplement allocated these payments into principal and interest components. *Id.* This $50 million transaction was recorded on the Debtors' books as a loan to Zetta PTE, and Plane 6 was carried as an asset on Zetta's consolidated balance sheet. *Id.* ¶ 165. This transaction closed in Oklahoma City and the aircraft was delivered to the Debtors in Windsor Locks, Connecticut. *Id.* ¶¶ 166, 167. All the payments made by Zetta PTE were to Universal Leader's bank account at HSBC Bank in New York. *Id.* ¶ 170. The payments were denominated in U.S. dollars. 7572 FAC ¶ 178. The parties also used a United States law firm and corporate trustee. *Id.* It was further required that the planes be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

maintained at a facility in the United States. *Id.*

In February 2016, Li caused Truly Great to invest $19 million in exchange for a 10% interest in Zetta
PTE (the "First Investment"). 6637 FAC ¶ 174. Li also loaned $10 million to Zetta PTE (the "First
Loan"). *Id.* Li also became a director of Zetta PTE. *Id.* Cassidy used $20 million from Li's investment to
pay deposits and payments on the CAVIC Aircraft. *Id.*

In early March 2016, Cassidy began inquiring about purchasing a $3.4 million, 70-foot yacht called the
Dragon Pearl. 6637 FAC ¶ 175. On May 16, 2016, Cassidy signed a contract with Maritimo Offshore
Pty Ltd. to purchase the Dragon Pearl. *Id.*

4.    The Bombardier Purchase Orders (Planes 8-9)

On February 6, 2016, soon after the initial purchases and at approximately the same time as the
transfer of cash from Li's initial investment, Cassidy executed two additional APAs for two additional
Global 6000s (Planes 8 and 9). 6637 FAC ¶ 176. Much like the Plane 2-5 APAs, in these agreements,
██████████████████████████████████ *Id.* ¶ 177. ████████████████████████████
██████ *Id.* Neither Plane 8 nor Plane 9 had been delivered by the time the Debtors filed for bankruptcy.
*Id.* ¶ 178.

Fazal-Karim was entitled to additional commissions of ██████ each on Planes 8 and 9, but it is not
clear if these commissions were paid. 6637 FAC ¶ 179.

On April 8, 2016, shortly after these purchases, Cassidy had Zetta PTE transfer $100,000 to Jetcraft
Asia. 6637 FAC ¶ 180.

5.    Bombardier Gives Cassidy Tickets and Talks About Giving Him Jet Skis

On July 14, 2016, Cassidy sent an e-mail to Mattar stating that he needed two Sea-Doo jet skis, worth
approximately $42,569, delivered to Gold Coast, Australia. 6637 FAC ¶ 306. (Maritimo, the entity from
which Cassidy purchased his yacht, is located in Gold Coast, Australia. *Id.*) On July 20, 2016, Cassidy
sent an e-mail to Mattar, Fazal-Karim, Yu, and others in which he stated that he was placing them "on
formal notice" of his "intention to Cancel all orders and not take deliver[y] of [Plane 3]." *Id.* ¶ 307. On
July 21, 2016, Cassidy sent another e-mail to the same individuals again stating that he planned to
"issue termination notice[s]" with respect to the transactions between the Debtors and Bombardier. *Id.*
¶ 308. The next day, Cassidy stated that he was "not going to continue talking on all this rubbish, the
ball is in your court." *Id.* ¶ 309. In the same e-mail, he asked Mattar and Fazal-Karim to "let [Cassidy]
know on the [jet skis], otherwise I need to order one shortly." *Id.*

On July 28, 2016, Cassidy requested that Bombardier provide him with five tickets to the Singapore F1
racing event on September 16-18, 2016, whose value was approximately $43,890. 6637 FAC ¶ 310.
On July 29, 2016, a Bombardier employee told Cassidy that another company could sell him tickets. *Id.*
Less than 20 minutes later, Cassidy sent an e-mail to Mattar, Fazal-Karim, Yu, and others and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
| --- | --- | --- | --- |
| Title | In re Zetta Jet USA, Inc., et al. | | |

instructed them to cancel the purchase agreements for Planes 4, 5, 8 and 9. *Id.* ¶¶ 310-11. The Trustee contends that, if the orders had been cancelled, the Debtors would have avoided $230 million in aircraft financing obligations that they could not afford, for overpriced aircraft and, in fact, would have been entitled to a net refund of $5 million in excess prepayments. *Id.* ¶ 312. On July 30, 2016, Mattar allocated the F1 tickets to the Zetta team and stated that the Debtors would not have to pay for them. *Id.* ¶ 313.

On August 24, 2016, Cassidy followed up with Fazal-Karim regarding the two jet skis, by asking him if Mattar could take care of this issue, possibly through arranging the intermediation of Philippe Crevier ("Crevier"), a consultant paid by Zetta PTE. 6637 FAC ¶¶ 315-16. On September 7, 2016, Fazal-Karim told Mattar and Crevier that Crevier should order the jet skis and send Fazal-Karim the invoice. *Id.* ¶ 316. Fazal-Karim stated that he would "sort it out with Bombardier." *Id.* On September 14, 2016, Mattar wrote that Cassidy should buy the jet skis, bill them back to Jetcraft, and Mattar and Fazal-Karim would split the cost between them. *Id.* ¶ 318. Cassidy sent an invoice of $42,569 for the jet skis to Fazal-Karim. *Id.* ¶ 319. On September 21, 2016, Zetta PTE purchased the jet skis. *Id.* ¶ 320.

The Trustee contends that the purchase of the jet skis violated Bombardier's Code of Ethics, which states that "[e]mployees, suppliers, partners and other third parties representing Bombardier must avoid giving or receiving gifts or entertainment if these might improperly influence the recipient's judgment or might be perceived to do so." 6637 FAC ¶ 324. Elsewhere, that Code of Ethics states that "an exchange of gifts" can be appropriate when "the gifts [are] reasonable, in good taste, and have token or nominal value." *Id.* ¶ 325.

6.    <u>The Second Element Transaction (Planes 10-11)</u>

By August and September 2016, the Debtors were facing significant financial problems, and only had "breathing room" of a month and a half. 6637 FAC ¶ 181. Cassidy stated shortly before this period that he was trying to "keep[] off the wolves," *i.e.*, keep the Debtors' creditors at bay. *Id.* ¶ 182. Nevertheless, Cassidy acquired more planes from Jetcraft through Fazal-Karim and from Element. *Id.* ¶ 181. In this transaction, the Debtors purchased a Bombardier plane (Plane 10) from Orion, a Jetcraft affiliate, and agreed to lease another Bombardier plane (Plane 11) owned by Element. *Id.*

Cassidy and Fazal-Karim first discussed the purchase of Plane 10 on June 14, 2016. 6637 FAC ¶ 184. Plane 10 had previously been purchased by Orion from an unrelated third party in a transaction financed by Element. *Id.* ¶ 183. Under that contract, ██████████████████████████ ; the first such payment was due June 30, 2016. *Id.* On June 19, 2016, Element internally circulated a financing proposal for the Debtors' purchase of Plane 10 for $48.8 million. *Id.* ¶ 185. In the last week of June, Element and Fazal-Karim discussed postponing Orion's interest payments until the earlier of 90 days or the sale of Plane 10. *Id.* ¶¶ 186-87.

On August 30, 2016, Zetta PTE, through Zetta Jet 6000-1, entered into an APA with Jetcraft Global and Orion for Plane 10. 6637 FAC ¶ 188. Zetta USA agreed to guarantee the operating lease on the aircraft, and Element Aviation entered into a loan agreement with Zetta Jet 6000-1 to finance the purchase. *Id.* The transaction was completed on September 22, 2016. *Id.* ¶ 189. No down payment was made. *Id.* That day, Zetta Jet 6000-1 sent a direction of funds letter to Element Aviation, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

confirmed the advance of the loan of ▮▮▮▮▮ and authorized and directed Element Aviation to disburse ▮▮▮▮▮ to Orion. *Id.* ¶ 191.

As part of the same transaction, the Debtors allegedly also agreed to acquire Plane 11. 6637 FAC ¶ 192. Earlier drafts of the Plane 10 loan agreement included a default if the Plane 11 transaction did not close within 30 days. *Id.* Although that provision was not included in the loan agreement because both Planes closed on the same day, it is alleged that the Debtors had an understanding that a default on either of those transactions would also be a default of the loan agreement for Plane 1. *Id.*

On September 22, 2016, ECN and TVPX entered into the Plane 11 Master Lease, and TVPX, as sub-lessor, leased Plane 11 to Zetta PTE, as sub-lessee, pursuant to the Plane 11 Sub-Lease. 6637 FAC ¶ 193. The Plane 11 Master Lease and the Plane 11 Sub-Lease (the Plane 11 Finance Lease) was allegedly a finance lease rather than a true lease. *Id.* ¶ 194. The Plane 11 Finance Lease ultimately operated as the sale of Plane 11 to Zetta PTE with 84 payments of $390,000 to be made to ECN over a seven-year period, and a mandatory purchase obligation of $18.5 million at the end of the lease. *Id.* Thus, the Debtors were obligated to pay $51.3 million for Plane 11 over seven years. *Id.*

As part of this overall transaction, Jetcraft Corp. and Element Aviation entered into a Repurchase Agreement dated September 22, 2016 (the Plane 10 Repurchase Agreement). 6637 FAC ¶ 199. Under the Plane 10 Repurchase Agreement, Jetcraft Corp. agreed that if the Debtors defaulted on their obligations with respect to Plane 10, Jetcraft Corp. would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

Delivery of both Plane 10 and Plane 11 was accepted in Cahokia, Illinois. 6637 FAC ¶ 198(c). The closing for the transaction occurred in Oklahoma City. *Id.* ¶ 198(b). The parties agreed that the transaction would be governed by New York law and the relevant payments were sent through Wachovia Bank in New York. *Id.* ¶¶ 198(d), (e).

Fazal-Karim, Jetcraft Corp., and Jetcoast received $▮▮▮▮▮ in commissions and ▮▮▮▮▮ in other profits on Plane 10. 6637 FAC ¶ 197. Jetcraft Corp. also received a $▮▮▮ "broker fee" from Element for facilitating the Plane 11 transaction. *Id.*

On November 21, 2016, Behrend sent a $500,000 payment from Jetcraft Global's bank account in the Cayman Islands to Cassidy's personal bank account. 6637 FAC ¶¶ 273-74. On November 22, 2016, Behrend asked Cassidy to send her an invoice in the amount of $500,000 directed to Orion, so that she could wire him $500,000 for "services" related to Plane 10. *Id.* ¶ 275. On February 10, 2017, Fazal-Karim asked Cassidy for a revised invoice reflecting a payment of $750,000. *Id.* ¶ 279. Fazal-Karim stated that he was asking for the invoice in the event that Cassidy convinced Zetta to pay an extra $250,000 for Plane 10, in which case Fazal-Karim would "resend" that money back to Cassidy. *Id.* Cassidy sent the requested invoice on February 13, 2017. *Id.* ¶ 281. Later in February 2017, Fazal-Karim told Element that he would not provide Element with a copy of Cassidy's invoices, but would show them to Element at an in-person meeting. *Id.* ¶ 283. The payment to Cassidy was not disclosed either to the Debtors' other directors, or in the transaction documents. *Id.* ¶¶ 284-85.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The Trustee contends that this payment, which it calls the Second Kickback, was a bribe, was fraudulently concealed and disguised as a payment for undescribed "services." *See* 6637 FAC ¶¶ 284-86. The Trustee also contends that it was a payoff for continued work with Fazal-Karim and Bombardier as well as an inducement to acquire Planes 10 and 11 in the Second Element Transaction, to acquire Planes 12-15 in the Challenger Transactions, and to accept delivery of Plane 3 and others rather than cancel the contracts as Cassidy expressly had threatened to do. *Id.* ¶ 271.

7.     <u>The Minsheng Refinancing and Challenger Transactions (Planes 12-15)</u>

Contemporaneously with the Second Element Transaction, Cassidy began working to refinance Planes 6 and 7. 6637 FAC ¶ 200. At this time, Zetta PTE was unable to make the payments required by the leases for Planes 6 and 7 and by the First Loan from Li. *Id.* ¶ 201.

In June 2016, Cassidy approached Li about refinancing Zetta PTE's purchase of Planes 6 and 7. 6637 FAC ¶ 203. In a June 28, 2016 e-mail, Cassidy informed Li that Minsheng had agreed to refinance both planes by purchasing them for a total of $80 million. *Id.* Cassidy told Li that the proceeds from this $80 million refinance would provide capital to Zetta PTE that could be used to purchase additional planes. *Id.* Cassidy described himself and Li as "partners" and "the priority over the banks." *Id.* Of the $80 million in proceeds, $55 million would cover the full principal balance owed under the 2015 Plane 7 Finance Lease plus $8.6 million of the $10.5 million termination fee. *Id.* ¶ 204. The remaining $1.9 million of the termination fee would be added to an unsecured loan along with the full principal balance owed under the 2015 Plane 6 Finance Lease. *Id.* Of the remaining $25 million in proceeds, Zetta PTE was to receive $12.6 million and was to use the remaining $12.4 million to make initial payments on four Bombardier Challenger 650 planes (Planes 12-15) from Bombardier. *Id.* Specifically, $6,852,560 was to be applied towards the purchase of Plane 12 (consisting of an upfront fee in the amount of $602,560, a security deposit in the amount of $870,000, and a down payment in the amount of $5,380,000) and $5,557,680 was applied towards the purchase of Planes 13-15. *Id.* ¶ 221.

In the same exchange, Li requested that, if Zetta PTE was unable to repay its debts as they became due, Cassidy and Zetta PTE give preference to Li over AVIC and Minsheng. 6637 FAC ¶ 205. Li also requested that, if in the future Zetta Jet had profits to share, Li and Cassidy should get an additional share of them. *Id.* ¶ 206. Cassidy did not disclose these positions to the other directors. *Id.* ¶ 208. Cassidy allegedly told the other directors that Li had agreed to lower the monthly payments on the loan, when in fact, Cassidy allegedly accepted the terms that Li had required. *Id.* ¶ 209. Cassidy also allegedly understated to the other directors the monthly payments due on Planes 6 and 7. *Id.* ¶ 210. Cassidy allegedly did not disclose that he needed immediate funds to pay for a yacht, or that he would take at least $2.66 million from the proceeds of the Minsheng Refinancing. *Id.* ¶ 213.

On July 19, 2016, Zetta PTE received another $10 million from Universal Leader (the "Second Loan"). 7572 FAC ¶ 247. The alleged terms of the Second Loan were as follows: Universal Leader would loan Zetta PTE $10 million for a term of three months at an interest rate of 10%; and Universal Leader and Cassidy would have a "priority profit share" in which Cassidy and Universal Leader would share the first 10% of profits for 2016, 2017, and 2018. *Id.* If repayment of either the First Loan or Second Loan was delayed, the profit split between Cassidy and Universal Leader would be increased each month by 1%. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

On August 12, 2016, Cassidy and Li caused Zetta PTE to enter into the August 2016 Plane 7 Purchase Agreement with Universal Leader. 7572 FAC ¶ 250. As described above, the new purchase price in this agreement was $55 million. *Id.* In the same month, Universal Leader and Zetta PTE entered the August 2016 Plane 6 Purchase Agreement, which provided for a purchase price of $48,423,839.69. *Id.* ¶ 251.

On September 20, 2016, the parties entered new sale and leaseback agreements for Plane 6 and Plane 7 (the "Plane 6 SLB Agreement" and "Plane 7 SLB Agreement"). 7572 FAC ¶ 253. Under these agreements, Wells Fargo, on behalf of Yuntian 3, purchased the interests of Glove Assets and Universal Leader (also held by Wells Fargo) in Planes 6 and 7. *Id.* ¶ 254. Simultaneously, Wells Fargo entered into aircraft lease agreements with TVPX (the "2016 Plane 6 Lease Agreement" and "2016 Plane 7 Lease Agreement"), in which the airplanes were subleased to Zetta USA (the "Plane 6 Sub-Lease" and the "Plane 7 Sub-Lease"). *Id.* ¶¶ 258, 262. These agreements provided that the Debtors could purchase the airplanes on the last day of the lease for the nominal sum of $1. *Id.* ¶ 259. The Debtors could not terminate their obligation to make rent payments absent exercise of the $1 purchase option or a total casualty loss of the aircraft. *Id.* ¶ 260. The Debtors were responsible for all the operational costs of the aircraft, as well as insurance, maintenance and other costs. *Id.* ¶ 263.

The Trustee contends that Li and Cassidy only intended to pay off the 2015 Plane 7 Finance Lease through the Minsheng Refinance. 7572 FAC ¶ 264. The Trustee argues that Li and Cassidy intended to leave the amount allegedly due and owing on Plane 6 under the August 2016 Plane 6 Purchase Agreement on Zetta PTE's books as a general unsecured loan (the "Plane 6 Loan"). *Id.* Thus, on September 20, 2016, the parties also entered into the Plane 6 Clarification. *Id.* ¶ 265. This document provided that Zetta PTE still had to repay the Plane 6 Loan, plus interest, to Glove Assets notwithstanding both the Minsheng Refinancing and that Plane 6 was never sold or delivered to Zetta PTE. *Id.*

Also on September 20, 2016, Zetta PTE and Zetta USA executed the Guarantee. 7572 FAC ¶ 267. In that agreement, Zetta PTE, Zetta USA, Cassidy and Asia Aviation guaranteed the obligations under the 2016 Plane 6 and 7 Lease Agreements. *Id.*

The Minsheng Refinancing closed on September 21, 2016. 6637 FAC ¶ 216. The closing occurred through an escrow agent in Oklahoma City. 7572 FAC ¶ 269. The signature pages were released in Oklahoma City and registered with the FAA in the same location. *Id.* ¶ 270. The parties required that all funds transferred at closing be held by Insured Aircraft Title Service ("IATS"), which is located in Oklahoma City, in its bank account at a Bank of America location in New York City. *Id.* ¶ 272. After the release of the signature pages, IATS initiated wire transfers from the Bank of America closing account to Universal Leader's New York bank account, to Minsheng through US Bank and to Zetta PTE through HSBC USA. *Id.* ¶ 273.

At closing, $12,410,240 was disbursed to Minsheng Business to pay deposits on Planes 12-15. 7572 FAC ¶ 299. Specifically, $6,852,560 was applied towards the purchase of Plane 12, and $5,557,680 was applied towards the purchase of Planes 13-15, which were never delivered. *Id.*

The day after closing, Cassidy took $3.66 million from Zetta Jet, characterizing the payment as a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"Director Fee," and deposited the funds into his personal bank account. 6637 FAC ¶ 216. Of this $3.66 million, $1 million was allegedly due and payable to Cassidy and his wife for their ultimate ownership of equity in Asia Aviation, an entity that the Trustee contends was worthless. *Id.* The Trustee contends that Cassidy could offer no justification for taking the remaining $2.66 million, and that Cassidy fabricated invoices to conceal his improper taking of these funds. *Id.* On September 27, 2016, less than one week after the Minsheng Refinancing closed, Cassidy took $607,084 out of the closing proceeds and made a payment on the Dragon Pearl. *Id.* ¶ 217. On September 30, 2016, he also transferred $336,030 from Zetta PTE's bank account to pay for a deposit on his condominium in Singapore. *Id.* The Trustee alleges that Cassidy's true purpose in promoting the Minsheng Refinancing was to prolong his aircraft debt and misappropriate the Debtors' funds. *Id.* ¶ 219. The Trustee also contends that Cassidy misappropriated an additional $2 million in Debtor funds by purchasing luxury goods, luxury cars, expensive vacations and other personal items. 7572 FAC ¶ 126.

On October 26, 2016, Zetta PTE purchased Plane 12 through an alleged finance lease structure. 7572 FAC ¶ 302. On that date, Yuntian 4, using Wells Fargo as a trustee, entered into an Aircraft Lease Agreement (the "Plane 12 Aircraft Lease"), with TVPX acting as a trustee for the Debtors. *Id.* TVPX then sub-leased Plane 12 to Zetta USA pursuant to an Aircraft Sub-Lease Agreement that was dated the same day (the "Plane 12 Sub-Lease"). *Id.* Zetta USA then operated Plane 12. *Id.* The Trustee contends that the Plane 12 Aircraft Lease is a "finance lease" for the same reasons as the leases used for Planes 6 and 7. *Id.* ¶ 303. The Plane 12 Aircraft Lease notes that the debt encumbering the plane is a "first priority New York mortgage and security agreement . . . which shall be registered with the FAA." *Id.* ¶ 306. Also on October 26, Zetta PTE and Zetta USA executed the Challenger Guarantee, pursuant to which the Debtors, Cassidy, and Asia Aviation guaranteed all the obligations under the Plane 12 Aircraft Lease and the other agreements at issue. *Id.* ¶ 304. The Guarantee was executed in Burbank, California. *Id.* ¶ 305. As before, the signature pages of the Plane 12 Aircraft Lease and related agreements were released from Oklahoma City and immediately filed with the FAA in that city. *Id.* ¶ 308. During the transaction, funds were moved from a Bank of America account in Oklahoma City to another bank account in the U.S. *Id.* ¶ 311.

Fazal-Karim negotiated the sales of Planes 12-15, and he was entitled to receive approximately ███ ███ in total commissions. 6637 FAC ¶¶ 222-23. The Trustee does not know if these commissions were paid. *Id.*

### 8. Cassidy and Fazal-Karim's Yacht Transactions

In early 2017, Cassidy and Fazal-Karim planned to begin a new business venture through which they would purchase a yacht from G-Yachts and operate charters. 6637 FAC ¶ 327. Ultimately, they targeted a 121-foot superyacht, originally called the Tosca, which was later renamed the Nyota by Fazal-Karim's wife. *Id.* Fazal-Karim purchased the Nyota. *Id.* ¶ 328. Cassidy and Fazal-Karim agreed that Fazal-Karim would pay for the Nyota and Cassidy would later pay for half of the purchase price. *Id.* It is alleged that Cassidy never paid his portion. *Id.*

It is also alleged that Fazal-Karim used his various companies and assets interchangeably during the transaction. 6637 FAC ¶ 329. On February 7, 2017, an employee of the yacht company sent Cassidy and Fazal-Karim an e-mail with an attached invoice to FK Partners for 10% of the purchase price on the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Nyota, after Fazal-Karim asked him to direct the invoice to FK Partners rather than FK Group. *Id.* ¶ 330.

Cassidy and Fazal-Karim used Philippe Crevier, a consultant paid by Zetta PTE and who used a Zetta PTE e-mail address and signature block, to work with a service company to help register a new Maltese company to manage the yacht. 6637 FAC ¶ 331. On February 13 and 14, 2017, Crevier, using his Zetta e-mail address, contacted a G-Yachts employee, and copied Fazal-Karim and others. *Id.* ¶ 332. Crevier confirmed that Cassidy would be listed as a director and shareholder of the entity that would own the Nyota "under his personal name." *Id.* No one suggested that Cassidy was entering the transaction on behalf of the Debtors. *Id.* On February 22, 2017, Cassidy sent an e-mail to a G-Yachts employee, with a copy to Fazal-Karim, stating that the Nyota would be listed on the Debtors' insurance policy for the "plane fleet," as Cassidy had done with the Dragon Pearl. *Id.* ¶ 333.

On June 1, 2017, Nicholas Houseman ("Houseman") of GSM Capital sent an e-mail to Cassidy with an attached invoice on behalf of FK Partners to "Geoff Cassidy" for 50% of the price of the Nyota. 6637 FAC ¶ 334. Houseman directed Cassidy to send the funds to an FK Partners account. *Id.* The same day, Fazal-Karim asked Cassidy to send the funds to his "Swiss account" rather than "Singapore." *Id.* Cassidy agreed to send the funds in euros to Switzerland as requested. *Id.* On June 2, 2017, Cassidy asked Fazal-Karim about Jetcraft paying for the two Sea-Doos described above. *Id.* ¶ 335. Fazal-Karim replied as follows: "Jetski has nothing to do with Jetcraft. You can offset jet ski on the boat. It is personal. The invoices to Jetcraft need to be settled for accounting purposes." *Id.* The Trustee alleges that the "boat" was the Nyota, that Fazal-Karim knew the payment for the Sea-Doos for Cassidy would cause issues for Jetcraft's accounting, and requested that Cassidy deduct the amount Fazal-Karim owed for the Sea-Doos from the amount Cassidy owed on the Nyota. *Id.*

The Trustee alleges that Cassidy did not disclose this transaction to the Debtors and that, even after he was removed from the Board of Directors of the Debtors, Cassidy misrepresented his involvement with the Nyota, stating that he had only been on the yacht as a guest. 6637 FAC ¶ 340.

The Trustee further alleges, on information and belief, that the Nyota was sold in August 2020 for approximately 3.5 million euros. 6637 FAC ¶ 339.

9.    Li's Third Investment

In June 2017, at about the same time as the yacht transactions by Cassidy and Fazal-Karim, Zetta PTE needed more capital to fund its day-to-day operations. 7572 FAC ¶ 318. Seagrim, Walter, and Cassidy urged Li to make an additional loan, warning him that Zetta PTE would fail without it. *Id.* On June 12, 2017, Cassidy wrote Li a letter confirming a "shareholder loan" in the amount of $15 million and stating that the "loan" would be "interest free on the condition that new investors are brought in under the agreement with BNP Paribas." *Id.* ¶ 319. The negotiations continued after June 12, and during that time, Li stated that he would need additional shares in exchange for the $15 million he was providing. *Id.* ¶ 320. Walter and Seagrim allegedly transferred shares totaling 20% of Zetta PTE's stock to Truly Great in exchange for the $15 million capital infusion (the "Third Investment"). *Id.* ¶ 321. The Trustee contends that this transaction was an equity investment rather than a true loan. *Id.* ¶ 322. On June 27, 2017, Universal Leader transferred $15 million to Zetta PTE's HSBC bank account. *Id.* ¶ 323.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

10.    <u>The Falconwing Transaction (Plane 16)</u>

By August 2017, the Debtors were experiencing further financial distress. At this time, Cassidy stated in writing that the Debtors were "unable to provide security that [they could] fulfill [their] obligations over time." 6637 FAC ¶ 224.

As part of the Second Element Transaction, Zetta PTE was obligated to make a payment of $5 million to Element Aviation on or before December 1, 2016 (the Element Obligation), and Jetcraft Corp. had entered into the Plane 10 Repurchase Agreement under which it guaranteed that payment. 6637 FAC ¶ 225. Zetta PTE was unable to pay the Element Obligation by December 1, 2016, and also had missed payments due on Planes 1, 10 and 11. *Id.* ¶ 226. Element threatened a default on all three planes. *Id.* Zetta PTE and Element Aviation tolled the deadline to February 28, 2017, but Zetta PTE then missed that deadline as well. *Id.*

On June 14, 2017, Fazal-Karim sent an e-mail to O'Keefe and Bergeron, both employees of Element, informing them that he was going to meet with Cassidy. 6637 FAC ¶ 227. Fazal-Karim asked Element to defer issuing a default notice to Zetta PTE for repeated failure to pay the Element Obligation. *Id.* At that time, Cassidy was working on an agreement to pay off the Element Obligation through a transaction to purchase a Bombardier Global 6000 (Plane 16) from Falconwing Limited ("Falconwing"), which was owned by Fok Kin Canning ("Fok") and Wu Kebo ("Wu"). *Id.* ¶ 228. The contemplated purchase price was $11 million, to be paid in the form of 1500 block hours. *Id.*[5] It was anticipated that Plane 16 would be resold to Jetcraft Global for ▮▮▮▮▮▮, of which $5 million would be used to pay off the Element Obligation. *Id.* In light of this potential transaction, in an e-mail on June 20, 2017, Element agreed to defer action on the default, and on June 30, 2017, again continued the deadline for the Element Obligation to the earlier of the sale of Plane 16 or July 31, 2017. *Id.* ¶ 229. This transaction was eventually consummated in early August 2017. *Id.* ¶ 230. In addition, Zetta PTE and Jetcraft Global entered into a Side Letter Agreement on August 9, 2017, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* At this time, Fazal-Karim had entered into one LOI and had received another LOI to re-sell Plane 16 at ▮▮▮▮▮▮ *Id.*

Cassidy stated to Seagrim and Walter that the transaction was necessary to secure immediate cash so the Debtors could fulfill their obligations. 6637 FAC ¶ 232. Cassidy also stated that Debtors needed to offer 1500 block hours or Falconwing would not sell Plane 16, fearing that the Debtors were at risk of defaulting on their obligations. *Id.* The Trustee alleges that the true purpose of the transaction was to benefit Element and Fazal-Karim by paying down $5 million of the outstanding amount and thereby decrease the amount Jetcraft Corp. would owe under the Plane 10 Repurchase Agreement. *Id.* ¶ 231.

The Falconwing Transaction closed on August 15, 2017. 6637 FAC ¶ 233. On that day, Jetcraft Corp. transferred ▮▮▮▮▮▮ from its Bank of America account in North Carolina to the Oklahoma bank account of IATS, which was acting as the escrow agent. *Id.* IATS then transferred $5 million to Element at the direction of the Debtors. *Id.*

On September 5, 2017, after Cassidy had been removed from his position and 12 days before the

---

[5] The term "block hours" refers to the right to utilize an aircraft for a given period of time.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Debtors filed for bankruptcy, Cassidy sent an e-mail to O'Keefe of Element and Fazal-Karim stating that his "last deed at Zetta" was to get them $5 million; he then thanked them for their "time and assistance in closing that saga out." 6637 FAC ¶ 234. Cassidy also warned Fazal-Karim and Element that the Debtors were insolvent and advised them to "cover [their] position." *Id.* ¶ 235.

On December 28, 2017, Jetcraft Global entered into a contract to sell Plane 16 to Thorney Alpha Pty Ltd for ▓▓▓▓▓▓. 6637 FAC ¶ 236. The Trustee contends that, after the deduction of costs, Zetta PTE was entitled to $387,500.48 under the Side Letter Agreement. *Id.* Jetcraft Global has not paid the amounts the Trustee contends are due and owing under the Side Letter Agreement. *Id.*

> 11.    The Relationship Between Fazal-Karim and Mattar

Throughout the transactions described above, Fazal-Karim made certain related payments to Mattar. 6637 FAC ¶ 294. The Trustee has a spreadsheet reflecting a ▓▓▓▓▓ payment for Planes 1 and 6, an ▓▓▓▓▓▓ payment for Planes 2-5, and payments totaling ▓▓▓▓▓ for Planes 12-15. *Id.* ¶ 293. As to the payments related to Planes 2-5 and 12-15, the amounts were exactly ▓▓▓▓ of the amount of Fazal-Karim's commissions for those planes. *Id.* The spreadsheet also contains an entry reflecting an agreement to pay ▓▓▓▓ related to Planes 8-9, which is ▓▓▓▓ of Fazal-Karim's promised commission, but it does not show a payment received. *Id.* The Trustee argues that the spreadsheet shows Mattar was aware of the First Kickback. *Id.* ¶ 295. The Trustee also argues that Mattar has destroyed documents relevant to his alleged misconduct. *Id.* ¶¶ 297-303.

> E.    The Overpricing Allegations

The Trustee contends that each of the planes was significantly overpriced. 6637 FAC ¶ 342. The 6637 FAC cites, without further specificity, "expert analysis of publicly available valuations of similar planes from three sources as well as specific transactions involving substantially similar planes during the relevant time frame" and "further expert analysis from the perspective of the value provided to the Debtors' estates . . . ." *Id.* ¶¶ 343, 345. The purchase price for each plane, along with the fair market value and estate value identified by the Trustee, are summarized in the following table. *Id.* ¶¶ 344-45.

| Plane | Purchase Price | Alleged Fair Market Value | Alleged Estate Value |
|---|---|---|---|
| Plane 1 | ▓▓▓▓▓ | $35,700,000 | $29,300,000 - $31,600,000 |
| Plane 2 | ▓▓▓▓▓ | $37,400,000 | $29,600,000 - $33,900,000 |
| Plane 3 | ▓▓▓▓▓ | $37,400,000 | $28,500,000 - $32,900,000 |
| Plane 4 | ▓▓▓▓▓ | $35,700,000 | $16,864,168 - $21,364,168 |
| Plane 6 | $50,000,000 | $39,000,000[6] | $21,300,000 - |

---

[6] In the 7572 FAC, the Trustee alleges that the fair market value of this aircraft is $35.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 288.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

| | | | $27,300,000[7] |
|---|---|---|---|
| Plane 7 | $50,000,000 | $37,600,000[8] | $21,300,000 -<br>$27,300,000[9] |
| Plane 10 | ██████████ | $37,400,000 | $18,500,000 -<br>$23,000,000 |
| Plane 11 | ██████████ | $30,400,000 | $11,647,222 -<br>$14,447,222 |
| Plane 12 | ██████████ | $21,375,000 | Not Stated |

The Trustee contends that the Debtors overpaid for the planes because Cassidy failed to engage in a competitive bidding process with other private luxury jet manufacturers, and took this course due to bribes and kickbacks he received. 6637 FAC ¶ 346. The Trustee also contends that Cassidy failed to negotiate prices with Bombardier and Jetcraft, and instead paid "full retail in a buyer's market." *Id.* ¶ 347. The Trustee also contends that Cassidy failed to seek quantity discounts from Jetcraft or Bombardier, notwithstanding that it is common in the industry to provide discounts when several planes are purchased at the same time. *Id.* ¶ 348.

The Trustee also contends that Planes 1 and 10 were purchased by Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion at significantly lower prices, and then resold to the Debtors shortly thereafter. 6637 FAC ¶ 349. Plane 1 was purchased by Jetcoast at ██████████ *Id.* ¶ 350. It was then sold to the Debtors about two months later for a base purchase price of ██████████, plus $1.855 million in upgrades, and a $2 million security deposit, for a total purchase price of ██████████. *Id.* ¶ 355. Plane 10 was purchased by Orion for ██████████. *Id.* ¶ 358. However, it was sold to the Debtors nine months later for ██████████. *Id.* ¶ 359.

       F.     Zetta PTE Files for Bankruptcy

In mid-2017, during preparations for Zetta PTE's first, statutorily mandated audit, Zetta PTE's CFO began asking questions about the $2.66 million Cassidy received following the Minsheng Refinancing. 6637 FAC ¶ 361. Cassidy allegedly falsified two invoices to cover up his alleged embezzlement. *Id.* Zetta PTE's CFO later resigned during the audit. *Id.*

On August 12, 2017, Walter sent the Zetta PTE Board of Directors and the Debtors' new CFO an e-mail stating that "Zetta has been operating without proper financial controls," noting that the CFO leaving in mid-audit was a "BIG RED FLAG," and accusing Cassidy of "managing a **Ponzi scheme**." 6637 FAC ¶ 362. In a follow-up e-mail later that day, Walter also noted that Cassidy's presentation to a French investment bank overstated the value of the Debtors' aircraft by $150 million, which Walter twice called another "**MASSIVE RED FLAG**." *Id.* Walter demanded that Cassidy "prove to us that Zetta is not a Ponzi scheme." *Id.*

---

[7] In the 7572 FAC, the Trustee alleges that the estate value of this aircraft is between $22.7 million and $28.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 288.

[8] In the 7572 FAC, the Trustee alleges that the fair market value of this aircraft is $35.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 286.

[9] In the 7572 FAC, the Trustee alleges that the estate value of this aircraft is between $22.7 million and $28.7 million, at least at the time of the Minsheng Refinancing. 7572 FAC ¶ 286.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

On August 17, 2017, the Zetta PTE Board of Directors held a meeting in Hong Kong. 6637 FAC ¶ 363. Seagrim, Walter and Li voted to suspend Cassidy and Tang. *Id.* On August 22, 2017 they were removed from the board and their other roles at the Debtors. *Id.*

At the time Cassidy was removed, he was preparing a Second Business Plan to entice new investors. 7572 FAC ¶ 140. The Trustee contends that the last draft of the Second Business Plan included materially false statements, underestimating the amount of capital the Debtors would need to make the required payments on the planes that had already been ordered, overstating the Debtors' revenues and profits, overvalued the Debtors' fleet of planes, and stating that the Debtors were not involved in any pending or threatened legal proceedings. *Id.* ¶¶ 141-45.

On September 8, 2017, the Debtors filed a civil action against Cassidy in the United States District Court for the Central District of California. 6637 FAC ¶ 364. On September 15, 2017, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. *Id.* ¶ 365.

On November 30, 2017, the Trustee shut down the Debtors' operations and terminated all employees due to a lack of funds to operate the business. 6637 FAC ¶ 366. On December 4, the Debtors' Chapter 11 cases were converted to Chapter 7 cases. *Id.*

On September 27, 2017, BAC asserted before the Bankruptcy Court that the Plane 5 APA was an executory contract between BAC and Zetta PTE and that Zetta PTE should be compelled to assume or reject it by a date certain. 2004 FAC ¶ 55. This matter was later resolved by a stipulation. *Id.* ¶¶ 58-59.

On December 20, 2017, the Trustee moved to reject the Plane 5 APA, terminating the Debtors' future obligations under the Plane 5 APA. 2004 FAC ¶ 60. On January 25, 2018, the Bankruptcy Court granted the Trustee's motion. *Id.* ¶ 61. On April 24, 2018, BAC and CAVIC filed proofs of claim relating to the Plane 5 APA and, in the case of CAVIC, the March 31 Assignment. *Id.* ¶¶ 64-65.

Li, via Universal Leader and Glove Assets, also filed proofs of claim in these Chapter 7 cases. 7572 FAC ¶ 332. Yuntian 3 and Yuntian 4 also filed proofs of claim. *Id.*

### III. Legal Standards

#### A. Standard of Review

In an appeal from an order of a bankruptcy court, conclusions of law are reviewed de novo and findings of fact are reviewed for clear error. *Blausey v. U.S. Tr.*, 552 F.3d 1124, 1132 (9th Cir. 2009) (citing *In re Salazar*, 430 F.3d 992, 994 (9th Cir. 2005)). The clear error standard is "significantly deferential, requiring a definite and firm conviction that a mistake has been committed before reversal is warranted." *United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008) (internal quotation marks omitted). A "district court may affirm on any ground supported by the record." *Thrifty Oil Co. v. Bank of America, Nat'l Trust and Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003); *In re DeMasi*, 227 B.R. 586, 587 (D.R.I. 1998) ("[The] Court is not bound to remain within the confines of the Bankruptcy Court's reasoning for its decision, but is free to affirm the decision below on any ground supported by the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

record.").

A bankruptcy court's dismissal of an action for failure to state a claim is reviewed *de novo*. *In re Turner*, 859 F.3d 1145, 1148 (9th Cir. 2017). A bankruptcy court's decision to deny leave to amend is reviewed for abuse of discretion, but whether leave to amend would be futile is reviewed *de novo*. *Id.* "A bankruptcy court abuses its discretion if it applies an incorrect legal standard or misapplies the correct legal standard or its factual findings are illogical, implausible, or without support from evidence in the record." *In re Aykiran*, BAP No. NC-21-1134-TFG, 2022 WL 214816, at *3 (B.A.P. 9th Cir. Jan. 25, 2022).

Whether a plaintiff has Article III standing is a question of law that is reviewed *de novo*. *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002). Denial of a motion to consolidate is reviewed for abuse of discretion. *Cf. May v. Bennett*, 122 F.3d 1072 (Table), 1997 WL 537502 (9th Cir. 1997) (reviewing district court's consolidation order for abuse of discretion). Denial of a motion to require a deposit in an interpleader matter may also be reviewed by a district court. *See Am. Gen Life Ins. Co. v. Eisenhauer*, Case No. ED CV 15-00412-VAP (KKx), 2015 WL 13039439, at *3 (C.D. Cal. May 7, 2015).

        B.     Motion to Dismiss

Fed. R. Civ. P. 12(b) "applies in adversary proceedings" in bankruptcy court. Fed. R. Bankr. P. 7012(b).

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must state facts sufficient to show that a claim for relief is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

A party may move to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). "Dismissal . . . is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support [one]." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citation omitted), allowing leave

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

**IV.** **The 7572 Appeal**

The Trustee challenges the order of the Bankruptcy Court dismissing with prejudice three groups of claims: (1) the avoidance claims, which are the first and second causes of action; (2) the recharacterization claims, which are the sixth, eighth, and ninth causes of action; and (3) the disallowance claim, which is the tenth cause of action.

      A.    The Avoidance Claims (First and Second Causes of Action)

The Bankruptcy Court dismissed the avoidance claims with prejudice because it determined that § 548 does not apply extraterritorially, and that all of the relevant conduct was there. The Bankruptcy Court also rejected the Trustee's argument that, because the 7572 Appellees filed proofs of claim, all aspects of the relevant transactions are subject to federal bankruptcy law with an extraterritorial application of § 548 permitted.

      1.    Whether § 548 Applies Extraterritorially

"United States law governs domestically but does not rule the world." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)). "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). As a result, the presumption against extraterritoriality bars non-domestic application of a statute unless "Congress has affirmatively and unmistakably instructed that the statute will do so." *Id.* (citing *Morrison*, 561 U.S. at 261). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* (quoting *Morrison*, 561 U.S. at 255). However, "an express statement of extraterritoriality is not essential" and "[c]ontext" has occasionally been "dispositive." *Id.* at 340.

The Supreme Court has adopted a "two-step framework for analyzing extraterritoriality issues." *Nabisco*, 579 U.S. at 337. "At the first step, [courts] ask whether the presumption against extraterritoriality has been rebutted--that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* "If the statute is not extraterritorial, then at the second step [courts] determine whether the case involves a domestic application of the statute, and [courts] do this by looking to the statute's 'focus.' " *Id.* "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

The statute at issue provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--(A) made such

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) [certain other conditions apply]." 11 U.S.C. § 548(a)(1).

The Trustee contends that this provision must be read in conjunction with 11 U.S.C. § 541(a)(1), which provides that a debtor's "estate is comprised of all the following property, wherever located and by whomever held: . . . all legal or equitable interests of the debtor in property as of the commencement of the case." The estate also includes "[a]ny interest in property that the trustee recovers under" various provisions of the Bankruptcy Code. 11 U.S.C. § 541(a)(3).

Courts have reached different outcomes as to whether § 548 applies extraterritorially. The two leading cases are *French* and *Midland Euro*. In *French*, the Fourth Circuit concluded that "creditors are entitled to the 'interests of the debtor in property' under § 541--expressly including all property 'wherever located'--and that they may avoid a debtor's fraudulent transfer of the same 'interest[s] of the debtor in property' under § 548." *In re French*, 440 F.3d 145, 152 (4th Cir. 2006). As *French* then explained, "Congress thus demonstrated an affirmative intention to allow avoidance of transfers of foreign property that, but for a fraudulent transfer, would have been property of the debtor's estate." *Id.*

*Midland Euro* noted that "[n]othing in the text of § 548 indicates congressional intent to apply it extraterritorially." *In re Bankr. Est. of Midland Euro Exch. Inc.*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006). *Midland Euro* also rejected the interpretation of § 541 in *French* stating that "[t]he majority of the courts have concluded that property held by third-party transferees only becomes 'property of the estate' after the transfer has been avoided." *Id.* (collecting cases). *Midland Euro* also recognized that the holding in *French* was premised on the assumption "that the debtor retains a 'legal or equitable' interest in the property transferred pre-petition, or to paraphrase, that 'property of the estate' includes property transferred but not yet recovered." *Id.* at 719. *Midland Euro* added that *French* had "ignore[d]" the language of § 541(a)(3). *Id.*

Under § 541(a)(1), the property of the estate includes property interests when "the debtor [has] an interest in the property 'as of the commencement of the case' . . . ." *Id.* at 719. Under § 541(a)(3), the property of the estate also "includes any interest in property that the trustee *recovers* . . . ." *Id.* (emphasis added). If interests in property are part of the estate under § 541(a)(1) even before they are recovered, then § 541(a)(3) would be redundant. Reading these two provisions together, property that was fraudulently transferred but not recovered is not part of the estate at the commencement of the case. According to *Midland Euro*, *French* "violate[d] [the] maxim of statutory interpretation that holds that the court should attempt to give meaning and effect to every word, clause and section of a statute." *Id.*

Some cases have disagreed with *Midland Euro*. *Lyondell* held that "fraudulently conveyed property does not become property of the estate until it has been recovered" but dismissed this distinction as "just a matter of timing." *In re Lyondell Chem. Co.*, 543 B.R. 127, 153 (Bankr. S.D.N.Y. 2016). Indeed, *Lyondell* held that "sections 541(a)(1) and (a)(3) were speaking as of different times" and rejected the proposition that "property not in the estate as of the commencement of the case cannot be brought into the estate because it is in a foreign locale." *Id.* at 153-54. *Lyondell* stated that it was "hard to believe

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

that Congress intended for the Code to apply extraterritorially with respect to property of the estate, but not to apply extraterritorially with respect to what would have been property of the estate but for a fraudulent transfer." *Id.* at 154. Similarly, *Madoff* held that "[i]n *French*, extraterritorial application of Section 548 was not premised on fraudulently transferred assets constituting actual property of the estate prior to recovery" because "Section 548's reference to Section 541 expressed congressional intent to grant the Trustee authority to avoid and recover *all transfers* that, but for a fraudulent transfer, would have been property of the estate, even if not currently property of the estate." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Madoff*"), 480 B.R. 501, 528 (Bankr. S.D.N.Y. 2012).

The Trustee also argues that the holding of the Bankruptcy Court was inconsistent with *Begier v. I.R.S.*, 496 U.S. 53 (1990). There, the Supreme Court held that, "[b]ecause the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate--the property available for distribution to creditors--'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier*, 496 U.S. at 58. The Supreme Court used § 541 as "guidance" for defining the phrase "property of the debtor" in the preferential transfer statute. *Id.* at 58-59. However, *Begier* did not present issues as to extraterritoriality and, accordingly, did not address the strong presumption against its application.

In reviewing this issue, most courts have agreed with *Midland Euro*. *See, e.g.*, *In re CIL Ltd.*, 582 B.R. 46, 89-92 (Bankr. S.D.N.Y. 2018), *amended on other grounds on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) (rejecting *Lyondell* on the grounds that, although § 541(a)(3) might be viewed as giving rise to a mere "timing" problem, Congress knows how to place foreign transactions within the jurisdictional reach of a statute; and distinguishing *Begier* because it was not an extraterritoriality case); *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (rejecting *French* and its progeny because "[p]roperty transferred to a third party prior to bankruptcy in payment of an antecedent debt is neither property of the estate nor property of the debtor at the time the bankruptcy case is commenced, the only two categories of property mentioned in Bankruptcy Code § 541(a)(1)"; and distinguishing *Begier* because "[t]he Supreme Court read section 541(a) as a limitation on the trustee's avoiding powers, not as an expansion of those powers"); *In re Sherwood Invs. Overseas Ltd., Inc.*, No. 15-CV-1469-ORL-40TBS, 2016 WL 5719450, at *11 (M.D. Fla. Sept. 30, 2016) (the position adopted in *French* "ignores the remainder of § 541's text--notably, a subsection which limits property of the estate to property *recovered* as a fraudulent transfer"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 230 n.2 (S.D.N.Y. 2014), *supplemented*, No. 12-MC-115 JSR, 2014 WL 3778155 (S.D.N.Y. July 28, 2014), *rev'd on other grounds sub. nom. In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019) (rejecting *French* because it relied "on a notion that the foreign property 'would have been property of the debtor's estate' absent a fraudulent transfer," which the court concluded was incorrect); *see also In re Maxwell Commc'n Corp. plc* ("*Maxwell I*"), 186 B.R. 807, 819 (S.D.N.Y. 1995), *aff'd sub nom. In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036 (2d Cir. 1996) ("[N]othing in the language or legislative history of § 547 expresses Congress' intent to apply the statute to foreign transfers.").

The majority position is the more persuasive one for several reasons. *First*, although § 541 and § 548 contain similar language and are addressing similar issues, the phrase defined in § 541, which is "property of the estate," is not used anywhere in § 548. For this reason, it is of limited value in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

interpreting § 548. Even if § 541 provides "guidance" in interpreting § 548 as it does in interpreting § 547, the presumption against extraterritoriality requires "a clear, affirmative indication that [a given statute] applies extraterritorially." *Nabisco*, 579 U.S. at 337.

*Second*, as noted in *Midland Euro* and cases that have adopted its analysis, the interpretation in *French* of § 541 renders § 541(a)(3) surplusage. As *Lyondell* points out, property that would be part of the estate had it not been fraudulently transferred may eventually be recovered and become part of the estate--but only if the Trustee meets its burden to prove each of the elements specified in § 548. Because recovery of an alleged fraudulent transfer is not guaranteed, it is incorrect to call the distinction raised in *Midland Euro* "just a matter of timing." *See Lyondell*, 543 B.R. at 153.

*Third*, *Lyondell* found no reason for Congress to reach extraterritorial property that is undisputedly part of the estate while leaving untouched extraterritorial property that might have been part of the estate but for an alleged fraudulent transfer. However, this would not have been an irrational policy choice. The resolution of § 548 claims can be especially contentious and fact intensive. Fraudulent transfer claims often subject a foreign citizen to the potential burden associated with alleged liability for fraudulent or other deceptive conduct. In addition, if the Trustee is successful, a foreign citizen will have to surrender property in its possession to a United States court; this does not always occur with other types of bankruptcy claims. § 548 claims present concerns about comity to a greater extent than some other claims litigated during a bankruptcy proceeding. Among other things, the presumption against extraterritoriality "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *Nabisco*, 579 U.S. at 335.

*Finally*, many courts have concluded this statute is not an extraterritorial one. This supports the conclusion that Congress did not write "clear[ly]" or "unmistakably" when it allegedly instructed that § 548 applies extraterritorially. *Cf. id.*

For the foregoing reasons, the presumption against extraterritoriality is a strong one, and it has not been rebutted by the Trustee.

2.     Whether the Relevant Conduct Occurred Abroad

The next issue is an analysis of the second step of the test stated in *Nabisco*. The Trustee disputes the conclusion of the Bankruptcy Court that the relevant conduct occurred abroad. The Trustee contends that the relevant conduct was domestic because the transfers at issue were made in the United States, the relevant obligations were incurred in the United States, and extraterritorial transfers may be disgorged or avoided when they are made on account of domestic obligations.

"If the statute is not extraterritorial, then at the second step [courts] determine whether the case involves a domestic application of the statute, and [courts] do this by looking to the statute's 'focus.' " *Nabisco*, 579 U.S. at 337. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* Of course, it is "a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

United States." *Morrison*, 561 U.S. at 266. Accordingly, "the presumption against extraterritorial application" is not "a craven watchdog" that "retreat[s] to its kennel whenever *some* domestic activity is involved in the case." *Id.*

> a)    Whether the Transfers Were Extraterritorial

As the Trustee concedes, the funds used in the relevant transactions began in a Singapore bank account belonging to Zetta PTE, a Singapore corporation. 7572 Opening Brief at 29. The funds then passed through a United States correspondent bank in New York. *Id.* at 29-30. Then, the funds passed through a United States corresponding bank account to Universal Leader's Hong Kong bank account. *Id.* at 30.[10] The Bankruptcy Court determined that these transfers were foreign in nature because, notwithstanding that the funds were routed through New York, they passed from Singapore to Hong Kong. *Id.* The Trustee contends that "the use of U.S. correspondent bank accounts in foreign transactions between foreign parties constitutes domestic conduct under § 548." *Id.*

In discussing these issues, the parties discuss two cases. *First*, in *Arcapita*, it was recognized that "the focus of the [Bankruptcy Code's] avoidance and recovery provisions is the initial transfer that depletes the property that would have become property of the estate." *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 244 (Bankr. S.D.N.Y. 2017), *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022), and *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022) (quoting *In re Ampal-Am.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017)). In *Arcapita*, the bankruptcy court relied on a previous holding by the district court that the defendants had minimum contacts with New York because their "New York contacts--*i.e.*, the receipt of the transferred funds in New York correspondent bank accounts--are at the heart of this cause of action." *Id.* at 236. The district court reasoned that "when a defendant purposely selects and uses a correspondent bank account to effectuate a particular transaction, and a plaintiff later files a lawsuit asserting a cause of action arising out of that transaction, the defendant can hardly claim that it could not have foreseen being haled into court in the forum in which the correspondent bank account it had selected is located." *Id.* Although the bankruptcy court acknowledged that the personal jurisdiction and extraterritoriality analyses are distinct, it cited the law of the case doctrine and relied on the determination by the district court that the transfers in New York were central to the preference claim at issue. *Id.* at 245, 245 n.8. *Arcapita* also cited cases interpreting other statutes in which it was determined that "the use of bank accounts in the United States [was] sufficient to displace the presumption against extraterritoriality." *Id.* at 245. Although *Arcapita* acknowledged that other cases had reached a different outcome, it distinguished them because "both sides of the challenged transfer used a U.S. bank to complete the transfer." *Id.* at 246. As a result, *Arcapita* held that certain transfers from the debtor's New York bank to the defendants' New York correspondent banks were domestic in nature. *Id.* at 249.

*Second*, *Picard* held that "[t]he relevant conduct . . . is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property." *Picard*, 917 F.3d at 100. Thus, "[w]hen a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States." *Id. Picard* acknowledged that its holding relied on "two nexuses" between

---

[10] With respect to Minsheng Refinancing, certain funds passed from Minsheng's Hong Kong bank account to a Hong Kong account owned by one of Li's entities. 7572 Opening Brief at 29-30.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the relevant transactions and "the United States: (1) the debtor is a domestic entity, and (2) the alleged fraud occurred when the debtor transferred property from U.S. bank accounts." *Id.* at 99 n.9. The Second Circuit did not address whether a transfer would be domestic if only one of these two factors was present. *Id.*

The Trustee also relies on cases involving other statutes. Under the federal stolen-goods statute, "[t]he use of correspondent banks in foreign transactions between foreign parties constitutes domestic conduct within § 2314's reach, especially where bank accounts are the principal means through which the relevant conduct arises." *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 692 (S.D.N.Y. 2017). However, this statute has a different focus than that of § 548. It is "primarily concerned with [controlling] the movement of stolen property across state lines" rather than preventing fraud. *Id.* (quoting *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 99 (D.D.C. 2017) ). The Trustee also relies on *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020). Unlike *Prevezon*, *Ho* did not apply the presumption against extraterritoriality; rather, the issue before the Second Circuit was the interpretation of the words "to" and "from" in the money laundering statute. The Trustee's reliance on *United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993) is unpersuasive for the same reason.

The 7572 Appellees also argue that the use of correspondent banks should be disregarded because their conduct is not relevant under the statute. "[T]o the extent that a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred . . . from--(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). "[A] transferee is one who . . . has 'dominion over the money or other asset, the right to put the money to one's own purposes.' " *In re Incomnet, Inc.*, 463 F.3d 1064, 1070 (9th Cir. 2006) (quoting *Abele v. Modern Fin. Plans Servs., Inc.* ("*In re Cohen*"), 300 F.3d 1097, 1102 (9th Cir. 2002)). "The inquiry focuses on whether an entity had legal authority over the money and the right to use the money however it wished." *Id.* The Trustee cites *Bahrain Islamic Bank* for the proposition that a correspondent bank "act[s] as [the recipient's] agent when it receive[s] . . .funds, and thus, [the correspondent bank's] receipt of the funds in [the United States] can be imputed to [the recipient]." *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 70 n.18 (S.D.N.Y. 2016). However, *Bahrain Islamic Bank* only held that personal jurisdiction had been established over the recipient because of its use of a correspondent bank; it did not hold that the transfers at issue were domestic. *Id.* at 71. Moreover, Ninth Circuit precedent is controlling in this matter. Under the Ninth Circuit dominion test, that a correspondent bank is an agent of a transferee does not make the bank itself a transferee unless that bank has dominion over the property.

The 7572 Appellees have the more persuasive position. *Picard* is persuasive in its determination that § 548 targets the transfer of property, not its receipt. Even *Arcapita* acknowledges that transfers are relevant only because they may "deplete" the property of the estate. In any completed transfer, money is both transferred and received. Nevertheless, the focus of § 548 is the effect on the debtor-transferor rather than the effect on the transferee. To the extent *Arcapita* held otherwise, it would be inconsistent with *Picard*, which would be binding if *Arcapita* were decided presently. Furthermore, to the extent *Arcapita* held that the focus of the relevant cause of action was the use of the correspondent banks, it relied on the law-of-the-case doctrine and the minimum-contacts test. *Arcapita*, 549 B.R. at 67. Because there has been no prior determination in this action that the use of the correspondent banks

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

was at the core of the Trustee's causes of action, there is no reason to apply the law-of-the-case doctrine. In addition, the minimum-contacts test only requires contacts "between the defendant and the forum State such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 105 (1987) (internal quotations omitted). The standard here is different: Where did the relevant conduct that is the "focus" of the statute occur? Because *Arcapita* is based on matters that does not apply in this case, its holding is unpersuasive with respect to the issues presented here.

The 7572 Appellees also persuasively contend that the focus of § 548 is on the debtor-transferor and not the banks the debtor-transferor and the transferee may use as conduits. If a debtor fraudulently transfers property to a correspondent bank, § 550 does not permit recovery of that property from the bank under § 548 unless the bank has dominion over the property. *See Incomnet*, 463 F.3d at 1070. The Trustee contends that, although § 550 determines who is a transferee, § 550 does not determine whether a debtor has an interest in property. Nevertheless, because § 550 limits the recoveries allowed under § 548, it is relevant to understanding its purpose.

Because the focus of § 548 is on the debtor-transferor and the transfer it makes, it is determined that the use of U.S. correspondent banks does not make a transfer domestic for purposes of § 548 unless at least one of the *Picard* factors is present. In this context, either the debtor must be a United States entity, or the debtor must have transferred property from United States bank accounts. It is not necessary to address the question reserved in *Picard*, which was the status of a transfer where only one of the *Picard* factors was present. Here, neither factor is present. Zetta PTE is a Singapore entity, and the Trustee has not identified any allegation in the 7572 FAC that any of the money it transferred came from a United States bank account, apart from the use of correspondent banks described above.

It does not appear that there was any other error by the Bankruptcy Court in the relevant portion of the 7572 Final Dismissal. None of the parties involved in the relevant transactions is from the United States; all are from Singapore, BVI, China, Hong Kong, Ireland, or Canada. *See* 7572 R. 02156. Thus, whether or not this factor is relevant, it would not weigh in favor of a finding that the transaction was domestic. Similarly, the choice of law provisions at issue adopt Hong Kong and English law. *See* 7572 R. 02162. Again, whether or not this factor is relevant, it would not weigh in favor of a finding that the transaction was domestic.

The Bankruptcy Court did not err in determining that the registration of the planes with the FAA and their operation in the U.S. in compliance with FAA regulations, the maintenance of the planes at a U.S. base, and the use of Wells Fargo and TVPX as nominal trustees related to FAA registration did not support the Trustee's position. The "focus" of the statute is on the initial transfer that depletes what would have become property of the state, not the parties' other, subsequent business activities. Nor did the Bankruptcy Court err in holding that the use of American professionals does not make the transaction domestic. *See, e.g., In re CIL Ltd.*, 582 B.R. 46, 96 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018). The Trustee has presented no contrary authority.

Finally, the Bankruptcy Court also did not err in holding that payment in U.S. dollars did not warrant a contrary conclusion. The Bankruptcy Court cited authority that the denomination of the payment is of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

limited utility in determining whether the transaction is domestic. *See Banco Safra S.A. - Cayman Islands Branch v. Samarco Mineracao S.A.*, No. 16 CIV. 8800 (RMB), 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019), *aff'd*, 849 F. App'x 289 (2d Cir. 2021) (for purposes of fraud claims, "Banco Safra's allegation that the transactions listed in Exhibit A were 'consummated with U.S. dollars' is also insufficient to plead a U.S. domestic transaction"). Given that fraudulent conveyance actions and fraud claims have a similar "focus," this authority is persuasive. Furthermore, the Trustee has cited no contrary authority.

In light of the preceding discussion regarding *Arcapita* and *Picard*, the Bankruptcy Court did not err in determining that, because the Debtors did not transfer property from United States bank accounts, the structure of the transactions did not support the Trustee's position. For all of the foregoing reasons, the Trustee cannot prevail on this basis.

b)    Whether the Obligations Were Extraterritorial

"[T]he primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors." *In re N. Merch., Inc.*, 371 F.3d 1056, 1059 (9th Cir. 2004). Ultimately, the goal of this statute is "to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property." *Id.* at 1060 (quoting *Walker v. Treadwell* (*In re Treadwell*), 699 F.2d 1050, 1051 (11th Cir.1983)). This principle applies whether the transaction involves property transferred or obligations incurred. Fraudulent transfers may "deplete the debtor's estate of valuable assets without bringing in property of similar value from which creditors' claims might be satisfied." *Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 989 (2d Cir. 1981). In addition, "the incurring of an obligation chargeable against the debtor's property, as distinguished from the actual grant of an interest in that property, may unfairly deplete the debtor's estate if the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred." *Id.* Thus, an obligation chargeable against the debtor's property depletes the estate because the debtor may have to transfer an interest in that property at some future time.

In a § 548 case based on transfers, "[t]he relevant conduct . . . is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property." *Picard*, 917 F.3d at 100. If obligations deplete the debtor's estate because they suggest that future transfers will occur, it is logical that, in a § 548 case based on obligations, the relevant conduct is the debtor's future transfer of property out of the estate. Therefore, the relevant question is the source of the transfers Zetta PTE was obligated to make. The 7572 FAC alleges that the entirety of Zetta PTE's financial apparatus was located in Singapore. 7572 FAC ¶ 85. The 7572 FAC does not identify any assets or funds Zetta PTE as being available to pay the obligations at issue, except the Debtors' bank accounts, which were located in Singapore. *See generally* 7572 FAC ¶¶ 341-407. Therefore, the allegations in the 7572 FAC do not raise a plausible inference that Zetta PTE incurred obligations sufficient to suggest that there would be future transfers of property located in the United States.

The Trustee contends that the obligations were incurred domestically for the following reasons: (1) the signature pages were sent to the United States; (2) the agreements became effective once the signature pages were released; (3) the parties used United States corporate trusts; (4) Zetta USA signed a guarantee in the United States; (5) the debtors accepted the aircraft in the United States; and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(6) certain of the closing funds were transferred through a Untied States bank account so the closing agent could distribute them to the parties. 7572 Opening Brief at 34-35. This domestic conduct does not include any of the future transfers that might deplete the estate and harm creditors.

The Trustee contends that the focus of § 548 in an "obligations incurred" case is the place where the agreements closed, not where the obligations were subsequently performed. 7572 Opening Brief at 24. However, *Picard*, *Northern Merchandise*, and other cases emphasize that the focus of § 548 is the depletion of the property of the estate. This can only occur in a jurisdiction where the estate has property. There are no allegations in the 7572 FAC suggesting that any such jurisdiction is within the United States.

The Trustee argues that the Bankruptcy Court failed to consider the distinction between transfers and obligations, which the Trustee contends prejudice creditors "not because of a reduction in estate assets . . . but rather the fraudulent inflation of [the] claims pool . . . ." 7572 Opening Brief at 36. The cases cited above do not suggest that the focus of § 548 is different when applied to "transfers made" and "obligations incurred." Although fraudulent transfers and fraudulent obligations may harm creditors in different ways, this distinction does not warrant a finding that the focus of § 548 is different in fraudulent obligation and fraudulent transfer cases.

> c)  Whether § 550 Authorizes Recovery of Extraterritorial Transfers Based on Domestic Obligations

Even accepting the Trustee's argument that the relevant obligations were domestic, § 550 does not authorize recovery of extraterritorial transfers based on those obligations.

Under § 550, the Trustee can only recover property "to the extent a transfer is avoided under section . . . 548 . . . ." 11 U.S.C. § 550(a). "If the trustee avoids a 'transfer,' he can recover the property transferred or the value of the property under § 550." *In re Asia Glob. Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005). "If, on the other hand, he avoids an obligation, the obligation is rendered unenforceable, there is nothing to return and § 550 affords no remedy." *Id.*; *see In re Foxmeyer Corp.*, 290 B.R. 229, 234 (Bankr. D. Del. 2003) ("[E]ven if [an obligation] is avoidable as a fraudulent conveyance, [this] cannot result in any recovery to the Trustee under § 550(a)(1) given that only transfers of property are remediable under § 550(a)(1).")." Thus, § 550 only comes into effect to the extent the Trustee is permitted to avoid a transfer under § 548. § 550 does not provide the Trustee with any authority to avoid transfers beyond that provided by § 548. Because all of the transfers at issue in this action were extraterritorial, the Trustee cannot avoid them by citing § 550.

"[T]ransfers made by the debtor on account of [a fraudulently incurred] obligation are not made for reasonably equivalent value, and may be set aside as actually or constructively fraudulent if the other requirements for actual or constructive fraud are met." *In re Brooke Corp.*, 541 B.R. 492, 507 (Bankr. D. Kan. 2015) (quoting 5 Collier on Bankruptcy ¶ 548.03[4][a]). However, *Brooke* is consistent with the principles discussed earlier. It does not state that § 550 provides the Trustee with authority to avoid transfers. Rather, it concludes that transfers made on account of a fraudulent obligation may be avoided provided that the other requirements of § 548 are met.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The Trustee's reliance on *In re Int'l Manuf. Grp., Inc.*, No. 14-25820-D-11, 2016 WL 7163588 (Bankr. E.D. Cal. Dec. 6, 2016), *report and recommendation adopted*, No. BR 16-2090-D, 2016 WL 7409947 (E.D. Cal. Dec. 22, 2016) is also unpersuasive. It held that "if one or more of the obligations [at issue] [we]re avoided, the trustee would be seeking . . . to recover the repayments made on the avoided obligations, repayments that were without question 'transfers.' " *Id.* at *6. Like *Brooke*, *International Manufacturing* does not suggest that § 550 provides the Trustee with authority to avoid transfers where § 548 would not. Furthermore, the bases offered by the Bankruptcy Court for distinguishing *International Manufacturing*--that it did not address extraterritoriality and that the trustee in *International Manufacturing* was seeking to avoid obligations to invalidate security interests--make *International Manufacturing* inapplicable.

Finally, the Trustee argues that *Picard* supports his position. *Picard* held that "Section 550(a) works in tandem with § 548(a)(1)(A) by enabling a trustee to recover fraudulently transferred property." *Picard*, 917 F.3d at 98. The Second Circuit determined that the focus of § 550(a) was "the debtor's initial transfer" because "it is the initial transfer that fraudulently depletes the estate" and "[o]nly the initial transfer involves fraudulent conduct, or any conduct, by the debtor." *Id.* Thus, so long as the initial transfer is domestic, subsequent extraterritorial transfers can be recovered. *Id.* at 99. *Picard* does not support the position of Trustee for two reasons. *First*, *Picard* and § 550(a) only mention transfers, not obligations. *Second*, the initial transfers here are all extraterritorial. Because the focus of § 550(a) is on initial transfers, the relevant conduct for purposes of § 550(a) is extraterritorial. Even if those extraterritorial transfers were made on account of domestic obligations, that is not a basis for the Trustee to seek to use § 550(a) to reach those transfers.

            3.    Whether Filing a Proof of Claim Permits an Extraterritorial Application of § 548

"[B]ankruptcy courts have summary jurisdiction to adjudicate controversies relating to property within their possession." *Katchen v. Landy*, 382 U.S. 323, 330 (1966). "The whole process of proof, allowance, and distribution is . . . an adjudication of interests claimed in a res[.]" *Id.* (quoting *Gardner v. State of New Jersey*, 329 U.S. 565, 573 (1947)). "This power to allow or to disallow claims includes full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is based. " *Id.* at 329 (quoting *Lesser v. Gray*, 236 U.S. 70, 74 (1914)) (internal quotations omitted). "The Bankruptcy Act . . . converts the creditor's legal claim into an equitable claim to a pro rata share of the res, a share which can neither be determined nor allowed until the creditor disgorges the alleged voidable preference he has already received." *Id.* at 336 (internal citation omitted). Indeed, "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure." *Id.* at 332 n. 9.

The Supreme Court has distinguished *Katchen*, limiting its holding to cases where "the process of adjudicating [the] proof of claim would necessarily resolve" the claim over which jurisdiction was asserted and where the right of recovery was "created by federal bankruptcy law." *Stern v. Marshall*, 564 U.S. 462, 497-98 (2011).

The Trustee relies on *In re Simon*, 153 F.3d 991 (9th Cir. 1998), which has two principal holdings. *First*, "[t]he district court in which the bankruptcy case is commenced obtains exclusive *in rem* jurisdiction over all of the property in the estate." *Id.* at 996. "The court's exercise of 'custody' over the debtor's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

property, via its exercise of *in rem* jurisdiction, essentially creates a fiction that the property--regardless of actual location--is *legally* located within the jurisdictional boundaries of the district in which the court sits." *Id.* "This includes property outside the territorial jurisdiction of the United States." *Id.* For this reason, a bankruptcy court may "enjoin[] [a creditor] from commencing collection against any bankruptcy estate property regardless of its geographic location." *Id.*

*Second*, "a bankruptcy court may enjoin a foreign collection action against the debtor personally, or as to assets which do not form part of estate property," so long as the creditor "fully participated in the . . . bankruptcy, thus surrendering to United States jurisdiction." *Id.* at 996-97. "Because allowing a participating creditor to disregard bankruptcy court orders would have 'substantial effects within the United States,' the presumption against extraterritorial effect of a statute does not apply." *Id.* at 997 (internal citation omitted) (quoting *Laker Airways, Ltd. v. Sabena Belgian World Airlines*, 731 F.2d 909, 925 (D.C. Cir. 1984)). This applied the pre-*Morrison* extraterritoriality standard, under which a statute was deemed to regulate extraterritorial conduct with substantial domestic effects, even if the statute contained no clear indication that it was meant to apply extraterritorially. *See Laker Airways*, 731 F.2d at 925. The Ninth Circuit rejected the creditor's argument that it submitted itself to limited bankruptcy court jurisdiction confined to the parameters of its proof of claim. *In re Simon*, 153 F.3d at 997. The Ninth Circuit noted that a creditor that files a proof of claim "loses the right to a jury trial on any counter-claims filed by the debtor or the trustee," "loses previously-held rights to assert 'legal claims' against the debtor and his estate," and "forefeit[s] any right it ha[s] to claim that the court lack[s] the power to enjoin [the creditor] from commencing a post-bankruptcy proceeding against the debtor." *Id.* However, the Ninth Circuit did not "decide whether [§ 524 of the Bankruptcy Code] applies extraterritorially in all cases . . . ." *Id.*

The Trustee also cites similar pre-*Morrison* authority for the proposition that "when a party affirmatively invokes the jurisdiction of the bankruptcy court, the presumption against extraterritoriality does not apply to that party." *Diaz-Barba v. Kismet Acquisition, LLC*, No. 08-CV-1446 BTM (BLM), 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010) (citing *In re Simon*, 153 F.3d at 997; *see also In re Interbulk, Ltd.*, 240 B.R. 195, 199 (Bankr. S.D.N.Y. 1999) (a preference action was not extraterritorial where the defendant was a domestic corporation, the preference was an effort to secure assets belonging to the debtor that were in New York, and the defendant filed a proof of claim).

In *Morrison*, the Supreme Court rejected the proposition that "the extraterritorial reach of [a statute] . . . raise[s] a question of subject-matter jurisdiction," holding that "to ask what conduct [a statute] reaches is to ask what conduct [it] prohibits, which is a merits question." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253-54 (2010). *Katchen* and other cases only held that "[t]he whole process of proof, allowance, and distribution" provides a bankruptcy court with "summary jurisdiction to adjudicate controversies." *Katchen*, 382 U.S. at 329-30 (quoting *Gardner*, 329 U.S. at 574); *In re Ass'n of Volleyball Pros.*, 256 B.R. 313, 316 (Bankr. C.D. Cal. 2000) ("Thus a proof of claim confers on the bankruptcy court both personal jurisdiction over the claimant and subject matter jurisdiction over the claim."). The 7572 Appellees contend that, post-*Morrison*, even if filing a proof of claim subjected them to the jurisdiction of the Bankruptcy Court, that does not affect the analysis as to extraterritoriality.

The Bankruptcy Court correctly determined that *In re Simon* does not control. *In re Simon* concerned the scope of § 524, which may be applied to enjoin actions to collect property of the debtor on account

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

of claims that have been discharged. That section applies to all "property of the debtor of the kind
specified in section 541(a)(2) . . . ." 11 U.S.C. § 524(a)(3). The property described in section 541
expressly includes property "wherever located . . . ." 11 U.S.C. § 541(a). Even if submitting a proof of
claim permits an extraterritorial application of § 524, it does not follow that submitting a proof of claim
permits an extraterritorial application of § 548. Further, the analysis in *In re Simon*, as well as the other
pre-*Morrison* case law cited by the Trustee, is clearly irreconcilable with *Morrison*. *In re Simon* held that
the conduct regulated by § 524 had substantial domestic effects, but it did not hold that the text of the
statute or its context reflected a clear showing that it was meant to apply extraterritorially. Further, *In re
Simon* held that § 524 could apply extraterritorially because the defendant had submitted to the
jurisdiction of the bankruptcy court. *Morrison* has now clarified that these are separate analyses:
extraterritoriality is a question as to the merits, not a jurisdictional one. The Trustee has not offered any
reason to extend *In re Simon* beyond the specific facts that were presented.

        B.     The Recharacterization Claims (Sixth, Eighth, and Ninth Causes of Action)

          1.     <u>Li's Third Investment (Sixth Cause of Action)</u>

The Trustee contends that the Sixth Cause of Action should not have been dismissed. Thus, he argues
that he does not seek to avoid any extraterritorial transfer of funds, but rather to object to and disallow a
claim filed by one of the 7572 Appellees under § 502. 7572 Opening Brief at 46.

Notwithstanding that the caption of the sixth cause of action cites both § 105(a) and § 502, the relief
sought by the sixth cause of action is the "recharacteriz[ation]" of the Third Investment "pursuant to 11
U.S.C. § 105(a) as an equity interest . . . ." 7572 FAC ¶ 502. Nothing in the sixth cause of action
mentions the disallowance of a claim. Therefore, the Bankruptcy Court correctly concluded that the
sixth cause of action was a recharacterization claim under § 105(a).

The Ninth Circuit has held that "courts may not rely on § 105(a) . . . to determine whether
recharacterization [of a debt as equity] is warranted." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141,
1149 (9th Cir. 2013). The sixth cause of action therefore failed to state a claim and was properly
dismissed.

          2.     <u>The 2016 Plane 6 and 7 Lease Agreements (Eighth and Ninth Causes of Action)</u>

The Trustee objects to the dismissal of the eighth and ninth causes of action. 7572 Opening Brief at 46.
The Trustee contends that these causes of action were stricken by the Bankruptcy Court. *Id.* However,
the Bankruptcy Court decided "to dismiss, rather than to strike, Counts 8 and 9 . . . ." 7572 Final
Dismissal at 35. Although the Bankruptcy Court concluded that the Trustee had exceeded the scope of
the leave to amend that had been granted earlier, these causes of action were also "dismissed based
on the presumption against extraterritoriality," like the avoidance claims on which these
recharacterization claims are based. *Id.* at 34. The Trustee has not addressed this ruling. Therefore,
any challenges have been waived. Even absent waiver, the Trustee has not provided any reason to find
that the conduct that is the focus of § 105(a) occurred domestically. For the same reasons as stated in
connection with the first and second causes of action, the eighth and ninth causes of action are
dismissed based on the presumption against extraterritoriality.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

       C.     The Disallowance Claim (Tenth Cause of Action)

The Bankruptcy Court dismissed this claim because it held that the Trustee failed to state claims under §§ 548 and 550. The Trustee does not contest the holding of the Bankruptcy Court that viable claims under §§ 548 or 550 are prerequisites to a disallowance claim under § 502; rather, the Trustee contends that his claims under §§ 548 and 550 are viable for the reasons already discussed. 7572 Opening Brief at 47-48. For the same reasons stated earlier, the Trustee's disallowance claim was properly dismissed.

       D.     Leave to Amend

In the 7572 Opening Brief, the Trustee refers to a request for leave to amend only in the context of the eighth and ninth causes of action. *See* 7572 Opening Brief at 46-47. The Trustee does not otherwise challenge the determination by the Bankruptcy Court that leave to amend would both be futile and cause prejudice to the 7572 Appellees. *See* 7572 Final Dismissal at 39-41; *see generally* 7572 Opening Brief.

As to the eighth and ninth causes of action, the Trustee contends that the Bankruptcy Court should not have stricken the claims as exceeding the scope of the permissible leave to amend. However, for the reasons previously stated, the Bankruptcy Court did not strike these claims, and it also dismissed them on extraterritoriality grounds. That alternative ruling is not challenged in the 7572 Appeal. In addition, in light of the prior determinations regarding extraterritoriality, further leave to amend as to these causes of action would be futile.

As to the other causes of action, the Trustee has waived any challenge to the determinations by the Bankruptcy Court that further leave to amend would be futile and prejudicial to the 7572 Appellees, by failing to address those determinations. Even absent such a waiver, the Trustee has not requested leave to amend as to the causes of action, and nothing in the Trustee's briefing suggests that there are additional allegations the Trustee could make to cure the deficiencies in the 7572 FAC. This determination is also supported by the Trustee's failure to cure the deficiencies in the original 7572 Complaint. Nor does an independent review of the 7572 FAC show that the deficiencies could be cured by granting leave to amend.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

## V.    The 2004 Appeal

This appeal raises several issues. The Trustee contends that the first five causes of action were
incorrectly dismissed. In the alternative, the Trustee contends that leave to amend should have been
granted. Finally, the Trustee challenges several interlocutory orders that denied motions made by the
Trustee: (1) a motion to compel Bombardier to turn over certain property to the Court; (2) a motion to
consolidate this action with another brought against Fazal-Karim and certain related entities; and (3) a
motion to amend the 2004 FAC.

### A.    Claims Against CAVIC (First, Third, Fourth, and Fifth Causes of Action)

#### 1.    Whether the Financed Leases Are Financings or True Leases (First Cause of
Action)

The Bankruptcy Court dismissed the first cause of action because it found the Trustee did not have
standing under Article III. It also found that English law provided the governing standard for determining
whether the leases in question are financings or true leases. Under that standard, it determined that the
leases in question were financings. It denied the Trustee leave to amend this claim because it
determined that the fraud theory proposed by the Trustee would be futile.

##### a)    Whether the Trustee Has Article III Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' "
*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under
Article III, the plaintiff must have . . . standing." *Id.* "[T]o establish standing, a plaintiff must show (i) that
he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury
was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."
*Id.* By contrast, "federal courts do not adjudicate hypothetical or abstract disputes," "do not possess a
roving commission to publicly opine on every legal question," "do not exercise general legal oversight of
the Legislative and Executive Branches, or of private entities," and "do not issue advisory opinions." *Id.*
at 423-24.

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts
must accept as true all material allegations of the complaint, and must construe the complaint in favor
of the complaining party." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002) (quoting
*Graham v. FEMA*, 149 F.3d 997, 1001 (9th Cir. 1998)).

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any
court of the United States . . . may declare the rights and other legal relations of any interested party
seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).
"[T]he dispute [must] be 'definite and concrete, touching the legal relations of parties having adverse
legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a
conclusive character, as distinguished from an opinion advising what the law would be upon a
hypothetical state of facts.' " *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting
*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)) (permitting a patentee to challenge the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

validity of a patent it had licensed rather than requiring the patentee to breach the license and wait to be sued). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). For example, a bankruptcy trustee may "seek[] a declaration that will bind [a defendant], to defeat its assertion that" the debtor has engaged in conduct that could expose it to liability. *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1077 (9th Cir. 2010).

CAVIC argues that the parties do not have adverse legal interests with respect to whether the Financed Leases are financings or true leases. CAVIC cites the Trustee's acknowledgement to the Bankruptcy Court that "recharacterization of the Delivered Aircraft Leases 'does not affect CAVIC's rights.' " 2004 Answering Brief at 31. The Trustee does not deny making this statement. 2004 Reply Brief at 28.

On appeal, the Trustee asserts that the first cause of action will "determine whether the Trustee or CAVIC holds a property interest in loan proceeds under the" Finance Leases. 2004 Reply Brief at 28. Elsewhere, the Trustee cites § 548 of the Bankruptcy Code as one possible basis for a claim against CAVIC. 2004 Opening Brief at 51. However, the 2004 FAC does not include any such fraudulent transfer claim, or a preference claim against CAVIC. Thus, even if the Trustee prevails on the first cause of action, CAVIC would not have to return to the Debtors any of the payments it received.

Declaratory judgments may be issued even when no "further relief is or could be sought" beyond the declaratory judgment itself. 28 U.S.C. § 2201(a). However, the authorities cited by the Trustee, *MedImmune* and *Lyon*, are distinguishable. In each of those cases, there was a concrete possibility that the defendant in the declaratory judgment claim would sue the plaintiff with respect to that claim. In *MedImmune*, the defendant could have sued the plaintiff for patent infringement had it breached the terms of the license. As a result, the plaintiff could seek a declaratory judgment that the patents at issue were invalid and that its products did not infringe them. In *Lyon*, the defendants could have sued the debtors for trespass, so the debtors could seek a declaratory judgment that their conduct did not constitute trespassing.

In this proceeding, neither party is seeking to recover money from the other on the basis that it is entitled to the payments under the Finance Leases. Neither party has threatened to bring such a claim, nor is there other evidence showing a sufficient probability that such an action would be filed. Indeed, the Trustee specifically argues that he only "seeks recharacterization to support claims against Bombardier in *Jetcraft*," a different action against a different defendant. 2004 Opening Brief at 60. In short, the Trustee has not shown that any possible future dispute is of "sufficient immediacy and reality" to provide him with Article III standing. *See Maryland Casualty*, 312 U.S. at 273.

This resolves the first cause of action in favor of CAVIC. However, even if the Trustee had standing, the 2004 CAVIC Final Dismissal could be affirmed on the alternative bases next addressed.

          b)      Whether English Law Should Be Applied

"In the Ninth Circuit, federal common law choice of law rules apply in bankruptcy cases." *In re Miller*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

292 B.R. 409, 413 (B.A.P. 9th Cir. 2003) (citing *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002)). "Federal choice-of-law rules in the Ninth Circuit follow the Restatement (Second) of Conflict of Laws," as a "source of general choice-of-law principles," and "an appropriate starting point for applying federal common law in this area." *In re Sterba*, 852 F.3d 1175, 1179 (9th Cir. 2017) (quoting *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987)).

"Issues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188." Restatement (Second) of Conflict of Laws § 186 (1971).

When there is a choice-of-law provision, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). Furthermore, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either" of two conditions holds. *Id.* § 187(2). *First*, the parties' choice of law does not control if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice . . . ." *Id.* § 187(2)(a). *Second*, the parties' choice of law does not control if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* § 187(2)(b).

Under § 188 of the Restatement, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 188(1) (1971). "In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2). Pursuant to § 6, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." *Id.* § 6(1). However, "[w]hen there is no such directive the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* § 6(2).

Under the California Commercial Code, "when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of the other state or nation shall govern their rights and duties." Cal. Com. Code § 1301(a). In addition, "[i]n the absence of [such] an agreement . . . this code applies to transactions bearing an appropriate relation to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

this state." *Id.* § 1301(b).

As an initial matter, the parties disagree regarding whether Restatement § 6 or Restatement § 187 applies. Some courts have concluded that "section 6(1) applies to choice of law clauses in a contract when a state has a statutory directive concerning such clauses," and "section 187 is intended to apply only when there is no such statutory directive." *In re Gibson*, 234 B.R. 776, 779 (Bankr. N.D. Cal. 1999). The Trustee also relies on *Eagle Enterprises*, which also concluded that the relevant section of the Pennsylvania Commercial Code was controlling; however, *Eagle Enterprises* followed "Pennsylvania's choice of law rules" in reaching this determination, rather than federal choice of law rules and the Restatement. *In re Eagle Enterprises, Inc.*, 223 B.R. 290, 292-98 (Bankr. E.D. Pa. 1998), *aff'd*, 237 B.R. 269 (E.D. Pa. 1999).

Other courts have made rulings consistent with the position of CAVIC, by applying § 187 to contracts without regard to any statutory provision. *See, e.g., In re CMR Mortg. Fund, LLC*, 416 B.R. 720, 729 (Bankr. N.D. Cal. 2009) (citing § 187 and holding, under federal choice of law principles, "parties may agree to apply the law of a forum to decide all questions regarding the construction and performance of an agreement, but not questions regarding capacity to contract, or other contract-formation issues"); *In re Mayacamas Holdings LLC*, 608 B.R. 522, 526 (Bankr. N.D. Cal. 2019), *aff'd in relevant part, rev'd in part on other grounds and remanded sub nom. Carmel Fin., LLC v. Schoenmann*, 622 F. Supp. 3d 830 (N.D. Cal. 2022) ("Federal common law applies section 187 of the Restatement (Second) Conflicts of Law to determine the enforceability of contractual choice-of-law provisions."); *see also In re Maue*, 611 B.R. 367, 383 (Bankr. W.D. Wash. 2019) ("Although § 6 of the Restatement covers general factors for consideration when analyzing choice of law, other sections of the Restatement specifically deal with the validity and enforceability of a choice of law clause in a trust agreement.").

*In re Zukerkorn*, 484 B.R. 182 (B.A.P. 9th Cir. 2012), *aff'd*, 591 F. App'x 631 (9th Cir. 2015) also supports the position advanced by CAVIC. There, § 187 was applied notwithstanding that the trustee argued that the public policies embodied in the California Probate Code limited the grantor's ability to choose to have Hawaiian law apply to her trust. *Id.* at 191. The Trustee distinguishes *Zukerkorn* because the California Probate Code was at issue, not the California Commercial Code. However, the Trustee has not provided a persuasive reason for this distinction. Indeed, "choice of law provisions are usually respected by California courts in the area of both contracts and trusts." *Id.* at 192.

The Bankruptcy Court held that § 187 applies. This decision is correct for several reasons. *First*, the text of, and comments to, § 6 suggest that it does not control the enforceability of a choice-of-law provision in a federal bankruptcy case. According to § 6, a court is to "follow . . . statutory directive[s] of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1) (1971). This principle applies because a court "subject to constitutional limitations, must follow the directions of its legislature." *Id.* § 6 cmt. a. For a federal bankruptcy court applying federal choice of law principles, the relevant legislature is Congress, not the California state legislature. Congress has not adopted the Uniform Commercial Code. This supports the view that the California Commercial Code does not govern the enforceability of a choice-of-law provision in a bankruptcy proceeding.

*Second*, the comments characterize the section of the Uniform Commercial Code on which the relevant section of the California Commercial Code was based as "a statute directed to choice of law" permitting

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"the application of the law chosen by the parties . . . ." *Id.* Section 6 does not read this section of the Uniform Commercial Code as a statute that provides "for the application of the law of a particular state . . . ." *Id.* It would be inconsistent with this comment to read the California Commercial Code narrowly.

*Third*, in federal bankruptcy proceedings that occur within the Ninth Circuit, federal choice of law principles apply. *See In re Vortex Fishing Sys., Inc.*, 277 F.3d at 1069. It would be inconsistent with this holding if, by operation of § 6 of the Restatement, a California statute, rather than federal common law, governed the enforceability of a choice-of-law provision in a federal bankruptcy proceeding. The reasoning adopted in *In re Vortex* applies. "[B]ecause th[is] case can only be litigated in federal court," "the risk of forum shopping which is avoided by applying state law has no application . . . ." *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995). Accordingly, "[t]he value of national uniformity of approach need not be subordinated . . . to differences in state choice of law rules." *Id.*

Whether § 6 or § 187 applies, the Bankruptcy Court correctly concluded that English law governs. To the extent § 187 applies, the initial question is whether "the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). This occurs where the parties "incorporate into the contract by reference extrinsic material which may . . . be the provisions of some foreign law," thereby "fill[ing] gaps in a contract which the parties could themselves have filled with express provisions." *Id.* § 187 cmt. c. Thus, as to "rules relating to construction, to conditions precedent and subsequent, to sufficiency of performance and to excuse for nonperformance, including questions of frustration and impossibility," the choice of law provision "will be applied. . . ." *Id.* §§ 187 cmt. c, 187(1). "Examples of [questions that cannot be resolved by the parties] are those involving capacity, formalities and substantial validity." *Id.* § 187 cmt. d. In these cases, § 187(2) applies.

The issue here is whether the contract is a financing or a lease. This is not one that the parties could resolve entirely by agreement. Under the approach advocated by the Trustee, this question depends on an examination of the terms of an agreement rather than the labels used by the parties. 2004 Reply Brief at 26-27. Even under the formalist approach advocated by CAVIC, the relevant question is whether the agreement provides that title is retained by the seller or lessor. *See* 2004 Answering Brief at 27-28. Thus, the question is whether the agreements operate as financings or as leases. The rules of no specific jurisdiction are raised by this issue. Therefore, it is appropriate to apply § 187(2).

Under § 187(2), a choice of law provision is enforced unless there is no reasonable basis for the law chosen by the parties in their agreement, or if the choice of law provision violates a state's fundamental policy. On appeal, the Trustee does not identify any fundamental policy allegedly contravened by the choice of law provision at issue. The Trustee contends, however, that there is no reasonable basis for choosing English law. 2004 Reply Brief at 24-25. Section 187 recognizes that "[c]ontracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so." Restatement (Second) of Conflict of Laws § 187 cmt. f. (1971). Courts need not "apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge." *Id.* However, "[t]he parties to a multistate contract may have a reasonable basis for choosing a state with which the contract has no substantial relationship"; "the parties should be able to choose a law on the ground that they know it well and that it is sufficiently developed." *Id.* The Third Circuit has

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|-------------------------------------------------------------|------|----------------|
| Title | In re Zetta Jet USA, Inc., et al. | | |

recognized that this "is a minimal standard." *Zavecz v. Yield Dynamics, Inc.*, 179 F. App'x 116, 121 (3d Cir. 2006).

The parties involved in this action are located in several jurisdictions and their activities have occurred in different countries. The Bankruptcy Court correctly noted that the parties had a legitimate interest in having all their contracts governed by a single body of law. 2004 CAVIC Final Dismissal at 14. In addition, the Bankruptcy Court noted that "international aircraft financing and leasing contracts" are "generally governed by New York or English law." *Id.*; Carlos Sierra, *Ten Years of the Cape Town Convention and the Aircraft Protocol in Mexico*, Air & Space L., 2018, at 11. This is sufficient to meet the minimal "reasonable basis" standard of § 187(2).

If § 6 applies, and the enforceability of the choice of law provision is determined by Cal. Com. Code § 1301, this Court would reach the same result. In accord with § 187(2), Cal. Com. Code § 1301 only requires a "reasonable relation to . . . [the] state or nation" whose law the parties have agreed to use, rather than a "substantial relationship." Again, in accord with § 187(2), the section of the UCC upon which Cal. Com. Code § 1301 is based affirms "the right of the parties to a multi state transaction or a transaction involving foreign trade to choose their own law." UCC § 1-301 cmt. 1. It also states that "the test of 'reasonable relation' is similar to that laid down by the Supreme Court in *Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403 (1927)." *Id.* In *Seeman*, a choice of law provision was upheld where it was based on "a legitimate interest" and could not "be condemned as an evasion" of the usury law that would otherwise govern. *Seeman*, 274 U.S. at 408-09. Finally, the UCC recognizes that "an agreement as to choice of law may sometimes take effect as a shorthand expression of the intent of the parties as to matters governed by their agreement, even though *the transaction has no significant contact with the jurisdiction chosen*." UCC § 1-301 cmt. 1. (emphasis added). Neither party cites any caselaw suggesting that the tests in Cal. Com. Code § 1301 and § 187(2) of the Restatement are different.

For these reasons, it is determined that English law applies.

c)      Whether the 2004 FAC Plausibly Pleads a Recharacterization Claim

The Trustee contends that "the Bankruptcy Court erred when it held that English law proscribed recharacterization." 2004 Opening Brief at 53. The Trustee incorporates by reference more than 300 pages of material addressing English law. However, these materials do not provide a sufficient basis to show any error in the analysis by the Bankruptcy Court.

Based on a review of the materials cited in the 2004 CAVIC Final Dismissal, the Bankruptcy Court did not err. "In English law, there is a clear, formalistic distinction between a sale and a hire purchase or lease." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 700 F. Supp. 2d 681, 688 (D.N.J. 2010). When the parties enter a hire purchase agreement, which is a "lease with an option to purchase provided at the end of the term of the lease," "the lessor retains ownership of the goods" "[u]nless the option is exercised." *Id.*

In the reply brief, the Trustee argues for the first time that the Bankruptcy Court ignored a distinction between a financing lease and an operating lease, and incorporates by reference certain materials regarding English law previously submitted to the Bankruptcy Court. 2004 Reply Brief at 26-27.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|-----------------------------------------------------------|------|----------------|
| Title | In re Zetta Jet USA, Inc., et al. | | |

However, the Bankruptcy Court considered and correctly rejected the Trustee's argument that the distinction between financing leases and operating leases compelled a ruling in favor of the Trustee.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

d)      Whether the Trustee Could Add Additional Allegations to Alter the Choice
of Law Analysis

The Trustee also argues in the 2004 Reply Brief that a choice-of-law clause does not limit the Trustee's avoidance powers. 2004 Reply Brief at 22-23. However, because the first cause of action seeks only a declaratory judgment and does not concern the Trustee's powers to avoid contracts and recover property, this issue is not material.

The Trustee argues that choice-of-law clauses do not bind bankruptcy trustees in fraudulent conveyance actions. The Trustee relies on *Morse Tool*, which held that "[t]he parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege that they were defrauded by the conveyance." *In re Morse Tool, Inc.*, 108 B.R. 384, 386 (Bankr. D. Mass. 1989). Therefore, a "choice-of-law clause carries little weight" in "a fraudulent conveyance action [rather than] a contract action." *Id.* The Trustee's position is unpersuasive for two reasons.

*First*, this is not a fraudulent conveyance action because the Trustee has not alleged any claims against CAVIC under § 548. Nor could the Trustee amend the 2004 FAC to do so. "An action or proceeding under section . . . 548 . . . of [the Bankruptcy Code] may not be commenced after the earlier of--(1) the later of--(A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee . . . or (2) the time the case is closed or dismissed." 11 U.S.C. § 546(a). The order for relief was entered in 2017, and the Trustee was appointed shortly thereafter. The Trustee does not dispute that any § 548 claim against CAVIC would be untimely. 2004 Opening Brief at 59-60.[11]

Nor is the statute-of-limitations analysis different as to the first cause of action, which seeks declaratory relief. "Declaratory judgment actions . . . are 'subject to a statute of limitations generally applicable to civil claims.' " *Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1015-16 (N.D. Cal. 2015) (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369-70 (9th Cir. 1996), *as amended* (June 14, 1996)). When "a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period time will govern." *Id.* (quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688-89 (9th Cir. 1993)). The Trustee cannot get around the two-year statute of limitations by styling his claim as one for declaratory judgment rather than one to recover a fraudulent conveyance.

The Trustee contends that leave to amend should have been granted because the recharacterization claim is "essentially part of the claims allowance process and determination of property interests of the estate, and therefore not subject to [the] statute of limitations." 2004 Opening Brief at 60. In support of this position, the Trustee relies on *Maxim*, which held that "[a] claim to recharacterize debt as equity is essentially part of the claims process, a process that has not yet begun in the underlying bankruptcy case and will not until there is money to distribute to Debtor's claimants." *In re Maxim Truck Co., Inc.*,

---

[11] Nor does the "relation back" doctrine aid the Trustee. *See* Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15(c). The Bankruptcy Court determined that a § 548 claim would not relate back because it did not arise "out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." 2004 R. 10627-34; *see* Fed. R. Civ. P. 15(c)(1)(B). This determination has not been challenged on appeal. *See generally* 2004 Opening Brief.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

415 B.R. 346, 359 (Bankr. S.D. Ind. 2009). However, the Trustee's claims are premised on the Declaratory Judgment Act, which has an applicable limitations period. In addition, a claim to recharacterize debt as equity is part of the claims process because the status of an investment as debt or equity establishes its priority. Here, the Trustee seeks to recharacterize the lease to recover certain payments from Bombardier rather than to resolve claims against the estate. The Trustee also relies on *Fitness Holdings*, which did not address the statute of limitations at all. *See In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1148 (9th Cir. 2013).

*Second*, the holding in *Morse Tool* that fraudulent conveyance actions do not sound in contract is inconsistent with decisions by the Supreme Court and the Ninth Circuit. The Supreme Court held that fraudulent conveyance suits are "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Stern v. Marshall*, 564 U.S. 462, 492 (2011) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)). For purposes of the statute of limitations, the Ninth Circuit has held that "a cause of action to recover fraudulent conveyances" is "not founded upon a tort . . . ." *United States v. Neidorf*, 522 F.2d 916, 917-18 (9th Cir. 1975). To the extent these cases conflict with *Morse Tool*, Supreme Court and Ninth Circuit precedent controls. Thus, at least one decision within the Ninth Circuit has rejected the contention that "fraudulent transfer actions are not actions based on contracts and are not governed by the choice of law provisions within a contract." *In re Century City Drs. Hosp., LLC*, 466 B.R. 1, 9 (Bankr. C.D. Cal. 2012). This provides an independent basis for concluding that the Trustee's requested amendments would not alter the choice of law analysis.

> 2. <u>Whether CAVIC's Alleged Security Interest in the Refund Is Perfected (Third Cause of Action); Whether the Trustee May Recover the Refund from CAVIC (Fifth Cause of Action); and Whether the Trustee May Recover the Refund from CAVIC (Fifth Cause of Action)</u>

Both parties argue that the status of these three causes of action depends on whether the 2004 FAC plausibly alleges that the March 31 Assignment was an assignment for security rather than an absolute assignment. *Compare* 2004 Opening Brief at 18-33 *with* 2004 Answering Brief at 24-31. The March 31 Assignment purported to assign certain of the Debtors' rights to CAVIC, including the benefit of certain advance payments made by the Debtors and the right to the performance of certain contractual obligations by BAC. *See* 2004 Dkt. 58 at 118. The Trustee argues that the Bankruptcy Court made three errors. *See* 2004 Reply Brief at 9. Each is considered in the following discussion.

> a) Whether the Bankruptcy Court Erred by Failing to Use the "Transfer of Risk" Test

"To decipher a security agreement from an absolute assignment is often a difficult task." *Matter of Candy Lane Corp.*, 38 B.R. 571, 575 (Bankr. S.D.N.Y. 1984). "[N]o particular phraseology is required to effect an assignment." *Id.* "All that is required is that the property must be sufficiently identifiable and there must be an intent to assign a present right in the subject matter of the assignment, divesting the assignor of all control over that which is assigned." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Nevertheless, "[a] document which is seemingly an absolute assignment on its face may nevertheless be treated as a security agreement in certain instances. *Candy Lane*, 38 B.R. at 575. A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." *Id.* (quoting N.Y. U.C.C. § 1-201(37)). The courts must "determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen." *Id.* (quoting 1 G. Gilmore, Security Interests in Personal Property § 11.1, at 334 (1965)). "As is true with an assignment, no formal wording is required to establish a security agreement." *Id.* at 576. "[T]he intent of the parties governs," and "[t]he determination should be based on an examination of the substance of the documents in the context of the surrounding transaction." *Id.* "However, it is incumbent upon the party challenging the assignment to show by clear and convincing proof that only a security interest was intended." *Id.* at 577.

The Ninth Circuit has adopted a similar standard. "Whether the parties intended outright sales or loans for security is determined from all the facts and circumstances surrounding the transactions at issue." *In re Golden Plan of Cal., Inc.*, 829 F.2d 705, 709 (9th Cir. 1986). In this analysis, the transfer of risk is often an especially significant factor. "The absence of risk 'seems to result in a finding of a debtor-creditor relationship in most cases.' " *In re Com. Money Ctr., Inc.*, 350 B.R. 465, 484 (B.A.P. 9th Cir. 2006) (quoting *In re Woodson Co.*, 813 F.2d 266, 271 (9th Cir. 1986)). However, "the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest." *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 544 (3d Cir. 1979).

The parties and the Bankruptcy Court have both relied on several cases applying this test. In those decisions, consistent with the principles stated above, whether the assignor retains a material risk after the assignment is a very significant factor. However, other factors are also considered.

In *Commercial Money*, the debtor was required to pay to the counterparty a minimum fixed amount plus certain principal and interest payments, regardless of what was paid by the nominal lessees. 350 B.R. at 483. Once the principal was paid in full, any residual value in the transferred assets was returned to the debtor; the counterparty was not permitted to receive more than repayment of the principal and interest. *Id.* at 484. For this reason, the court determined that the counterparty had "none of the potential benefits of ownership" and was "contractually allocated none of the risk of loss." *Id.* Therefore, it was determined that the transaction was a loan rather than a sale. *Id.*

In *Joseph Kanner*, an assignment was also deemed an assignment for security. *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937, 940 (2d Cir. 1973). The assignment occurred simultaneously with the loan. *Id.* It was undisputed that any payment received under the assignment would be applied to reduce the amount due under the loan. *Id.* Conversely, any payment in excess of the loan amount would have been returned to the payee. *Id.* The bank treated the assignment as a source of payment of the loan if the parties did not pay it. *Id.* In addition, the bank acted in a manner consistent with an assignment for security because it required the note to be personally endorsed and attached property of the endorsers when amounts were not paid under the note. *Id.* The bank also did not object when part of the property at issue was transferred to a third party notwithstanding that it later argued that it had been assigned that property. *Id.*

In *Major's Furniture*, an assignment was deemed a secured loan. 602 F.2d at 546. It was first

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

determined that the allocation of risks supported the view that the transaction constituted an assignment for security. *Id.* at 545. The debtor was required to retain the risk that the accounts being assigned would be uncollectible, the counterparty required warranties that the accounts were collectible, the counterparty required the debtor to make credit checks, the counterparty required the debtor to indemnify it, and the counterparty required the debtor to repurchase any account after the customer was in default for more than 60 days. *Id.* The counterparty only assumed the risk that the debtor became unable to fulfill its obligations. *Id.* In addition, it was determined that the counterparty unilaterally imposed new conditions on the parties' ongoing relationship, which was consistent with a "line of credit" transaction but not a true sale. *Id.*

In *O.P.M. Leasing*, it was determined that certain portions of the rent payments were assigned absolutely while others were assigned for security. *In re O.P.M. Leasing Servs., Inc.*, 30 B.R. 642, 646 (Bankr. S.D.N.Y. 1983). The analysis began with a review of the language of the relevant agreements. *Id.* However, other language in those agreements suggested the assignment was for security. *Id.* The court noted that the monthly payments to the assignee were in excess of the rent payments allegedly assigned. *Id.* Furthermore, the note was collateralized by payments beyond the rent payments at issue. *Id.* The parties anticipated that the excess amounts would be remitted by the assignee to the assignor. *Id.* The court also concluded that the assignee was to credit the assignor for the monthly balance at issue. *Id.* at 647. The assignor also retained a reversionary right to the equipment for which rent was being paid. *Id.* Thus, when the agreement ended, the assignee would not receive the equipment. *Id.* The assignor received the equipment at the end of the lease, covenanted to the assignee that it would pay taxes on the collateral, covenanted to the assignee that it would warrant and defend its interest in the collateral, and made other similar commitments. *Id.*

In *Golden Plan*, the Ninth Circuit rejected the argument by the bankruptcy trustee that an assignment was for security. 829 F.2d at 709. Instead, it determined that an absolute sale had occurred. *Id.* The documentation showed that the investors received absolute ownership of the loan in question from one of the affiliates of the debtors. *Id.* Another debtor acted as the collection agent for the loan, collecting payments made under the loan, and passing them to the investors; it was also responsible for handling foreclosure if one became necessary. *Id.* Further, the investors received no contractual guarantee of repayment or compensation in the event of a foreclosure. *Id.* In the event of a default under the loan, the debtor could pay the investors the amount they were owed, in which case the debtor could collect that amount (and any late charges) from the party obligated under the loan. *Id.* at 710. Thus, the investors could receive payments notwithstanding that the borrower had defaulted on the underlying obligation. *Id.* However, if this occurred, the investors would not receive any late fees. *Id.* The investors also testified that a sales transaction was intended. *Id.*

The Ninth Circuit reached a different outcome in *Woodson*. There, the court found the transaction was a loan from the participants to the lead lender rather than a sale. *Woodson*, 813 F.2d at 271. The lead lender did not retain a percentage participation in any of the loans. *Id.* Further, the lead lender relieved the participants from any risk of loss because the participants were paid interest regardless of whether the original borrower paid the lead lender. *Id.* The Ninth Circuit also noted the wide variation in the interest rate paid by borrowers to the lead lender and that paid by the lead lender to the participants. *Id.* at 272. It was determined that the rates were tied to prevailing borrowing rates rather than a servicing fee, which showed that this was a lending transaction rather than a purchase. *Id.* Finally, it was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

determined that the participants did not possess any of the usual indicia of ownership. *Id.*

In discussing several of these cases, *Evergreen Valley* listed "[s]everal factors" that "indicate when an assignment operates to create a security interest only." *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982). "A security interest is indicated where the assignee retains a right to a deficiency on the debt if the assignment does not provide sufficient funds to satisfy the amount of debt." *Id.* "A security interest is also indicated when the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source." *Id.* "Likewise, a security interest is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt." *Id.* "Evidence that the assignor's debt is not reduced on account of the assignment is also evidence that the assignment is intended as security." *Id.* "Finally, the contract language itself may express the intent that the assignment is for security only." *Id.* "In contrast, assignments have been found to be absolute transfers where the assignment operates to discharge the underlying debt." *Id.* at 661-62. In *Evergreen Valley*, the assignment at issue was held to have created a security interest because the assignor was liable for any deficiency, payment from some other source would extinguish the debt, the debt was discharged as money became available under the agreement rather than upon the assignment, and the agreement itself indicated an intent to create a security interest. *Id.* at 662.

Similarly, in *Candy Lane*, the contractual language was ambiguous regarding whether the assignee was to be repaid from the condemnation award that was assigned but, if that fund proved insufficient, then the assignee could collect on personal guarantees by the assignor's principals. 38 B.R. at 577. It was, therefore, determined that "[w]hether this assignment was absolute or intended as security presents a triable issue of fact which cannot be disposed of by summary judgment." *Id.*

*Voboril* also identified factors that were relevant to determining whether an assignment is an absolute transfer of ownership or a grant of security. *In re Voboril*, 568 B.R. 797, 799 (Bankr. E.D. Wis. 2017). "Generally, an assignment of accounts creates a security interest where: (1) the assignee retains a right to a deficiency on the debt; (2) the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source; (3) the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt; (4) the assignor's debt is not reduced on account of the assignment; or (5) the contract language itself expresses the intent that the assignment is only for security." *Id.* In *Voboril*, the agreement stated that payment to the assignee was to commence only after a default. *Id.* at 799-800. Nor did the agreement state or imply that the assignment reduced or eliminated the debt. *Id.* at 800. Instead, its stated purpose was to provide "collateral security" for the repayment of certain debts. *Id.* Furthermore, the assignee had no interest in the property after the loan was paid off. *Id.* For these reasons, it was determined that the assignment granted a security interest. *Id.* at 799.

The Trustee relies on *Arthur Pew Construction Co. v. Lipscomb*, 965 F.2d 1559 (11th Cir. 1992). This decision does not address whether the assignment was absolute or for security. Instead, it addressed whether bank officials assumed a duty to maintain the assignments for the benefit of another party and whether they were liable for any breach of that duty. *Id.* at 1575.

The Trustee also relies on *S & H Packing & Sales Co., Inc. v. Tanimura Distributing, Inc.*, 883 F.3d 797

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(9th Cir. 2018). There, the Ninth Circuit defined the issue presented as follows: "[W]hether, in the context of determining the assets included in a PACA trust, a court needs to conduct a threshold true sale inquiry before it determines whether a transaction transferring PACA trust assets was a commercially reasonable sale." *Id.* at 801. The Ninth Circuit answered this question in the affirmative. It then directed that, in determining when a true sale has occurred, "a district court should look to the substance of the transaction to determine whether the transaction is a true sale or a secured loan." *Id.* at 802. "In doing so, the transfer of risk should be a primary factor to which a court looks." *Id.* Elsewhere, the Ninth Circuit called the transfer of risk "a key, but not the sole, factor." *Id.* at 801. In assessing whether risk has been transferred, courts can examine "[1] the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, [2] the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, [3] whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and [4] whether the assignment itself reduces the debt." *Id.* at 808 (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995)).

The Trustee contends that the Bankruptcy Court erred by failing to adopt the "transfer of risk" test from *S & H Packing*. The Trustee argues that, under the "transfer of risk" test, "[t]he ultimate question is which party bears the true burden of ownership after the transaction . . . ." 2004 Opening Brief at 29. According to the Trustee, an assignment is for security whenever all risk has been transferred to the assignee. *S & H Packing* did not adopt such a test. *S & H Packing* emphasized that the transfer of risk was "not the sole" factor, calling it "*a* primary" and "*a* key" factor rather than the "ultimate question." 883 F.3d at 801-02 (emphasis added). This language is consistent with *Woodson*, where the assignment left the assignor with no risk of loss, which "*seems to result* in a finding of a debtor-creditor relationship in *most cases*." 813 F.2d at 271 (emphasis added). The Trustee also misinterprets the rule by seeking to equate the transfer of risk with the transfer of "the burdens of ownership." Instead, what is important in evaluating the transfer of risk is "who accepts risk of non-payment on the transferred accounts," not who possesses or operates the underlying property. *See S & H Packing*, 883 F.3d at 809 (quoting *S & H Packing & Sales Co. v. Tanimura Distrib. Inc.*, 850 F.3d 446, 457 (9th Cir. 2017)).

The Bankruptcy Court distinguished *S & H Packing* on the basis that it was decided under PACA. Other courts have declined to limit *S & H Packing* to PACA cases. *See, e.g.*, *In re Medley*, No. 20-BK-11768-SY, 2023 WL 1960799, at *6 n.3 (B.A.P. 9th Cir. Feb. 13, 2023) ("Although *S & H Packing & Sales* concerned a PACA transaction, there is no reason to think that its analysis of whether a factoring agreement is a 'true sale' or actually a secured loan is inapplicable in other contexts."). Although *S & H Packing* discussed the history and purposes of PACA, *S & H Packing* did not limit its holding to matters arising under PACA. Indeed, *S & H Packing* is consistent with the other cases cited above. Therefore, although the Bankruptcy Court erred in limiting *S & H Packing* to PACA cases, it did not err in rejecting the Trustee's characterization of the "transfer of risk" test.

In the 2004 CAVIC Final Dismissal, the Bankruptcy Court identified the following eight factors supporting its conclusion that the 2004 FAC did not adequately allege an assignment for security:

1) the plain language of the agreement;
2) the timing of the assignment and the loan;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

3) whether payments received under the assignment would be applied to reduce the amount of the loan;

4) whether the assignment will be a source of payment if the loan is not paid;

5) whether any excess paid on the loan will be returned to the assignor;

6) whether the assignee retains a right to deficiency if the assignment does not satisfy the amount of debt owed;

7) whether the assignee's rights in the assigned property would be extinguished if the assignor paid the debt from another source; and

8) whether, before the complaint was filed, the assignee filed proofs of claims or other documents asserting that it was a secured party.

2004 CAVIC Final Dismissal at 47.

The third, fourth, fifth, sixth, and seventh factors all address whether any risk of loss was retained by the assignor. It was appropriate to consider these factors for the reasons stated in *S & H Packing*, *Woodson*, *Commercial Money*, and the other cases cited earlier. Nor did the Bankruptcy Court err by considering the first, second and eighth factors. In *Golden Plan*, the Ninth Circuit considered the language of the relevant agreements as one factor in determining whether the relevant assignment was absolute. 829 F.2d at 709. The second factor, which is the length of time between the assignment and the loan, was considered by the Second Circuit in *Joseph Kanner*, and the Trustee has identified no reason why this was an error. 482 F.2d at 940. Nor has the Trustee identified any reason why the decision in *Candy Lane* was incorrect in considering the eighth factor--whether the assignee filed proofs of claims or other documents asserting that it was a secured party. 38 B.R. at 576-77. Even the 2004 FAC relies on these factors. 2004 FAC ¶¶ 95-118.

> b) Whether the Bankruptcy Court Erred by Failing to Consider Parol Evidence

Neither party contends that the parol evidence rule applies. *See In re Com. Money Ctr., Inc.*, 350 B.R. 465, 482 (B.A.P. 9th Cir. 2006) ("We interpret *Golden Plan* to mean that testimony should be admitted or excluded consistent with the ordinary rules regarding parol evidence."); *Singer v. Boychuk*, 194 A.D.2d 1049, 1051 (1993) (holding that an assignment was absolute under New York law "because plaintiff's intent clearly is set forth in the documents, [and] parol evidence is not admissible to alter the plain import of the language"); *Kolbe v. Projects & Joint Ventures Int'l, Inc.*, 186 A.D.2d 988, 98889 (1992) ("Oral declarations or secret agreements between a mortgagor and an assigning mortgagee made prior to the assignment are inadmissible against the assignee to establish a defense to the action brought by the assignee to enforce the mortgage.").

The Trustee nevertheless identifies three places in the 2004 CAVIC Final Dismissal where the Bankruptcy Court allegedly erred by declining to consider parol evidence. *First*, the Trustee quotes language from the 2004 CAVIC Final Dismissal that "[u]nder New York law, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." 2004 CAVIC Final Dismissal at 36. However, the court recognized on the next page that "[p]arol evidence may be used to show that an absolute assignment was intended for security." *Id.* at 37. The Bankruptcy Court did not exclude any evidence under the parol evidence

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

rule.

*Second*, the Trustee argues that the Bankruptcy Court refused to consider the Term Sheet based on the Plane 5 APA's integration clause and the parol evidence rule. 2004 Opening Brief at 35 (citing 2004 CAVIC Final Dismissal at 38). However, the Bankruptcy Court considered the Term Sheet in a detailed analysis. The Bankruptcy Court was evaluating the Trustee's allegations that the Term Sheet formed the "blueprint" for the structure of the relevant transaction. 2004 FAC ¶¶ 46, 70. The Bankruptcy Court correctly rejected this allegation as conclusory and implausible given that the Term Sheet stated it contained "proposals" rather than agreements and stated it was a non-binding "letter of intent." 2004 CAVIC Final Dismissal at 38. Although the Bankruptcy Court stated the letter of intent was not legally binding, the Bankruptcy Court did so to explain why the Trustee's allegations were implausible considering the role played by a letter of intent in a commercial transaction. After all, "[d]etermining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Bankruptcy Court did not make these statements to support an application of the parol evidence rule. The Bankruptcy Court noted that the assignment contained an integration clause not as part of the application of the parol evidence rule, but to support the points discussed here. The parol evidence rule is not mentioned in the language cited by the Trustee.

*Third*, the Trustee argues that the Bankruptcy Court held it could not consider extrinsic evidence where the language of the contract was unambiguous. However, the language cited by the Trustee did not exclude any extrinsic evidence. Rather, the Bankruptcy Court held that the principle that "specific terms control over general ones" is not relevant unless the specific and general terms are "inconsistent or in conflict with one another." 2004 CAVIC Final Dismissal at 51-52. The Bankruptcy Court also held that disputes about a contract's meaning can be resolved as a matter of law but that arguments "stretch[ing] the documents beyond their ordinary meaning" do not change that principle. *Id.* at 53. Again, these holdings were not related to parol evidence.

        c)      Whether the Bankruptcy Court Erred in Applying the Governing Standards

The Bankruptcy Court did not err in applying the governing standards. Accepting the factual allegations in the 2004 FAC as true except where they are contradicted by documents incorporated by reference, and drawing all plausible inferences in favor of the Trustee, none of the relevant factors supports the Trustee's position.

        (1)      <u>Plain Language of the Documents</u>

The Trustee concedes that Article 1 of the March 31 Assignment states that it was absolute. 2004 FAC ¶ 96. However, the Trustee alleges that Article 10.1 of the March 31 Assignment suggests that the assignment was for security. *Id.*. Neither Article 4 nor Article 10.1 supports the Trustee's position. Article 10.1 states that ███████████████

███████████████████████████████████████████████████████

        *See* 2004 FAC ¶ 69. Article 4 of the March 31 Assignment states that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"Bombardier and [the Debtors] acknowledge and agree that, for the purposes of Article 10.1 of the Agreement, [CAVIC] is an entity that has been established by a third party financier in connection with the [Debtors'] acquisition of the Aircraft." 2004 Dkt. 58 at 119. This Article also states that "[n]otwithstanding the provisions of Article 10.1 of the Agreement, Bombardier and [the Debtors] individually and collectively acknowledge and agree that this Assignment is made in conformity with Article 10.1 of the Agreement." *Id.* Article 4 of the March 31 Assignment, particularly as reflected in its second half, is a waiver of Bombardier's rights under Article 10.1 to prevent Zetta PTE from assigning its rights under the Plane 5 APA. Article 4 does not state or imply that the March 31 Assignment would have been permitted absent Bombardier's consent, that CAVIC provided financing to Zetta PTE or that Zetta PTE acquired the aircraft. Even if the Trustee's reading were plausible, and Zetta PTE planned to acquire the aircraft in some manner, that would not be basis to show that Zetta PTE had not assigned its rights to that aircraft to CAVIC.

The Trustee also argues that "the fact that EDC required CAVIC to sign . . . an express *security* assignment of CAVIC's rights under the March 31 Assignment" supports its position. 2004 FAC ¶ 101. The Trustee's argument is unpersuasive. Even if CAVIC assigned its rights for security, it does not necessarily follow that Zetta PTE's assignment was also for security. To the extent the labels used by CAVIC and EDC are relevant, they suggest that the parties stated that assignments were absolute when they were absolute and stated that they were for security when they were for security.

The Trustee next argues that the Consent designated Zetta PTE as a "buyer," and that this designation supports its position. 2004 FAC ¶ 102. However, this document also designated Zetta PTE as an "assignor" and stated that its rights were "assigned by" it to CAVIC. 2004 CAVIC Final Dismissal at 52; 2004 First Dismissal at 48. This language does not support the Trustee's contention that Zetta PTE retains title to the rights it assigned to CAVIC. The Trustee does not address the assessment of this language by the Bankruptcy Court. *See generally* 2004 Opening Brief; 2004 Reply Brief.

The balance of the Trustee's positions related to this factor are conclusions about the legal effect of the relevant documents rather than factual allegations. *See, e.g.*, 2004 FAC ¶¶ 97, 99. Consequently, these contentions need not be taken as true. This factor does not support the Trustee.

(2)    Timing of the Assignment

The Trustee alleges that "[t]he March 31 Assignment was a condition precedent to CAVIC's draw request under the PDP Facility Agreement." 2004 FAC ¶ 105. Specifically, the Trustee alleges that EDC required that the Plane 5 FPA, Plane 5 FPA Guarantee, and other documents be in place before it granted CAVIC's draw request. *Id.*

This factor does not support the Trustee. In *Joseph Kanner* and *Candy Lane*, a borrower made an assignment to a lender at the same time that the lender extended credit. It was determined that this suggested that the assignment was for security. Here, Zetta PTE made an assignment to CAVIC at the same time that EDC extended credit to CAVIC. The Trustee does not allege that the Debtors were a party to any of the contracts to which EDC was a party. *See* 2004 FAC ¶¶ 48, 105. Thus, there are not allegations that EDC--or anyone else--extended credit to the Debtors at the time of the assignment. *Joseph Kanner* and *Candy Lane* are distinguishable on this basis. As before, whether the transaction

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

between CAVIC and EDC was an assignment for security is not relevant to whether the transaction between Zetta PTE and CAVIC was an assignment for security. Even accepting the Trustee's contention that cross-default provisions were in place in these two transactions, the Trustee has not alleged that Zetta PTE extended credit to CAVIC simultaneously with the March 31 Assignment.

(3)     Whether Payments Received Under the Assignment Would Reduce the Loan Amount

The Trustee alleges that the Debtors had no debt to CAVIC on account of Plane 5 prior to the March 31 Assignment and the entry of the alleged PDP Loan. 2004 FAC ¶ 104. The Trustee also alleges that, "[p]ayments made by the Debtors to CAVIC on account of the alleged Plane 5 PDP Loan pursuant to the Plane 5 FPA and the Plane 5 Guarantee, would directly reduce the Plane 5 PDP Loan balance." *Id.* ¶ 106.

The Trustee's argument on this factor has four parts. *First*, the Trustee alleges that the Debtors had the right, exercisable through TVPX, to issue a notice to sell under Section 2.2.2 of the Plane 5 FPA, to require CAVIC to prepay the alleged Plane 5 PDP Loan prior to the Expiry Date upon the Debtor's compliance and funding of the payment of the outstanding balance owed under the PDP Facility Agreement under Section 4.2 of the Plane 5 FPA. 2004 FAC ¶ 106. However, the Trustee's allegations are not consistent with the transactional documents on which they are premised. Section 2.2.2 obligates CAVIC to sell its interest in Plane 5 to TVPX, if TVPX requested that it do so, and other conditions were satisfied. 2004 Dkt. 58-1 at 1261. It does not state that it relieves the Debtors of their obligations, or provide the Debtors with any rights. Indeed, the Debtors were not parties to the Plane 5 FPA. Section 4.2 imposes conditions on the exercise of the right in Section 2.2.2--and certain other rights; it does not state that the Debtors would be relieved of their debt as a result of payments under the March 31 Assignment. *Id.* at 1263. The Debtors are never mentioned in either Section 2.2.2 or Section 4.2. *See id.* at 1261, 1263.

*Second*, the Trustee alleges that the Debtors incurred debt in the full amount of the alleged Plane 5 PDP Loan, and that the Debtors made two interest payments under Section 6.1.1 of the Plane 5 FPA and Plane 5 FPA Guarantee. 2004 FAC ¶¶ 104, 107. Although the Debtors guaranteed TVPX's performance to CAVIC, interest payments made by the Debtors on TVPX's behalf would not reduce the amount owed by the Debtors under the PDP Facility Agreement. Only the latter amount pertains to the rights that were assigned in the March 31 Assignment.

*Third*, the Trustee alleges that BAC issued a credit memo to the Debtors that reduced the amount of the debt. 2004 FAC ¶ 108. However, the Trustee acknowledges that this credit memo was the result of a "settlement agreement between the Debtors and BAC with respect to a number of issues *unrelated to Plane 5.*" *Id.* (emphasis added). Because this credit memo is not related to the March 31 Assignment, the Trustee's allegations regarding its contents are not relevant.

*Fourth*, the Trustee alleges that the parties contemplated in the Term Sheet that the alleged Plane 5 PDP Loan would be rolled into the Plane 5 EDC Long-Term Financing Facility to be repaid by the Debtors through quarterly rent installments under the Plane 5 Lease Agreement and Plane 5 Sub-Lease. 2004 FAC ¶ 109. However, the Term Sheet states that it was a non-binding offer. An allegation

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

that the parties at one point considered rolling the alleged Plane 5 PDP Loan into the Plane 5 EDC Long-Term Financing Facility is not sufficient to allege that the parties ultimately agreed to enter such a transaction. For the reasons stated above, the Bankruptcy Court did not err in rejecting the Trustee's arguments related to the Term Sheet.

This factor supports CAVIC.

(4)    Whether the Assignment Is a Source of Payment on the Loan

The Trustee alleges that the March 31 Assignment was a source of payment for the alleged Plane 5 PDP Loan. Specifically, the Trustee alleges that the March 31 Assignment was intended to grant CAVIC the right to collect any amounts due to Zetta PTE under the Plane 5 APA as one of the "securities" for repayment of the alleged PDP Loan. 2004 FAC ¶ 113. The Trustee also alleges that the parties contemplated that the March 31 Assignment would be a source of payment if Debtors defaulted under the Plane 5 FPA and Plane 5 Guarantee. *Id.*

The allegations regarding the parties' intent in entering into the March 31 Assignment, as well as the legal effect of that document, are conclusory. Further, the Bankruptcy Court correctly observed that the transactional documents do not refer to a Plane 5 PDP Loan. The March 31 Assignment does not mention securities. To the extent the Trustee relies on § 19 of the Head Lease to support the argument on this factor, the Bankruptcy Court correctly concluded that § 19 governs the risk of damage to the aircraft. *See* 2004 First Dismissal at 49. It is not linked to whether the March 31 Assignment was a source of payment on any alleged loan.

(5)    Whether Excess Paid on the Loan Would Be Returned to the Assignor

The Trustee advances two arguments regarding this factor. *First*, the Trustee alleges that the Debtors could always issue a notice to sell and force CAVIC to pay off the alleged Plane 5 PDP Loan upon providing sufficient funds to CAVIC to do so and retain any upside in value. 2004 FAC ¶ 110. The provisions cited by the Trustee permit CAVIC to sell its interest in Plane 5 to TVPX, or permit TVPX to purchase that interest. *See* 2004 Dkt. 58-1 at 514. CAVIC would only have to sell its rights under the APA if it defaulted, or if TVPX required CAVIC to exercise its rights under the PDP Facility Agreement voluntarily to prepay the loan from EDC. These provisions do not pertain to excess proceeds under the alleged loan, and the Debtors are not a party to the contract that contains these provisions.

*Second*, the Trustee alleges that "the Debtors retained any excess over the principal and interest owed under the Plane 5 EDC Long-Term Financing Facility Agreement." 2004 FAC ¶ 112. Specifically, the Trustee contends that payments received from a governmental authority or an insurance provider with respect to a total loss of Plane 5 were to be paid first to EDC (to repay amounts owed by CAVIC to EDC) and then the excess were to be paid to TVPX and ultimately Zetta PTE. *Id.* However, this provision addresses payments from governmental entities and insurance providers, not excess payments made by the Debtors under the alleged loan.

This factor supports CAVIC's position.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(6)    <u>Whether the Assignee Retained a Right to Deficiency</u>

The Trustee alleges that "[t]he Debtors were jointly and severally liable under the Plane 5 FPA Guarantee if the alleged Plane 5 PDP Loan was not repaid." 2004 FAC ¶ 114. The Trustee relies on Sections 2.1(c), 2.4, and 2.5 of the Plane 5 FPA Guarantee. *Id.* The Trustee also alleges that Zetta PTE remained jointly and severally liable on all obligations under the Plane 5 APA under the March 31 Assignment. *Id.*

The Trustee is correct that the Debtors guaranteed TVPX's performance to CAVIC under the Plane 5 FPA. *See* 2004 Dkt. 58-1 at 560. Each of the Debtors was liable jointly and severally with every other guarantor for the full amount guaranteed to CAVIC. *Id.* However, the Plane 5 FPA Guarantee does not provide that any Debtor was jointly and severally liable with CAVIC for any amount owed to EDC or anyone else. *See id.* Consequently, this provision gave CAVIC no right to pursue the Debtors if BAC defaulted on the assigned obligations.

The Trustee is also correct that Zetta PTE was jointly and severally liable with CAVIC under the APA. *See* 2004 First Dismissal at 50. However, the Bankruptcy Court correctly distinguished between joint and several liability and a right to a deficiency. This factor supports a finding that an assignment is for security if the assignee can pursue the assignor if the value of the property assigned is insufficient to cover the assignor's obligations to the assignee. However, CAVIC's only right against the Debtors was for contribution or indemnity in the event that CAVIC paid the amount owed jointly and severally by both CAVIC and the Debtors. Even if this right qualified as a right to a "deficiency," the $30 million payment owed by CAVIC and the Debtors under the Plane 5 APA was paid by EDC almost immediately after the March 31 Assignment, thereby extinguishing their potential joint and several liability. *See* 2004 FAC ¶ 52. Therefore, the Trustee's allegations do not raise a plausible inference that the assignment was one for security.

This factor supports the view that the assignment was absolute.

(7)    <u>Whether the Assignee's Right to the Property Would Be</u>
<u>Extinguished if the Assignor Paid Off the Loan</u>

The Trustee's argument with respect to the seventh factor is identical to that with respect to the fifth. The Trustee alleges that the Debtors' issuance of a notice to sell under Section 2.2.2 of the Plane 5 FPA would require CAVIC to prepay the alleged Plane 5 PDP Loan. The Trustee also alleges that the consequent funding of the loan prepayment by the Debtors would have extinguished CAVIC's rights under the March 31 Assignment and would have required CAVIC to re-assign its rights back to the Debtors. 2004 FAC ¶ 116. For the reasons already stated, the Trustee's allegations regarding the effect of the notice to purchase and notice to sell provisions are legal conclusions that are contradicted by the relevant transactional documents.

This factor supports CAVIC's position.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

        (8)    <u>Whether the Assignee Filed Proofs of Claim Asserting It Was a
Secured Party</u>

The Trustee alleges that CAVIC filed proofs of claim 162 and 163 relating to the Plane 5 APA and
March 31 Assignment. 2004 FAC ¶ 118. The Trustee alleges that these proofs of claims acknowledged
that the Debtors were obligated to pay interest on the Plane 5 PDP Loan pursuant to Section 6.1.1 of
the Plane 5 FPA and Plane 5 FPA Guarantee, and that these proofs of claim stated that some or all of
the claim against the Debtors is secured. *Id.* The Trustee argues that these representations are "flatly
inconsistent" with CAVIC's present position that the assignment was absolute. *Id.*

The proofs of claim, which are attached to the 2004 FAC, do not support the Trustee's position.
Instead, the proofs of claim expressly state that the assignment was "absolute[]" and further state that
they were filed "as a prophylactic, due to the upcoming bar date, and in response to statements made
by the Chapter 7 Trustee, concerning his 'investigation' of the transaction relating to Purchase
Agreement 186 and the Assignment." 2004 Dkt. 58 at 68, 71, 89, 92. There is no inconsistency
between this text and CAVIC's present position.

This factor does not support the Trustee.

        B.    Whether the Appeal Against BAC Is Moot

The 2004 Appellees assert that, after judgment was entered in their favor and against the Trustee and
after the automatic stay of that judgment expired, CAVIC requested that BAC pay to it the $30 million
that is in dispute between the parties. 2004 Dkt. 65-1 ¶ 7. The 2004 Appellees have stipulated that, on
March 31, 2022, CAVIC and BAC terminated the Aircraft Purchase Agreement 6000-08186 relating to
Plane 5 and BAC returned the PDP to CAVIC. *Id.* ¶¶ 8, 9.

As a result, BAC claims the appeal is moot with respect to its interests.

        1.    <u>Article III Mootness</u>

An "appellate court lacks jurisdiction and must dismiss the appeal" when it is moot. *Shell Offshore Inc.
v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). "A case is moot when the issues presented are
no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *City of Erie
v. Pap's A.M.*, 529 U.S. 277 (2000)). "When events change such that the appellate court can no longer
grant 'any effectual relief whatever to the prevailing party,' any resulting opinion would be merely
advisory." *Id.* (quoting same).

BAC asserts that the second cause of action is moot because it has now terminated the Plane 5 APA to
the extent that it was not terminated previously. The second cause of action "seeks a declaratory
judgment that the Plane 5 APA is terminated," and no other relief. 2004 FAC ¶ 135. The Trustee
disputes that BAC paid the PDP to CAVIC in a final and irrevocable manner and requests jurisdictional
discovery regarding the "circumstances and timing of the termination." 2004 Reply Brief at 15.
However, the Trustee does not dispute that the Plane 5 APA has now been terminated. Because the
Trustee has not identified any legal interest with respect to the timing of the termination of the Plane 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|-------------------------------------------------------------|------|----------------|
| Title    | In re Zetta Jet USA, Inc., et al.                           |      |                |

APA, a determination that the Plane 5 APA was terminated when the Trustee rejected it, rather than at the time of the stipulation between the 2004 Appellees, would not affect the legally cognizable interest of any party. Therefore, the 2004 Appeal is dismissed as **MOOT** with respect to the second cause of action.

BAC does not contend that the sixth cause of action is moot under Article III. However, mootness is an issue that a court is to consider *sua sponte*. The Trustee seeks "prejudgment interest against BAC from the date the Refund was due to be paid" through the date the Refund is paid into the estate. 2004 FAC ¶ 160. For this and other reasons, it appears that there remains a controversy between the Trustee and BAC with respect to the sixth cause of action.

This ruling disposes of the second cause of action. However, even if this cause of action were not moot, the Bankruptcy Court did not err in dismissing this cause of action, for the reasons stated in the discussion of the second cause of action below.

        2.    Equitable Mootness

The doctrine of equitable mootness "has some sway in bankruptcy cases where public policy values the finality of bankruptcy judgments because debtors, creditors, and third parties are entitled to rely on a final bankruptcy court order." *In re Thorpe Insulation Co.*, 677 F.3d 869, 880 (9th Cir. 2012). Equitable mootness requires a "comprehensive change of circumstances" so "as to render it inequitable for th[e] court to consider the merits of the appeal." *Id.* (quoting *In re Roberts Farms*, 652 F.2d 793, 798 (9th Cir. 1981)). In addition, the case must "present transactions that are so complex or difficult to unwind that the doctrine of equitable mootness would apply." *Id.* (quoting *Lowenschuss v. Selnick*, 170 F.3d 923, 933 (9th Cir. 1999)).

The Ninth Circuit has adopted the following test for deciding the equitable mootness issue:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Id.* at 881. Failure to gain a stay is a "factor to be considered," but is not "controlling." *Id.* at 881-82.

BAC argues that the appeal is equitably moot both because the Trustee failed to seek a stay of the judgment and because many of the steps contemplated by the judgment have been completed. 2004 Answering Brief at 34-35. BAC concedes that the third and fourth factors do not weigh in favor of mootness. *Id.* at 35. The Trustee does not dispute that it failed to seek a stay of the judgment. *See* 2004 Reply Brief at 17-18.

Equitable mootness does not warrant dismissal of the appeal. Although the Ninth Circuit has applied

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the equitable mootness doctrine to bankruptcy court orders other than those confirming a reorganization plan, *see In re City of Vallejo, CA*, 551 F. App'x 339 (9th Cir. 2013), BAC has not made an adequate showing that it would be inequitable to consider the merits of the sixth cause of action. Notwithstanding that the Trustee failed to seek a stay and that BAC has now paid CAVIC, the other two factors support the Trustee's position. BAC has not identified any third party whose interests would be affected by this appeal. Nor would granting relief to the Trustee create an "uncontrollable situation" for the Bankruptcy Court. If the Trustee prevails, BAC and/or CAVIC will have to pay the Refund to the Debtors' creditors. The stipulation between BAC and CAVIC involved a single, simple payment from BAC to CAVIC. There has been no showing that this transaction was complex or difficult to unwind.

For these reasons, it is appropriate to consider the merits of the sixth cause of action.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|----------|------------------------------------------------------------------|------|----------------|
| Title | In re Zetta Jet USA, Inc., et al. | | |

C.     Claims Against BAC (Second and Sixth Causes of Action)

1.     <u>Whether the Claims Against BAC Are Derivative of Those Against CAVIC</u>

BAC argues that the claims in which it has been named are, at best, derivative of the third, fourth and fifth causes of action against CAVIC. 2004 Answering Brief at 35-36. The Trustee does not respond to this argument, and does not offer any basis upon which the second and sixth causes of action could be maintained if the third, fourth and fifth causes of action fail. *See* 2004 Reply Brief at 19-21. Thus, because the March 31 Assignment was absolute, the Trustee has no interest in the Refund and cannot recover it from either Bombardier or CAVIC.

In light of these determinations and for the same reasons that the claims against CAVIC fail, those against BAC fail. This determination is dispositive as to the second and sixth causes of action. Further, for the reasons stated below, these causes of action were also properly dismissed for the other reasons stated by the Bankruptcy Court.

2.     <u>Whether the Plane 5 APA Is Terminated (Second Cause of Action)</u>

The Bankruptcy Court found that, even if the March 31 Assignment was for security, the Trustee had not adequately alleged that BAC constructively terminated the Plane 5 APA. During the proceedings before the Bankruptcy Court, the Trustee raised three theories allegedly supporting the claim of constructive termination. Each is renewed in connection with this appeal.

a)     Election of Remedies

Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). "When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options." *Id.* "He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." *Id.* "The non-repudiating party must, however, make an affirmative election." *Id.* What is important is "whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election." *Id.* at 259 (quoting *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995)). "There is no specific time limit within which to make this election and generally, an election need not be made until the time comes when the party making the election must render some performance under the terms of the contract." *Id.* "At this point, 'either performing or failing to perform will indicate an election.' " *Id.* (quoting *Bigda*, 898 F. Supp. at 1004).

The Trustee argues that BAC elected to treat the Plane 5 APA as terminated by filing a proof of claim. The Bankruptcy Court correctly held that BAC's proof of claim was not an election of remedies. A proof of claim is not an action seeking to recover damages. Rather, the timely filing of a proof of claim is a procedural prerequisite to receiving a distribution from the bankruptcy estate. When "proof of [a] claim is not timely filed," it can be denied. 11 U.S.C. § 502(b)(9). The proof of claim also expressly stated that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

it was not "an election of remedy . . . ." 2004 Dkt. 58 at 60. For this reason, the proof of claim did not suggest to the Debtors that BAC had made an election. Nor has the Trustee identified on appeal any performance obligation that required BAC to make an election.

b)    UCC § 2-718

"Where the seller justifiably withholds delivery of goods because of the buyer's breach, the buyer is entitled to restitution of any amount by which the sum of his payments exceeds (a) the amount to which the seller is entitled by virtue of terms liquidating the seller's damages . . . or (b) in the absence of such terms, twenty per cent of the value of the total performance for which the buyer is obligated under the contract or $500, whichever is smaller." N.Y. U.C.C. Law § 2-718(2).

The Trustee contends that a deposit must be returned within a reasonable time after the non-breaching party has elected to seek liquidated damages resulting from the alleged breach of the underlying contract. The Trustee's contentions are unpersuasive. Section 2-718 only entitles the buyer to restitution of payments made by the buyer. Even if the March 31 Assignment was for security, which would have entitled the Debtors to the Refund, the Debtors did not make any payments to BAC. The Trustee does not challenge on appeal the Bankruptcy Court's finding that it was undisputed that the PDP was paid by CAVIC.

The cases cited by the Trustee do not address circumstances in which the plaintiff did not make a deposit. *Gongora v. Eye Gallery of Scarsdale*, 51 Misc. 3d 140(A), 37 N.Y.S.3d 207 (N.Y. App. Term. 2016) ("Plaintiff commenced this small claims action to recover a $750 deposit that she had given to defendant."); *McCann v. McSorley*, 53 Misc. 3d 48, 49, 39 N.Y.S.3d 583 (N.Y. App. Term. 2016) ("Plaintiff commenced this small claims action to recover the $1,800 deposit that he had paid defendant."); *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 680 (7th Cir. 1987) ("Davis paid Diasonics a $300,000 deposit on February 29, 1984.").

In the 2004 Reply Brief, the Trustee contends, for the first time, that "[l]oan proceeds transferred by a lender to [a] third party on a debtor's behalf are property of [the] debtor . . . ." 2004 Reply Brief at 20. Even if this argument had not been waived by failing timely to raise it, the cases cited by the Trustee do not support this position. *See In re TOUSA, Inc.*, 422 B.R. 783, 872-73 (Bankr. S.D. Fla. 2009), *quashed in part on other grounds*, 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012), and *aff'd*, No. 10-CV-62035-KMM, 2017 WL 8785510 (S.D. Fla. Mar. 8, 2017) ("If funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers has a property interest in the funds."); *In re Bay Plastics, Inc.*, 187 B.R. 315, 336 (Bankr. C.D. Cal. 1995) (the debtor did not receive value where "the selling shareholders gave up their shares of stock in the debtor in exchange for their payment of $3.5 million" and "[t]he debtor itself received neither shares nor money").

Because it is determined that § 2-718 does not entitle the Trustee to a refund of the PDP, it is unnecessary to address whether § 2-718 requires that the refund be made within a commercially reasonable time.

c)    Judicial Estoppel

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). There are no "inflexible prerequisites" or "exhaustive formula[e] for determining the applicability of judicial estoppel." *Id.* at 783 (quoting *New Hampshire v. Maine*, 532 U.S. 742 (2001)). However, the Supreme Court has highlighted three factors that "typically inform" the analysis. *Id.* at 782 (quoting same). "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* (quoting same). "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' " *Id.* (quoting same). "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting same).

None of these considerations supports the Trustee's position. The Bankruptcy Court did not err in holding that BAC's position was not inconsistent. The Trustee argues that BAC's position was inconsistent because it represented that it has no interest in the PDP, which means the Plane 5 APA must have been terminated, and then denies that the Plane 5 APA has been terminated. There is no such inconsistency. BAC's position is that it had not terminated the Plane 5 APA but that, once the Plane 5 APA had been terminated, it would return the PDP once the Bankruptcy Court determined who was entitled to it. *See* 2004 Answering Brief at 43-44. Even if there had been some inconsistency in these positions, the Trustee has not shown that the Bankruptcy Court adopted the position that BAC had not terminated the Plane 5 APA. Nor has the Trustee identified an unfair advantage obtained by BAC--or an unfair detriment suffered by the Trustee--that cannot be avoided if judicial estoppel is not applied.

        3.   <u>Whether the Trustee May Recover the Refund from BAC (Sixth Cause of Action)</u>

The Trustee objects to the ruling by the Bankruptcy Court with respect to the sixth cause of action. The Trustee argues that the Bankruptcy Court held that "the Trustee could not obtain relief" "even if the March 31 Assignment was a security interest" "because the estate would still be bound by the Debtors' pre-petition conveyance." 2004 Opening Brief at 50.

The Trustee contends that "the proposition that the bankruptcy trustee is not bound by the pre-petition debtor's agreements for the purposes of a fraudulent transfer action has been Ninth Circuit law for over 50 years." 2004 Opening Brief at 50 (citing *Pac. Metal Co. v. Joslin*, 359 F.2d 396, 397 (9th Cir. 1966)). However, *Pacific Metal* did not involve an alleged fraudulent transfer or avoidance. Although "the contract [was] void against the trustee, who stands in the shoes of creditors," *Pacific Metal* reached this conclusion because the applicable provision of Washington law was that, when a "contract permits both repossession and a deficiency judgment," it is only "valid against creditors, as a chattel mortgage, if recorded as such," and the contract was not properly recorded. *Pacific Metal*, 359 F.2d at 397.

    D.     The Interlocutory Orders

        1.   <u>The Trustee's Motion to Compel</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The Trustee argues that the Bankruptcy Court erred in denying the Trustee's motion to compel BAC to pay the PDP into the Bankruptcy Court's registry. The Bankruptcy Court held that it did not have authority to grant the Trustee's motion under either Fed. R. Bankr. P. 7022, which is analogous to Fed. R. Civ. P. 22, or § 105 of the Bankruptcy Code. The Trustee challenges both of those determinations.

"Rule 22(a) [of the Federal Rules of Civil Procedure] applies in adversary proceedings" in a bankruptcy court. Fed. R. Bankr. P. 7022. Under Rule 22, "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead." Fed. R. Civ. P. 22(a)(1). "Joinder for interpleader is proper even though: (A) the claims of the several claimants, or the titles on which their claims depend, lack a common origin or are adverse and independent rather than identical; or (B) the plaintiff denies liability in whole or in part to any or all of the claimants." *Id.* In addition, "[a] defendant exposed to similar liability may seek interpleader through a crossclaim or counterclaim." Fed. R. Civ. P. 22(a)(2).

This action is not a traditional interpleader proceeding. BAC, the only party that might be subject to overlapping liability if both the Trustee and CAVIC prevail on their claims that they are entitled to the Refund, has not sought to join any parties in this action. It has only sought the dismissal of the claims in which it is named.

The Trustee argues that BAC has effectively joined the Trustee and CAVIC in an interpleader action because it disavows any interest in the funds that are at issue. In interpreting the removal statute, the Ninth Circuit has held that an action was an interpleader when "the substantive posture of the parties mirrored the substance of an action in interpleader, even if the motion practice of the parties did not use the same labels as actions taken to initiate an interpleader proceeding." *Quality Loan Serv. Corp. v. 24702 Pallas Way, Mission Viejo, CA 92691*, 635 F.3d 1128, 1132 (9th Cir. 2011) (quoting *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 633 (5th Cir. 2002)).

Even if *Quality Loan* applies outside the context of removal, the Trustee's argument that Rule 22 compels BAC to deposit the PDP into the Bankruptcy Court's registry is not persuasive. As *Quality Loan* acknowledged, an interpleader action can occur even if "the funds [a]re never deposited with the court." 635 F.3d at 1132. Indeed, nothing in Rule 22 states that the disputed property must be deposited with the court while the interpleader action is pending. Although the Bankruptcy Court denied the Trustee's attempt to enter a preliminary injunction ordering BAC to deposit the funds, 2004 Dkt. 44-5 at 2423-2442, the Trustee has not challenged that ruling on appeal.

The Trustee argues that, in the alternative, 11 U.S.C. § 105(a) provides the Bankruptcy Court with authority to compel a party to deposit funds in which it has expressly disclaimed an interest. Under § 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *Id.* This is not a "roving commission to do equity" or authorization "to create substantive rights that are otherwise unavailable under applicable law . . . ." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986). In addition, this is "the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003). Thus, the use of this power must "be tied to another Bankruptcy Code section

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

and not merely to a general bankruptcy concept or objective." *Id.* (quoting 2 Collier on Bankruptcy ¶ 105.01[1]). Fed. R. Bankr. P. 7065 permits bankruptcy courts to enjoin parties in adversary proceedings, but the Bankruptcy Court denied the Trustee's motion for a preliminary injunction, which is a ruling that is not challenged on appeal. Because the Trustee "is not entitled to substantive relief under th[at] section[] . . . [and] no provision of the Bankruptcy Code may be successfully invoked . . . section 105(a) affords . . . no independent relief." *See id.*

The cases relied upon by the Trustee are distinguishable. For example, the Trustee cites a case in which a party "disavowed any interest in the interpleaded funds" and for this reason was not permitted to take them back from the court on "judicial estoppel" grounds. *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 597-98 (5th Cir. 1996). *In re Tekoil & Gas Corp.*, No. 08-80270-G3-11, 2008 WL 3297854 (Bankr. S.D. Tex. Aug. 1, 2008) did not rely on section 105. Instead, that case involved a straightforward application of sections 363 and 365 of the Bankruptcy Code. *Id.* at *2. The other case on which the Trustee relies held that "a deposit is not a jurisdictional requirement to [R]ule 22(1) interpleader and thus was not required here." *Gelfgren v. Republic Nat. Life Ins. Co.*, 680 F.2d 79, 81-82 (9th Cir. 1982) (internal citation omitted). None of these cases supports the view that § 105(a) provides the Bankruptcy Court with the authority claimed by the Trustee.

### 2.    The Trustee's Motion to Consolidate

The Trustee argues that the Bankruptcy Court abused its discretion by refusing to consolidate the 2004 Adversary Proceeding with the Jetcraft Adversary Proceeding. "Rule 42 [of the Federal Rules of Civil Procedure] applies in adversary proceedings." Fed. R. Bankr. P. 7042. "If actions before the court involve a common question of law or fact, the court *may*: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a) (emphasis added).

The Trustee also argues that the Bankruptcy Court erred by holding that the Trustee was required to file amended complaints so that the Bankruptcy Court could make precise findings as to whether there were common question of law or fact. The Bankruptcy Court did not abuse its discretion. At the time this motion was denied, the 2004 Complaint and the complaint in the Jetcraft Adversary Proceeding had been dismissed, at least in part. Therefore, it was unclear which claims would be re-alleged. Furthermore, even if there were common questions of law or fact between the 2004 Adversary Proceeding and the Jetcraft Adversary Proceeding, the Jetcraft Adversary Proceeding covers a wide range of transactions between the Debtors and Jetcraft. In many of them, the 2004 Appellees played no role. Conversely, Jetcraft played no role in connection with the Refund. In light of these circumstances, the Bankruptcy Court did not abuse its discretion in denying the request for consolidation.

### 3.    The Trustee's Motion for Leave to Amend

The Trustee challenges the denial of his motion for leave to amend "to add allegations relating to choice of law from the proposed consolidated amended complaint." 2004 Opening Brief at 57. For the reasons stated in connection with the first cause of action, the Trustee's proposed amendments would be futile. The Trustee does not have Article III standing to bring the first cause of action against CAVIC, and is not seeking "affirmative relief on fraudulent transfer claims against CAVIC." *Id.* at 59-60. Rather,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

the "Trustee seeks recharacterization to support claims against Bombardier in *Jetcraft*." *Id.* at 60. As a result, new theories for avoiding the English choice-of-law clause would not assist the Trustee in advancing viable claims. Further, the 2004 Appeal only identifies one way in which the proposed allegations would assist the Trustee. Thus, the Trustee contends that leave to add allegations of fraud would bring this case within the ambit of *Morse Tool*. For the reasons previously discussed, such an amendment would be futile because a § 548 claim against either CAVIC or Bombardier would now be barred by the statute of limitations; a declaratory judgment action for recharacterization would be subject to the same analysis; and *Morse Tool* is inconsistent with later Supreme Court and Ninth Circuit precedent. For all of these reasons, the Bankruptcy Court did not err in holding that leave to amend would have been futile.

In the alternative, if the proposed amendments had been allowed, this would have prejudiced the 2004 Appellees. Although the Trustee's proposed amendments did not add additional claims against the 2004 Appellees, the proposed allegations presented very detailed positions regarding all of the transactions and activities of the Debtors and Cassidy--even those in which CAVIC and BAC played no role. *See generally* 2004 Dkt. 50-6. Had the Trustee's proposed amendments been allowed, CAVIC and BAC would have faced a substantially greater burden in answering the amended complaint and then conducting sufficient discovery. Because the Trustee did not make an adequate showing that these new allegations were germane to the transactions in which the 2004 Appellees participated, the Bankruptcy Court could have denied the Trustee's motion on grounds of prejudice.

Nor would it be appropriate to grant leave to amend as to other causes of action. Apart from the challenge rejected above, the Trustee does not otherwise contest the determination by the Bankruptcy Court that leave to amend would both be futile and would prejudice the 2004 Appellees. *See* 2004 CAVIC Final Dismissal at 64-67; 2004 Bombardier Final Dismissal at 11-14; *see generally* 2004 Opening Brief. The Trustee has waived any challenge to this determination by failing to address it on appeal. Even absent this waiver, the Trustee has not requested leave to amend as to the other causes of action, and nothing in the Trustee's briefing suggests that there are additional allegations the Trustee could make to cure the deficiencies in the 2004 FAC. This determination is also supported by the Trustee's failure to cure the deficiencies in the original 2004 Complaint. Nor does an independent review of the 2004 FAC show that the deficiencies could be cured by granting leave to amend.

## VI.    <u>The 6637 Appeal</u>

The Trustee challenges the Bankruptcy Court's dismissal with prejudice of three groups of claims: (1) the tort claims, which are the first, second, third, sixth, and seventh causes of action; and (2) the bankruptcy claims, which are the twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-fifth, thirtieth, and thirty-first causes of action. The Trustee also appeals the decision by the Bankruptcy Court to deny consolidation and to deny the Trustee further leave to amend.

A.    The Tort Claims (First, Second, Third, Sixth, and Seventh Causes of Action)

1.    <u>Choice of Law</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

"In the Ninth Circuit, federal common law choice of law rules apply in bankruptcy cases." *In re Miller*, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003) (citing *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002)). "Federal choice-of-law rules in the Ninth Circuit follow the Restatement (Second) of Conflict of Laws, as a "source of general choice-of-law principles," and "an appropriate starting point for applying federal common law in this area." *In re Sterba*, 852 F.3d 1175, 1179 (9th Cir. 2017) (quoting *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir. 1987)).

The Trustee argues that California choice-of-law rules apply. In a recent case, the Ninth Circuit held that "[j]udicial creation of federal common law to displace state-created [choice-of-law] rules must be 'necessary to protect uniquely federal interests.' " *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1089 (9th Cir. 2022) (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1507 (2022)). This rule applies "[i]n federal question . . . and other cases in which . . . jurisdiction is not grounded in diversity." *Id.* In *Dobbas*, the Ninth Circuit held that, because "state law supplie[d] 'the substantive rule of decision,' there [wa]s no federal interest in 'supplant[ing] the otherwise applicable choice-of-law rule.' " *Id.*

The Ninth Circuit has identified a unique, federal interest in applying federal choice-of-law rules in bankruptcy cases. Specifically, the Ninth Circuit has referred to the substantial "value [in] national uniformity of approach" in bankruptcy cases. *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995). Federal jurisdiction in bankruptcy cases is exclusive. *See* 28 U.S.C. § 1334. Thus, unlike the rule that applies in many areas of the law, in bankruptcy cases, "the risk of forum shopping which is avoided by applying state law has no application . . . ." *Lindsay*, 59 F.3d at 948.

Neither *Dobbas* nor *Cassirer* addressed the choice-of-law standard that applies to a bankruptcy case. In dicta, one case has rejected the Trustee's argument that *Dobbas* compels the use of state choice-of-law principles whenever state law provides the substantive rule of decision. *DotC United, Inc. v. Google Asia Pac. Pte. Ltd.*, No. 22-CV-04990-JSC, 2023 WL 3202663, at *2-3 (N.D. Cal. May 1, 2023) (evaluating "state law breach of contract claims"). *DotC* recognized that the Ninth Circuit had "stated [a] federal interest in uniformity in New York Convention cases," and found that it satisfied the requirement in *Dobbas* that some "federal interest" be present before federal choice-of-law principles could apply. *Id.* at *3. The Ninth Circuit has made similar statements about the importance of uniformity in both bankruptcy and New York Convention cases. Therefore, *Lindsay* and its progeny remain binding authority.

The Trustee concedes that Zetta PTE's agreements with Bombardier contained a New York choice-of-law clause that purports to govern tort claims between the parties. 6637 Opening Brief at 45. Each such agreement contained the following language:

> This Agreement including its formation, performance, termination and/or enforcement and the parties' relationship in connection therewith, together with any related claims arising under common law or statute, whether sounding in contract, tort or otherwise shall be governed, construed and enforced in all respects in accordance with the laws of the State of New York, U.S.A., excluding the State of New York's conflicts of law provisions. The parties hereby irrevocably waive their rights to a jury trial of any claim or cause of action arising out of this Agreement or any related documents and any dealings

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

between them relating to this transaction or any related transactions.

6637 Dkt. 41-2 at 390. Zetta PTE signed these agreements; Zetta USA did not. *Id.* at 397.

The Trustee contends that tort claims cannot be governed by a contractual choice-of-law provision.

None of the Ninth Circuit cases cited by the parties is dispositive of this issue. In a maritime case, the Ninth Circuit held that "United States law determines the *enforceability* of a choice-of-law provision." *Odin Shipping Ltd. v. Drive Ocean V MV*, 221 F.3d 1348, 2000 WL 576436 (9th Cir. 2000) (unpublished disposition). However, "[t]he *scope* of that provision is a matter of contract construction and interpretation . . . which would in turn be governed by the law selected in the choice-of-law provision." *Id.* It was, therefore, determined that the law chosen in the contract would govern the parties' tort claims. *Id.* In another case, the Ninth Circuit held that "[a]lthough parties are generally entitled to select the law which applies to contractual claims, we have expressly determined that tort claims are not governed by a contractual choice-of-law provision." *Invs. Equity Life Ins. Co of Hawaii, Ltd. v. ADM Invs. Servs., Inc.*, 1 F. App'x 709, 711 (9th Cir. 2001). Neither of these cases has precedential effect.

In other cases, the Ninth Circuit has held that "[c]laims arising in tort are not *ordinarily* controlled by a contractual choice of law provision." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citing *Consol. Data Terminals v. Applied Digital Data Sys.*, 708 F.2d 385, 390 n.3 (9th Cir. 1983)) (emphasis added). In addition, *Sutter Home* applied Arizona choice-of-law principles, rather than federal ones. *Id.* at 405 n.3. The Trustee also relies on *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549 (9th Cir. 2020). However, *Cooper* holds that choice-of-law provisions "have no bearing on tort claims *filed by third parties*" that did not sign the contract, and *Cooper* was also decided using California choice-of-law principles. *Id.* at 559 (emphasis added).

The Bankruptcy Court was persuaded that a New York choice-of-law provision could govern tort claims under the circumstances permitted by New York law. This was not an error. Although *Odin Shipping* was not itself precedential, it cited a long line of cases for the proposition that, under federal choice-of-law principles, the scope of a choice-of-law provision is decided under the law selected in the provision. *See Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992); *Siegelman v. Cunard White Star*, 221 F.2d 189, 193 (2d Cir. 1955); *Jansson v. Swedish American Line*, 185 F.2d 212, 218 (1st Cir. 1950). The Trustee's reliance on *Sutter Home* and *Cooper* is misplaced. Neither supports the Trustee's conclusion that a choice-of-law provision signed by the plaintiff and the defendant cannot govern tort claims arising between those parties. Furthermore, as the Bankruptcy Court stated, both *Sutter Home* and *Cooper* relied on choice-of-law principles that are different from those at issue in a bankruptcy proceeding. Although some language in *Investors Equity* appears to bar choice-of-law provisions from governing tort claims, the only authority relied on by *Investors Equity* for that proposition is *Sutter Home*, which did not adopt such an absolute rule. Finally, *Investors Equity* is not a binding decision.

The Trustee argues that the tort claims at issue fall outside the choice-of-law provision for three reasons. *First*, the choice-of-law provision does not reach tort claims, even under New York law. "Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)). Here, the choice-of-law provision extends to both "the parties' relationship" and "any related claims," and is expressly applicable to claims "sounding in . . . tort . . . ." 6637 Dkt. 41-2 at 390. The Bankruptcy Court did not err in holding that this clause applied to the entire relationship between the parties. Nor did the Bankruptcy Court err in holding that the claims at issue were based on the formation, performance, termination or enforcement of the contracts entered by the parties, or the resulting contractual relationships. The alleged commercial bribes and kickbacks at issue in these claims were allegedly inducements for Cassidy to cause the Debtors to enter the contracts at issue and to decline to cancel them. Notwithstanding the Trustee's present position, the allegations in the 6637 FAC establish that the tort claims are closely related to the parties' contractual relationship.

*Second*, the Trustee contends that the conduct at issue predated Zetta PTE's agreement with Bombardier. The Trustee only cites 6637 FAC ¶¶ 251-52, which describe the conduct of Cassidy and Fazal-Karim "before the agreements relating to Planes 1-6 were executed," but while those agreements were being negotiated. Because this conduct pertains to the "formation" of "the parties' relationship," it falls within the scope of the clause. *See* 6637 Dkt. 41-2 at 390.

*Third*, the Trustee contends that, because Zetta USA did not sign any of the agreements with Bombardier, it is not bound by the choice-of-law provision. In the 6637 FAC, the Trustee alleged that the Debtors entered the agreements with Bombardier as well as Zetta PTE. 6637 FAC ¶ 106. The Trustee also alleged that Zetta USA guaranteed Zetta PTE's obligations under the agreements with Bombardier. *See id.* ¶ 116. Nevertheless, the Bankruptcy Court erred in assuming that Zetta USA was bound by the choice-of-law provision because Zetta PTE was so obligated. At this time, this Court cannot determine whether Zetta USA is bound by the choice-of-law provision. Thus, for purposes of the 6637 Appeal, Zetta USA's claims in the 6637 FAC are sufficient if they are viable under California law. The Trustee only contends that California law is more favorable in that its commercial bribery statute applies and that California takes a more limited view of the *in pari delicto* doctrine. *See* 6637 Opening Brief at 43.

*Finally*, the Trustee argues that the choice-of-law provision is unenforceable. The parties disagree whether § 187(1) or § 187(2) of the Restatement (Second) of Conflict of Laws applies. The Trustee relies on *Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003). There, "the agreement provided that federal maritime law governed the entire contract rather than the particular issue of attorneys' fees." *Id.* at 917. It was determined that "[f]ederal maritime law was not incorporated by reference as to any particular matter in the contract" and § 187(2) therefore applied. *Id.* In contrast, choice-of-law provisions that apply specifically to the "construction and performance of the Agreement" are evaluated under § 187(1). *In re CMR Mortg. Fund, LLC*, No. 08-32220 TEC, 2009 WL 2870114, at *3 (Bankr. N.D. Cal. Sept. 4, 2009).

It is determined that § 187(2) applies. The relevant question is whether "the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). § 187(1) applies where the parties "incorporate into the contract by reference extrinsic material which may . . . be the provisions of some foreign law," thereby "fill[ing] gaps in a contract which the parties could themselves have filled with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

express provisions." *Id.* § 187 cmt. c. Thus, as to "rules relating to construction, to conditions precedent and subsequent, to sufficiency of performance and to excuse for nonperformance, including questions of frustration and impossibility," the choice of law provision "will be applied . . . ." *Id.* §§ 187 cmt. c, 187(1). The choice-of-law provision at issue affects more than the importation of the default, gap-filling rules under New York law because the choice-of-law provision imports New York tort law. For these reasons, § 187(1) does not apply.

When § 187(2) applies, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either" of two conditions is present. Restatement (Second) of Conflict of Laws § 187(2) (1971). *First*, the choice of law of the parties does not control if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice . . . ." *Id.* § 187(2)(a). *Second*, the choice of law by the parties does not control if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* § 187(2)(b).

The Trustee contends that both conditions are satisfied here. This position is not persuasive. *First*, there was a reasonable basis for the choice of New York law by the parties. As the Bankruptcy Court noted, "international aircraft financing contracts" are "generally governed by New York or English law." 6637 Final Dismissal at 29; Carlos Sierra, *Ten Years of the Cape Town Convention and the Aircraft Protocol in Mexico*, Air & Space L., 2018, at 11. In addition, Zetta PTE and BAC were companies with worldwide activities, who had a legitimate interest in ensuring that their contracts would be interpreted under the laws of a single jurisdiction with a substantial number of precedents interpreting aircraft financing contracts. This is sufficient to meet the "reasonable basis" standard of § 187(2).

§ 187(2) presents "a minimal standard." *Zavecz v. Yield Dynamics, Inc.*, 179 F. App'x 116, 121 (3d Cir. 2006). § 187(2) also recognizes that "[c]ontracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so." Restatement (Second) of Conflict of Laws § 187 cmt. f (1971). Courts need not "apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge." *Id.* However, "[t]he parties to a multistate contract may have a reasonable basis for choosing a state with which the contract has no substantial relationship"; "the parties should be able to choose a law on the ground that they know it well and that it is sufficiently developed." *Id.* Even under California choice-of-law principles, courts have recognized that "international defendants have an interest in contracting under the laws of a state--even one not substantially related to the contract--for reasons of uniformity and predictability." *Cooper v. Certain Underwriters at Lloyd's, London*, 716 F. App'x 735, 736 (9th Cir. 2018).

The Trustee argues that these are insufficient bases for selecting New York law. However, the cases cited by the Trustee do not support this position. In *KST Data*, there was "a single agreement between two relatively sophisticated parties with no other identifiable connection, within or without the agreement, to New York." *KST Data, Inc. v. DXC Tech.*, No. CV 17-07927 SJO (SK), 2018 WL 5734227, at *5 (C.D. Cal. Mar. 26, 2018), *aff'd in part, rev'd in part and remanded sub nom. KST Data, Inc. v. DXC Tech. Co.*, 836 F. App'x 484 (9th Cir. 2020). There was no argument "that the parties have

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK; LA CV22-02004 JAK; and LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

a particular familiarity with New York law," "that the law itself would minimize uncertainty in a specific and foreseeable way," or that there were "many like agreements with parties in multiple states." *Id. KST* is distinguishable. In the present action, there was more than one contract at issue, there were more than two parties involved in the transactions, many of the parties were from different jurisdictions, and New York law would reduce uncertainty because it has more clarity as to the interpretation of aircraft financing contracts.

The Trustee's reliance on *NexRep* is also misplaced. *See NexRep, LLC v. ALIPHCOM*, No. 16-CV-06647-JSC, 2017 WL 1356345, at *3 (N.D. Cal. Mar. 8, 2017), *report and recommendation adopted*, No. 16-CV-06647-PJH, 2017 WL 1315461 (N.D. Cal. Apr. 7, 2017). *NexRep* did not address any of the arguments raised above; instead, the "record [did] not contain any information to support a reasonable basis for selecting New York law." *Id. NexRep* neither held nor suggested that the possible bases for selecting New York law identified in the opinion was exhaustive. Finally, the Trustee argues that uniformity and predictability does not support the selection of New York law because, although the APAs were all governed by New York law, the parties sometimes selected English law for other agreements. The relevant authorities do not suggest that absolute uniformity or absolute predictability is required to satisfy the "minimal" standard of § 187(2).

Finally, the Trustee argues that the choice-of-law provision is unenforceable because application of New York law would be contrary to a fundamental policy of California law. The Trustee contends that "California has a fundamental policy against shielding third parties who conspire with an employee by attributing the acts of the employee to the employer." 6637 Opening Brief at 50. The Trustee also cites California authority for the proposition that "[a]n agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal" and that "[a] corporation is not chargeable with the knowledge of an officer who collaborates with an outside to defraud it . . . ." *Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116, 1138 (2001), *as modified on denial of reh'g* (Aug. 21, 2001) (quoting Cal. Civ. Code § 2306; and quoting *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242, 264 (1966)).

It is unclear whether the application of New York law would contravene this policy. Both California and New York law recognize an *in pari delicto* defense: "federal and state courts in California have applied the *in pari delicto* defense to dismiss actions filed by bankruptcy trustees against third parties who may have participated with a debtor or a debtor's management in the concealment or dissipation of the debtor's assets prior to the petition date." *In re Yellow Cab Coop., Inc.*, 602 B.R. 357, 360 (Bankr. N.D. Cal. 2019). The Trustee cites *Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F. Supp. 3d 1156 (S.D. Cal. 2015), which determined that New York's failure to offer those who were insured a tort action against insurers that engaged in bad-faith conduct contravened a fundamental policy of California law. 88 F. Supp. 3d at 1170. The present litigation does not relate to disputes between insurers and insureds. The Trustee also suggests that New York law violates a fundamental California policy because the *in pari delicto* defense is broader under New York than California law. However, "the public policy exception in choice of law analysis . . . require[s] something more than the law of the other state be different from the law of California." *In re Zukerkorn*, 484 B.R. 182, 193 (B.A.P. 9th Cir. 2012), *aff'd*, 591 F. App'x 631 (9th Cir. 2015). The Trustee has not shown that New York law's version of the *in pari delicto* doctrine is sufficiently broad to contravene any fundamental policy of California.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Because the Trustee has not adequately identified any fundamental California policy that would be contravened by the application of New York law, it is unnecessary to determine whether California has a materially greater interest in the determination of this issue.

For the foregoing reasons, it is determined that New York law applies to the claims by Zetta PTE and California law to those by Zetta USA.

        2.    <u>Whether Fazal-Karim Was Bombardier's Agent</u>

The Trustee seeks to hold Bombardier liable for the conduct of Fazal-Karim and his company, Jetcraft. The Bankruptcy Court held that the Trustee had not adequately alleged agency in the 6637 FAC.

An agency relationship may exist for some, but not all, transactions between parties. The Trustee argues that agency must be evaluated globally, at least at the pleading stage. *See* 6637 Opening Brief at 30. The Trustee's position is not supported by the controlling cases.

The Eleventh Circuit has recognized, even on a motion to dismiss, that allegations that the alleged agents "may have sometimes functioned as [the defendant's] agent[s] . . . in other contexts, the Complaint [may] not allege that they operated in this capacity for purposes of the [relevant] [t]ransaction." *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1342 (11th Cir. 2017). The Trustee seeks to distinguish *Fundamental* because the complaint at issue expressly alleged that there was no agency relationship. *Fundamental* does not support this position. Instead, the complaint cited by the Trustee was filed by the defendant in a different case, although it was determined that the defendant's complaint was incorporated by reference and created an inconsistency that was "not helpful." *Id.* at 1343. Like the 6637 FAC, the complaint in *Fundamental* alleged that there was an agency relationship.

Furthermore, whether *Fundamental* is distinguishable is not related to the propriety of the transaction-by-transaction method of analysis adopted by the Eleventh Circuit. Bombardier also cites *Bd. of Managers of the 411 East 53rd Street Condominium v. Perlbinder*, No. 650603/2014, 2016 WL 1597761 (N.Y. Sup. Ct. Apr. 21, 2016). *Board of Managers* held that, for purposes of an action for assisting a breach of fiduciary duty, the defendant was an agent for one purpose but not another. *Id.* at *3. The Trustee suggests that *Board of Managers* has little force because it was a decision as to summary judgment. However, the Trustee has offered no reason why a transaction-by-transaction analysis would be appropriate in evaluating a motion for summary judgment but not a motion to dismiss.

The Trustee also relies on *Donovan v. Flamingo Palms Villas, LLC*, No. 208CV01675RCJRJJ, 2010 WL 11579451 (D. Nev. May 6, 2010). There, it was determined that "Plaintiffs did not at the dismissal stage need to specifically allege for each transaction which broker was an agent for which lender, and with respect to which loans," even though "[t]his will eventually have to be proved," because "the allegations listing the brokers and lenders separately, coupled with the allegation that the brokers were the agents of the lender" was sufficient. *Id.* at *7. *Donovan* supports a proposition that is distinct from the one advanced by the Trustee. In *Donovan*, there were sufficient allegations that the brokers were all agents of the lenders, so it was unnecessary to identify the lenders and brokers who were agents with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

respect to each transaction. Nothing in *Donovan* contradicts the general rule that, before it has been determined that agency has been sufficiently alleged, a transaction-by-transaction analysis is appropriate. The Trustee also relies on *Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2284 (DLC), 2002 WL 826847, at *6 (S.D.N.Y. May 2, 2002) for the principle that it is premature to conduct a transaction-by-transaction analysis of agency. *Cromer* did not address the issue identified by the Trustee. Therefore, applying these cases confirms that the Bankruptcy Court did not err in holding that agency must be adequately alleged with respect to each transaction, rather than adopting the Trustee's all-or-nothing analysis.

"[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 402-03 (S.D.N.Y. 2021) (quoting *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012)). "An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *Id.* at 403 (quoting *Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984)). "For 'an agency relationship . . . purported to be established by contract, 'a court will look to the language of the agreement to ascertain the relationship created between the parties.' ' " *JVJ Pharmacy*, 630 B.R. at 403 (quoting *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013)). However, "the realities of the contractual relationship between the parties, not labels in the agreement, control." *JVJ Pharmacy*, 630 B.R. at 403.

"Actual authority 'may be express or implied,' and in both cases 'exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.' " *Stewart v. Target Corp.*, No. 11-CV-3557 DLI RER, 2013 WL 1182080, at *4 (E.D.N.Y. Mar. 20, 2013) (quoting *Themis Capital, LLC v. Democratic Republic of Congo*, 2012 WL 3114732, at *4 (S.D.N.Y. July 26, 2012)). "Whether actual authority exists 'depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship.' " *Cromer Fin. Ltd. v. Berger*, No. 00 CIV. 2284 (DLC), 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002) (quoting *Itel Containers Int'l Corp. v. Atlantrafik Express Serv. Ltd.,* 909 F.2d 698, 702 (2d Cir.1990)).

"The question whether an agency relationship exists is highly factual, however, and can turn on a number of factors, including: the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006) (cleaned up) (quoting *Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.,* 522 F.2d 369, 375-76 (2d Cir.1975)).

"When . . . a contract for services is at issue, courts look to the purported principal's authority to give interim instructions to distinguish ordinary contractual obligations from provisions indicating control." *JVJ Pharmacy*, 630 B.R. at 406; *see* Restatement (Third) Of Agency § 1.01 (2006) cmt. f(1) (stating that "a principal has the right to give interim instructions or directions to the agent once their relationship is established").

Agency can also be established by apparent authority. However, "[a]pparent authority must be based

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

on words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction; an agent cannot, though his own acts, cloak himself with apparent authority." *1230 Park Assocs., LLC v. N. Source, LLC*, 852 N.Y.S.2d 92, 93 (N.Y. App. Div. 2008) (internal citation omitted). "Key to the creation of apparent authority is that the third person, accepting the appearance of authority as true, has relied upon it." *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980) (internal citation omitted).

Neither party identifies any material difference in the law of California and New York as to agency. Therefore, the analysis is the same as to Zetta USA's California claims. *See, e.g.*, *Holt v. Kormann*, No. SACV 11-1047 DOC MLG, 2012 WL 2150070, at *5 n.3 (C.D. Cal. June 12, 2012) ("The essential elements of an actual agency relationship are: (1) that the agent holds power to alter legal relations between the principal and third persons and between the principal and himself; (2) that the agent is a fiduciary with respect to matters within the scope of the agency; and (3) that the principal has the right to control the conduct of the agent with respect to matters entrusted to him."); Cal. Civ. Code § 2300 ("An agency is ostensible when the principal intentionally, or by want of care, causes a third person to believe another to be his agent who is not really employed by him."); Cal. Civ. Code § 2334 ("A principal is bound by the acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof.").

The Bankruptcy Court erred in holding that actual authority had not been adequately alleged. The Trustee made the following allegations. *First*, with respect to the transactions for Planes 1-6, 8-9, and 12-15, the Trustee alleges that Fazal-Karim negotiated the relevant transactions in cooperation with Bombardier employees. 6637 FAC ¶ 388.

*Second*, during the period the parties negotiated the transactions involving Planes 10 and 12-15, Fazal-Karim was subject to a Sales Representative Agreement with Bombardier. *Id.* ¶ 389. Under the Sales Representative Agreement, Bombardier designated Fazal-Karim its "PREFERRED sales representative," permitted Fazal-Karim to use Bombardier's "trademarks, trade names, and service marks," required Fazal-Karim to "comply with Bombardier's Code of Ethics and Business Conduct," prohibited Fazal-Karim from producing "advertising, invitation[s], . . . promotional material[s] or press release[s]" with information related to Bombardier's products without Bombardier's consent, and required Fazal-Karim to maintain certain records about his activities. *Id.* ¶ 394.

*Third*, Fazal-Karim held himself out publicly as Bombardier's "exclusive representative for Southeast Asia." *Id.* ¶ 390. He made similar statements directly to the Debtors. *Id.* ¶ 397.

*Fourth*, Bombardier gave Fazal-Karim sensitive, trade secret pricing information. *Id.* ¶ 392.

*Fifth*, Fazal-Karim worked with Bombardier's highest executives. *Id.* He also participated in internal Bombardier strategy decisions, made recommendations to executives, and took directions from Bombardier executives. *Id.*

*Sixth*, Bombardier trained Fazal-Karim, gave him the authority to use Bombardier's trademarks and logos, and required Fazal-Karim to comply with Bombardier's policies. *Id.* ¶ 393.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The third through sixth facts are applicable to all of the transactions at issue.

*Seventh*, with respect to Plane 1, the Trustee argues that Bombardier would receive a percentage of any return earned by Fazal-Karim's company when it sold Plane 1. *Id.* ¶¶ 250, 388, 610, 627.

*Finally*, with respect to Planes 2-6, 8-9, and 11-15, Fazal-Karim received, or would have received, commissions on the sale of the planes. *Id.* ¶ 399.

The Trustee incorporated by reference into the 6637 FAC certain agreements between Bombardier and Fazal-Karim, which include the following statement as to the status of Fazal-Karim:

> [Fazal-Karim] acknowledges and agrees that it is acting as an independent contractor and not as an agent of [Bombardier], and that [Fazal-Karim] has no express or implied authority to bind or obligate [Bombardier] in any manner whatsoever. [Fazal-Karim] further agrees not to make any claims, warranties or representations pertaining to the Aircraft, except as expressly authorized in writing by [Bombardier]. The prices and other terms and conditions of the sale of the Aircraft, including the Aircraft warranty, shall be established and determined solely by [Bombardier].

6637 Final Dismissal at 44.

Certain other circumstances are also relevant to the evaluation of the Trustee's allegations. Bombardier concedes that Fazal-Karim's role was to promote Bombardier's products and negotiate sales of them. That role is at the core of Bombardier's business. Fazal-Karim was also deeply involved in the process by which Bombardier bound itself to transactions with the Debtors. In addition, Fazal-Karim was negotiating high-value, complex transactions. All these alleged facts make it less likely that Bombardier would allow Fazal-Karim to operate without controlling the way he performed. Finally, the relationship between Fazal-Karim and Bombardier extended over several transactions and over a long time period. This also supports the Trustee's position that Fazal-Karim acted at Bombardier's direction and subject to its control. It is also relevant that Plane 10 was purchased from an unrelated third party rather than Bombardier. 6637 FAC ¶ 183.

The Bankruptcy Court incorrectly found all of the foregoing allegations to be conclusory and, therefore, insufficient. The Trustee adequately alleged that Bombardier could control Fazal-Karim's conduct. This has particular force as to Planes 12-15 because, during the negotiations regarding the sale of these planes, Fazal-Karim was subject to the Sales Representative Agreement and was expressly bound by Bombardier's Code of Ethics and Business Conduct. Bombardier also controlled certain of his advertising and public relations activities and required him to maintain certain records.

However, the Trustee has adequately alleged control even as to the remaining transactions. The Bankruptcy Court did not err in holding that the Sales Representative Agreement was not in force during the negotiations of the transactions in Planes 1-6 and 8-9. Nevertheless, the Trustee also alleged that Fazal-Karim was subject to Bombardier policies separate from the Trustee's allegations regarding the Sales Representative Agreement. 6637 FAC ¶ 393. The Trustee's allegation that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Bombardier provided training to Fazal-Karim has very limited force, but does suggest some level of control over his activities. Thus, it can be inferred that Bombardier would not need to train Fazal-Karim in how to do his work if Bombardier had no control over how he carried it out.

In addition to this direct evidence of control, the Trustee has provided circumstantial evidence that Bombardier had good reason to control Fazal-Karim's activities. Fazal-Karim was entrusted with trade secret pricing information as well as the rights to use Bombardier's trademarks, and to participate in high-level strategic discussions with Bombardier executives. Even Bombardier does not dispute, for purposes of the 6637 Appeal, that Fazal-Karim was entrusted with the negotiation of transactions on its behalf, and that these transactions were high-level, complex, and took place over a substantial period of time.

Fazal-Karim's statements about his own authority also provide support for the Trustee's position. Although, standing alone, this would not be sufficient to allege agency, that Fazal-Karim believed he had authority to act on behalf of Bombardier supports the plausibility of the allegation that Bombardier actually gave Fazal-Karim that authority. Finally, that Fazal-Karim performed much of the same work as Yu and Mattar, who were Bombardier employees, weighs significantly in favor of the sufficiency of the claims as to agency.

The Trustee's "actual authority" argument is less persuasive with respect to Planes 1 and 10, but the allegations are adequate. Bombardier sold Plane 1 to one of Fazal-Karim's companies months before any negotiations between Fazal-Karim and the Debtors. Plane 10 was purchased by Fazal-Karim from an unrelated third party rather than from Bombardier. *See* 6637 FAC ¶ 183. However, the Trustee has adequately alleged that the Plane 1 transaction was negotiated simultaneously with the transactions in Planes 2-5, and that the Plane 10 transaction was negotiated simultaneously with the transactions in Planes 12-15.

The Trustee has also adequately alleged that Fazal-Karim expressly linked the transactions in his conversations with Cassidy. *See* 6637 FAC ¶¶ 243, 271, 321. The payments that the Trustee identifies as the First Kickback and Second Kickback were allegedly disguised as part of the purchase price for Planes 1 and 10, respectively. A plausible inference from these allegations is that Fazal-Karim was acting individually in the transactions related to Planes 1 and 10, and that the kickbacks were paid during the transactions where Bombardier was less directly involved. Thus, they support the inference that Fazal-Karim wanted to prevent Bombardier from learning that Fazal-Karim was paying kickbacks. Another plausible inference from these allegations is that Fazal-Karim and Bombardier agreed that Fazal-Karim would pay kickbacks to Cassidy from the commissions paid to Fazal-Karim by Bombardier. Consequently, a reasonable inference is that the kickbacks were disguised as part of the purchase price for Planes 1 and 10, rather than one of the other transactions negotiated at the same time, to give Bombardier the basis for denying them. Because neither inference is implausible, the one that favors the Trustee is to be adopted.

The Bankruptcy Court did not err in rejecting the Trustee's argument that Bombardier's economic interest in Fazal-Karim's sale of Plane 1, or Fazal-Karim's potential commissions on the sale of Planes 2-6, 8-9 or 11-15, supported a finding of agency. However, for the reasons stated above, the Trustee's actual authority allegations are sufficient.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

In dismissing the 6637 FAC, the Bankruptcy Court relied in substantial part on the agency disclaimer in the agreements between Bombardier and Fazal-Karim. *See* 6637 Final Dismissal at 44. Although the analysis by the Bankruptcy Court of this issue was thorough, it erred in determining at the pleading stage, despite the allegations outlined above, that the agency disclaimer should be enforced. It is "the realities of the contractual relationship between the parties, not labels in the agreement, [that] control." *JVJ Pharmacy*, 630 B.R. at 403. In addition, the agreement is not entirely consistent in that it disclaims agency while designating Fazal-Karim a representative of Bombardier.

In contrast, the Bankruptcy Court did not err in holding that the Trustee's apparent authority theory has not been adequately alleged. The Trustee's theory is substantially the same with respect to each transaction. *First*, the Trustee alleges that Fazal-Karim stated on his website that he was an "exclusive representative" of Bombardier. 6637 FAC ¶ 390. The Trustee further alleges that an agent of Fazal-Karim told the Trustee in a letter that Fazal-Karim was an "authorized representative of Bombardier." *Id.* ¶ 391. The Trustee next alleges that Fazal-Karim told Cassidy that he was "clearly Bombardier's exclusive representative in Singapore," called himself "Bombardier's rep," and stated that he "negotiated this transaction for Bombardier." *Id.* ¶ 397. However, statements by Fazal-Karim do not support an apparent authority theory, which must be based on statements or conduct of the alleged principal, which is Bombardier, rather than the alleged agent, Fazal-Karim.

*Second*, the Trustee alleges that Fazal-Karim negotiated the transactions in Planes 1-6, 8-9 and 12-15 together with Mattar and Yu, who are undisputedly agents of Bombardier. 6637 FAC ¶¶ 388. The Trustee also alleges that Bombardier employees copied Fazal-Karim on most of the e-mails between Cassidy and Bombardier and relied on him to handle the relationship with the Debtors. *Id.* ¶¶ 395, 398. Unlike the first group of allegations, Bombardier's alleged reliance on Fazal-Karim in the negotiations with the Debtors is conduct of Bombardier, the alleged principal. However, even accepting the Trustee's theory that these three sets of transactions--for Planes 1-6, for Planes 8-9, and for Planes 12-15--were linked, the first two sets of transactions were accompanied by express statements to the Debtors about Fazal-Karim's authority, which are incorporated in the 6637 FAC by reference:

> Buyer understands that Jahid Fazal-Karim may be appointed as a sales representative of Seller in connection with this transaction. Whether or not said appointment is finally approved by Seller, Jahid Fazal Karim has no authority and will not have any authority to make any representations or warranties on behalf of Seller or to legally bind Seller under a contract for the sale of the subject Aircraft.

*E.g.*, 6637 Dkt. 41-2 at 396.[12]

---

[12] The Trustee argues that the Bankruptcy Court erred by considering these, and other, agency disclaimers. This was not error. The Trustee argues that ambiguities in a contract, or disputes about its meaning, cannot be resolved at the pleading stage. However, the agency disclaimers here are clear and unambiguous. Nor does the Trustee dispute the meaning of these agency disclaimers. The Trustee only contends that its other allegations are sufficient to show agency. The Trustee also asserts that the agency disclaimers are irrelevant because the Trustee did not sign them. However, a "bankruptcy trustee . . . stands in the shoes of the debtor" with respect to the trustee's "legal duty to collect property of the debtor's estate for the benefit of the debtor's creditors." *United*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

This language was sufficient to notify the Debtors that Fazal-Karim did not have the authority the Trustee claims. As to the transactions in Planes 12-15, Bombardier sold the planes to Yuntian 4 rather than the Debtors, so there are no comparable APAs between Bombardier and the Debtors related to Planes 12-15. Nevertheless, the ultimate outcome of the analysis is the same. The language discussed above shows that the Debtors were on notice that Fazal-Karim did not have authority to bind Bombardier to transactions, and the 6637 FAC does not contain further allegations that Bombardier said anything to suggest that Fazal-Karim's status had changed. Considering the foregoing, it has not been adequately alleged that the Debtors were presented with a basis for concluding that Fazal-Karim had the ability to bind Bombardier to the transactions in question. In addition, neither the 6637 FAC nor the arguments on appeal identify any manner in which the Debtors relied on Bombardier's alleged representations, which presents an independent basis to conclude that the Trustee adequately alleged apparent authority. However, because it has been determined that actual authority is adequately alleged, the defects in the Trustee's apparent-authority allegations are not material.

The determination that actual authority has been adequately alleged does not address the likelihood that the Trustee will be able to establish the factual allegations or whether there may be genuine disputes of material fact about them following discovery. Rather, they recognize that agency presents a "highly factual" question, *see Cleveland*, 448 F.3d at 522, and that the allegations are sufficiently plausible to warrant discovery as the alleged relationship between Bombardier and Fazal-Karim.

3.  Aiding and Abetting a Breach of Fiduciary Duty (First Cause of Action)

"The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff." *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014). New York law is not materially different. It requires the plaintiff to plead and prove "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Lesavoy v. Gattullo-Wilson*, 170 F. App'x 721, 723 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003)). To satisfy the second element, the defendant must have "actual knowledge of the breach of duty," because "[c]onstructive knowledge of the breach of fiduciary duty by another is legally insufficient to impose aiding and abetting liability." *Kaufman*, 760 N.Y.S.2d at 169. Further, knowing participation in a breach of fiduciary duty requires that the defendant provide "substantial assistance" to the violator of the fiduciary duty. *Id.* at 170. "However, the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Id.*

The first cause of action advanced by the Trustee alleges that Cassidy breached his fiduciary duty to the Debtors by accepting the First Kickback and the Second Kickback from Jetcraft, five sports tickets

---

*States v. One 2009 Maserati Granturismo*, No. ED CV-2361-PA (DTBx), 2016 WL 4502457, at *1 (C.D. Cal. June 6, 2016). The Trustee may only prevail where the Debtors would have valid tort claims. Because the Debtors received the agency disclaimers, they are relevant to the issues addressed in this action.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

from Bombardier, and potentially the Sea-Doos from Bombardier. The Trustee seeks to hold
Bombardier responsible for the First Kickback and Second Kickback on the basis of a claimed agency
relationship.

Bombardier does not dispute that the Trustee has adequately alleged wrongdoing by Jetcraft in paying
the First Kickback and Second Kickback to Cassidy. 6637 Opening Brief at 21-27. Instead, Bombardier
contends that these payments cannot be imputed to Bombardier. *Id.* Because the Trustee has
adequately alleged that Fazal-Karim and Jetcraft were agents of Bombardier for purposes of the
relevant transactions, the first cause of action is sufficiently alleged.

Because the first cause of action may proceed based on the First Kickback and Second Kickback, it is
unnecessary to determine whether the first cause of action is also sufficiently alleged with respect to
the purchase of the sports tickets and the potential purchase of the Sea-Doos. At the appropriate time,
the Bankruptcy Court may evaluate the evidence submitted in support of these two alternative theories
in light of the prior determination regarding agency.

        4.   <u>Conspiracy (Second Cause of Action)</u>

"To state a claim for civil conspiracy, a plaintiff must demonstrate the primary tort, plus the following
four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the
agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4)
resulting damage or injury." *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 251
(S.D.N.Y. 2014) (citation omitted). *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263,
299 (S.D.N.Y. 2023). Under California law, "to support a conspiracy claim, a plaintiff must allege the
following elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in
furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *AREI II Cases*, 216
Cal. App. 4th 1004, 1022 (2013) (cleaned up).

In dismissing the second cause of action, the Bankruptcy Court determined that Bombardier was only
accused of participating in the conspiracy through its agent Fazal-Karim. 6637 Final Dismissal at 63.
Because this determination on agency has been reversed, the dismissal of this cause of action is also
reversed. In addition, the Trustee may allege all the claims he has, even if they are inconsistent. Thus,
the Trustee is permitted to take the positions that Fazal-Karim was Bombardier's agent and that, in the
alternative, he was a co-conspirator of Bombardier.

        5.   <u>Cal. Bus. & Prof. Code § 17200 (Third Cause of Action)</u>

The Bankruptcy Court did not err in dismissing Zetta PTE's third cause of action. "A valid choice-of-law
provision selecting another state's law is grounds to dismiss a claim under California's UCL." *Cont'l
Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) (citing *Medimatch,
Inc. v. Lucent Techs, Inc.*, 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000)). Zetta PTE's claims are
governed by a valid New York choice-of-law provision for the reasons already stated. Therefore, there
was no error in dismissing this cause of action as to Zetta PTE.

The claims of Zetta USA against Bombardier are not governed by those choice-of-law provisions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Bombardier contends that Zetta USA's claims fail because the Trustee has not adequately alleged agency. For the reasons stated above, the Trustee's allegations on that issue are adequate. However, "the presumption against extraterritoriality applies to [California's] UCL in full force." *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011). Thus, "a non-California resident may have standing under the UCL . . . if either (1) the injury occurred in California, or (2) defendants' conduct occurred in California." *Wisdom v. Easton Diamond Sports, LLC*, No. CV 18-4078 DSF (SSX), 2018 WL 6264994, at *4 (C.D. Cal. Oct. 9, 2018). No party has identified any reason why the persuasive analysis in *Wisdom* should be limited to non-California residents, or why California would have an interest in applying its law to unfair business practices imposed on a California resident if the conduct and injury occurred outside California.

The Trustee has not alleged that any of the relevant conduct took place in California. Nor has the Trustee alleged that Zetta USA's injury occurred in California. Although the Trustee alleges that part of the funds used to buy the allegedly overpriced planes came from Zetta USA (6637 FAC ¶¶ 470-71), what is unlawful is the alleged acceptance of commercial bribes and the alleged breach of fiduciary duty by agreeing to purchase planes from Bombardier and failing to cancel those contracts. Cassidy allegedly did all those things in Singapore. Therefore, the third cause of action was properly dismissed with respect to Zetta USA.

### 6.    Fraudulent Misrepresentation (Sixth Cause of Action)

The Bankruptcy Court did not err in dismissing this claim. "A complaint for fraud must allege the following elements: (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages." *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1816 (1996). The elements of this cause of action under New York law are similar. "The elements of fraud in New York include: a false representation of material fact, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006).

Fraud must be alleged with particularity, and the 6637 FAC does not identify any misrepresentations to the debtors by either Bombardier or anyone who might be its agent. For example, the 6637 FAC alleges that Fazal-Karim and Cassidy falsified invoices to deceive the business partners of Orion and Fazal-Karim. 6637 FAC ¶¶ 600-04. However, there is no allegation that these invoices were sent to anyone associated with the Debtors.

The 6637 FAC alleges in conclusory terms that Fazal-Karim represented that the prices in the First and Second Element Transactions did not include the amounts of the First and Second Kickbacks. *Id.* ¶¶ 605-06. The 6637 FAC does not allege to whom these representations were made, what was misrepresented, and when and where the misrepresentations were made. The 6637 FAC also cites language from the Plane 1 and Plane 10 APAs where the Debtors warranted to Fazal-Karim, Jetcraft and other related entities that the Debtors had not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 608. This is a representation from the Debtors to Fazal-Karim. Therefore, it cannot form the basis of the Trustee's fraud claim. The Trustee argues that this language was drafted by Fazal-Karim and Jetcraft. 6637 Reply Brief at 26. Even if this had been adequately

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

alleged in the 6637 FAC, the Trustee must allege that one of the defendants made a knowingly false
representation to the Debtors. A representation by the plaintiff using language suggested by the
defendant is not a sufficient allegation of a representation by the defendant.

       7.    <u>Fraudulent Concealment or Nondisclosure (Seventh Cause of Action)</u>

The elements of this cause of action are the same under California and New York law. "[T]he elements
of an action for fraud and deceit based on a concealment are: (1) the defendant must have concealed
or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the
plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to
defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as
he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or
suppression of the fact, the plaintiff must have sustained damage." *Boschma v. Home Loan Center,
Inc.*, 198 Cal. App. 4th 230, 248 (2011) (quoting *Hahn v. Mirda*, 147 Cal.App.4th 740, 748 (2007)). "In
transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure
of material facts may arise in at least three instances: (1) the defendant makes representations but
does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely
to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not
known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from
the plaintiff." *Warner Constr. Corp. v. L.A.*, 2 Cal. 3d 285, 294 (1970).

Under New York law, "[a] duty to disclose arises in one of three circumstances: [1] where the parties
are in a fiduciary relationship; [2] under the special facts doctrine, where one party possesses superior
knowledge, not readily available to the other, and knows that the other is acting on the basis of
mistaken knowledge; or [3] where a party has made a partial or ambiguous statement, whose full
meaning will only be made clear after complete disclosure." *Kitchen Winners NY Inc. v. Rock Fintek
LLC*, 668 F. Supp. 3d 263, 290 (S.D.N.Y. 2023) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566, 582 (2d Cir. 2005)).

The Trustee first argues that he has adequately alleged active concealment by Bombardier and/or
Jetcraft. 6637 Opening Brief at 26-27 A review of the paragraphs cited by the Trustee shows that they
allege that Bombardier or Jetcraft failed to disclose the alleged kickbacks to the Debtors' directors, that
Cassidy concealed the alleged kickbacks from the Debtors' directors, or that Bombardier and Jetcraft
actively concealed the alleged kickbacks from persons other than the Debtors. Because the 6637 FAC
does not contain factual allegations sufficient to support a claim that Bombardier or Jetcraft engaged in
active concealment, that theory has not been adequately alleged.

The Trustee argues that the Bankruptcy Court erred in holding that the Trustee was required to allege
that the kickbacks were not reasonably discoverable by the Debtors, and that Bombardier and/or
Jetcraft knew the Debtors were acting based on inaccurate information. The Bankruptcy Court did not
err. The case cited by the Trustee holds that a defendant must know that the undisclosed facts are not
known to or reasonably discoverable by the plaintiff. *See Warner*, 2 Cal. 3d at 294.

Notwithstanding the foregoing, in light of the prior determination regarding agency, the Bankruptcy
Court erred in dismissing this claim. The Trustee has plausibly alleged that Bombardier is responsible

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

for the conduct of Fazal-Karim and Jetcraft in paying the alleged kickbacks. Although the Bankruptcy Court correctly held that the Trustee had not adequately alleged that information about the F1 tickets and Sea-Doos was not readily available to the directors of the Debtors, the Bankruptcy Court did not address the alleged kickbacks themselves. The 6637 FAC alleges that the directors did not know about the alleged kickbacks. Because the payments were allegedly made directly to Cassidy, it is plausible that information about these transfers was not readily or reasonably available to the directors of the Debtors. For the same reason, because no one allegedly disclosed these transfers to the directors of the Debtors, it is plausible that the defendants knew the directors acted based on mistake in approving the Plane 1 and Plane 10 APAs. Therefore, the Trustee has adequately alleged this cause of action.

        8.   <u>Unjust Enrichment</u>

The Trustee argues that this claim was improperly dismissed because unjust enrichment can be advanced as a standalone claim. "California courts 'appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy.' "*Glob. Med. Solutions, Ltd. v. Simon*, No. CV12-04686-MMM-JCX, 2013 WL 12065418, at *38 (C.D. Cal. Sept. 24, 2013) (quoting *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007) (collecting cases). The Ninth Circuit has determined that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.' " *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Nevertheless, "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.' " *Id. (quoting Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 231 (2014)); *accord ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).

To state a claim for restitution, a plaintiff must show that (1) the defendant received a benefit from the plaintiff, and (2) it would be unjust for the defendant to retain that benefit. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010); *Walters v. Fid. Mortg. of Cal.*, No. CIV-09-CV-3317-FCD/KJM, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) ("[T]o establish a cause of action for unjust enrichment, a plaintiff must plead 'receipt of a benefit and the unjust retention of the benefit at the expense of another.' ").

One unpublished decision by the Ninth Circuit held that "an independent claim for unjust enrichment [could] proceed," at least in some circumstances. *Bruton v. Gerber Prods. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017).

In other more recent cases, the Ninth Circuit has held that unjust enrichment claims may fail if there is a valid contract between the parties. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 n.6 (9th Cir. 2018) ("[A]n unjust enrichment claim does not lie where the parties have an enforceable express contract.") (quoting *Durell*, 183 Cal. App. 4th at 1370); *Goldwater Bank, N.A. v. Elizarov*, No. 22-55404, 2023 WL 387037, at *1 n.1 (9th Cir. Jan. 25, 2023) ("Goldwater's unjust enrichment claim . . . fails as a matter of law because there is a valid contract between the parties . . . ."). *Hartford Casualty Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988 (2015) is not to the contrary. There it was determined that an unjust enrichment claim could proceed, but only because it did "not contravene or alter any term of the contracts between" the parties. *Id.* at 1001.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

The relationship among the parties in this action is governed by several express contracts. The Trustee seeks the return of the funds the Debtors agreed to pay under those contracts because the Debtors were allegedly fraudulently induced to enter them. If granted, the relief sought by the Trustee would contravene and alter the terms of the contracts between the Debtors and the other parties to these agreements. For this reason, this cause of action fails to state a claim.

9.    In Pari Delicto

The Bankruptcy Court did not address the argument by the 6637 Appellees that all the tort claims against them are conclusively barred by their *in pari delicto* affirmative defense. On remand, the Bankruptcy Court shall consider this issue in light of the determinations in this Order regarding choice of law and agency.

B.    The Bankruptcy Claims (Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-Fifth, Thirty-First and Thirty-Second Causes of Action)

1.    Extraterritoriality (Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Thirty-First and Thirty-Second Causes of Action)

The arguments of the Trustee on extraterritoriality in the 6637 Appeal mirror those raised in the 7572 Appeal. For the reasons stated in connection with the 7572 Appeal, §§ 547 and 548 of the Bankruptcy Code do not apply extraterritoriality. Furthermore, because "[t]he relevant conduct . . . is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property," *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 100 (2d Cir. 2019), these statutes do not reach transfers made by the debtor abroad, even if the proceeds of the transfer were later received in the United States. Nor does it appear that the Trustee is seeking a domestic application under §§ 547 and 548 if his claims are construed under the "obligation" prong of those statues rather than the "transfer" prong. The Trustee is also incorrect in claiming that Bombardier "waived" the presumption against extraterritoriality by filing a proof of claim.

For the first time in the 6637 Reply Brief, the Trustee argues that initial transfers from Zetta USA to Zetta PTE provide an independent basis to avoid subsequent transfers to Bombardier. This argument has been waived. "[O]n appeal, arguments not raised by a party in its opening brief are deemed waived." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Even if the Trustee had not waived this argument, the 6637 FAC does not allege that the transfers at issue were initiated from the United States. The 6637 FAC merely alleges that Zetta USA operated charter flights, which generated revenues, a substantial portion of which were sent to Zetta PTE. *See* 6637 FAC ¶¶ 82, 94, 112. None of the allegations in the 6637 FAC sufficiently link these transfers to those challenged by the Trustee.

2.    Indispensable Parties (Fourteenth, Fifteenth, Thirty-First and Thirty-Second Causes of Action); the Constructive Fraudulent Transfer Claims (Thirteenth, Fifteenth, Seventeenth and Thirty-Second Causes of Action); the Actual Fraudulent Transfer Claims (Twelfth, Fourteenth, Sixteenth and Thirty-First

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

Causes of Action); and the Preference Claims (Eighteenth and Nineteenth
Causes of Action)

The 6637 Appellees argue that the dismissal of the bankruptcy claims may be affirmed for failure to join indispensable parties and because they have not been adequately alleged. Because all these claims are barred on extraterritoriality grounds, it is not necessary to address these additional arguments.

      3.    Violation of the Automatic Stay (Twentieth Cause of Action)

"[A]n individual injured by any willful violation of [the automatic stay] shall recover any actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).

"Under § 362[(k)], an *individual* harmed by a willful automatic stay violation is entitled to collect compensatory damages (including attorneys' fees) and, where appropriate, punitive damages." *In re Dyer*, 322 F.3d 1178, 1189 (9th Cir. 2003) (emphasis added). However, "the Trustee is ineligible to receive damages under that private cause of action, because [he] is not an 'individual.'" *Id.* (quoting *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 192 (9th Cir. 1995)). A bankruptcy trustee "may be entitled to recovery for violation of the automatic stay 'under section 105(a) as a sanction for ordinary civil contempt.'" *Id.* (quoting same). "Because the Trustee recovers under the contempt authority of § 105(a), rather than under § 362[(k)], however, the sanction award must conform to the legal standards governing that authority." *Id.* at 1190. Under § 105, sanctions are "permissive" and "a party with knowledge of bankruptcy proceedings is [not] charged with knowledge of the automatic stay." *Id.* at 1190-91.

The twentieth cause of action alleges that it is brought under § 362. Neither § 105 nor the word "contempt" is ever mentioned. The Trustee objects that he need not use "magic words" in requesting relief for a stay violation. Even assuming that this is correct, the Trustee must still provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Although there are similarities between the two statutes, a cause of action under § 362 is not the same as one under § 105. Nothing about the twentieth cause of action suggests that the Trustee was invoking the Bankruptcy Court's contempt authority or § 105.

Furthermore, this cause of action has not been adequately alleged for other reasons. The Trustee first argues that Bombardier set off debts owed by Bombardier to Zetta USA for charter flight services against debts owed by Zetta PTE to Bombardier under a separate services agreement. 6637 FAC ¶ 798. However, the 6637 FAC expressly alleges that the setoff took place eight days before the Debtors filed for bankruptcy. *Id.* ¶ 504. That Bombardier may have a financial obligation to the Debtors does not constitute a violation of the automatic stay. Thus, "merely retaining possession of estate property does not violate the automatic stay." *City of Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021).

The Trustee also argues that Bombardier violated the automatic stay by refusing to perform under the Smart Parts Agreement after the filing of the petition. 6637 FAC ¶ 799. However, the Trustee does not deny that he rejected the Smart Parts Agreement. *See* 6637 Opening Brief at 63. "After rejection, the performance of the non-bankrupt obligee is excused." *In re Pac. Express, Inc.*, 780 F.2d 1482, 1486 n.3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

(9th Cir. 1986). Because the only stay violation alleged in the 6637 FAC is the alleged failure to perform an already rejected executory contract, this theory fails. Nor would a breach-of-contract cause of action related to the Smart Parts Agreement be viable. Because Bombardier's performance was excused after the Trustee rejected the contract, leave to add this theory would be futile.

The Trustee requests leave to add a cause of action for breach of the Charter Agreements. *See* 6637 FAC ¶¶ 502-03; 6637 Opening Brief at 51. The 6637 FAC alleges that BAC agreed to pay $2,360,190 for charter services under the Charter Agreements. 6637 FAC ¶ 502. It further alleges that these debts became due and payable before the filing of the bankruptcy petition yet were not paid. *Id.* ¶ 503. It does not appear that a claim for breach of the Charter Agreements would be futile or that it would prejudice the 6637 Appellees. Therefore, leave to amend is granted as to this claim.

4.    § 502(d) (Twenty-Fifth Cause of Action)

Both sides agree that the twenty-fifth cause of action is dependent upon the fraudulent transfer and preference claims. 6637 Answering Brief at 92-93; 6637 Reply Brief at 50. Because the Bankruptcy Court properly dismissed those claims, this cause of action was also properly dismissed.

C.    The Trustee's Motion to Consolidate

The Trustee argues that the Bankruptcy Court erred by refusing to consolidate the 2004 Adversary Proceeding with the 6637 Adversary Proceeding. "Rule 42 [of the Federal Rules of Civil Procedure] applies in adversary proceedings." Fed. R. Bankr. P. 7042. "If actions before the court involve a common question of law or fact, the court *may*: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a) (emphasis added).

Specifically, the Trustee argues that the Bankruptcy Court erred by holding that the Trustee needed to file amended complaints so that it could make precise findings as to the presence of any common questions of law or fact. The Bankruptcy Court did not abuse its discretion. At the time this motion was denied, the 2004 Complaint and the 6637 Complaint had been dismissed, at least in part, and it was unclear which claims would be re-alleged. Furthermore, even if there are common questions of law or fact between the 2004 Adversary Proceeding and the 6637 Adversary Proceeding, the 6637 Adversary Proceeding covers a wide range of transactions, but CAVIC did not participate in many of them. For these reasons, it was not an abuse of discretion to deny consolidation.

D.    The Trustee's Motion for Leave to Amend

The Trustee seeks leave to amend the agency allegations and to address the *in pari delicto* defense in the event the 6637 Appellees prevail on these grounds. Because the agency allegations have been deemed sufficient and the 6637 FAC has not been dismissed on *in pari delicto* grounds, the requested leave to amend is moot.

As previously stated, the Trustee is given leave to add a breach of contract cause of action related to BAC's alleged breach of the Charter Agreements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK | Date | March 26, 2024 |
|---|---|---|---|
| Title | In re Zetta Jet USA, Inc., et al. | | |

However, leave to amend is not appropriate as to any of the other causes of action with respect to which the 6637 Final Dismissal is affirmed. The Trustee has not requested leave to add additional allegations with respect to those causes of action, and nothing in the Trustee's briefing suggests that there are additional allegations that could be made in support of those causes of action. That the Trustee has had a previous opportunity to amend the 6637 Complaint with respect to these causes of action weighs against granting leave to amend. Based on a review of the matters presented here, leave to amend would be futile. Finally, the Bankruptcy Court determined that leave to amend would be futile and prejudicial to the 6637 Appellees. 6637 Final Dismissal at 79-81. With respect to these causes of action, the Trustee has waived any challenge to the determination that leave to amend would be improper by failing to address the subject on appeal. *See generally* 6637 Opening Brief.

## VII.   <u>Conclusion</u>

For the reasons stated in this Order, the 21-7572 Final Dismissal, 22-2004 CAVIC Final Dismissal and 22-2004 Bombardier Final Dismissal are **AFFIRMED**. The 22-6637 Final Dismissal is **REVERSED IN PART** as to the first, second, and seventh causes of action and **AFFIRMED IN PART** as to all other claims. All the interlocutory orders of the Bankruptcy Court are **AFFIRMED**. In the 6637 Adversary Proceeding, the Trustee is given leave to add a breach of contract cause of action related to BAC's alleged breach of the Charter Agreements. However, the Trustee is not given leave to add any other parties, causes of action, or legal theories.

This Order is initially issued under seal. Within 14 days of its issuance, the parties shall jointly submit any proposed redactions, with a corresponding declaration from a percipient witness as to why the information should not be available on the public docket in this action. Based on a review of those submissions, a redacted version of this Order shall be made available on the public docket in conformance with the determinations made in response to the requested redactions.

**IT IS SO ORDERED.**

|  |  |
|---|---|
|  | _____ : _____ |
| Initials of Preparer | tj |